**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | |
| Plaintiff, | ) | Hon. Ronald A. Guzman |
| | ) | |
| v. | ) | Mag. Judge Geraldine Soat Brown |
| | ) | |
| ALTA COLLEGES, INC., et al., | ) | Case No. 14-cv-3786 |
| | ) | |
| Defendants. | ) | |
| | ) | |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF
THEIR MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**

Joseph J. Duffy
William P. Ziegelmueller
Mariah E. Moran
Henry M. Baskerville
STETLER, DUFFY & ROTERT, LTD.
10 South LaSalle Street, Suite 2800
Chicago, Illinois 60603
Phone: 312-338-0200
Fax:    312-338-0070

TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... ii

INTRODUCTION ................................................................................................................... 1

FACTUAL BACKGROUND ..................................................................................................... 2

ARGUMENT ......................................................................................................................... 6

I.   The SAC Should Be Dismissed with Prejudice Pursuant to Fed. R. Civ. P. 9(b) and 12(b) ......... 6

    A. Counts I and II Fail to Plead a Claim With Requisite Particulary ........................................... 6

        1. Count I does not allege a violation of the ILCFA with particularity ............................. 7

        2. Count II does not allege a violation of the ILFCA with particularity ......................... 12

    B. Counts III and Count IV Do Not Adequately Allege a Violation of the CFPA ..................... 12

        1. Westwood is not subject to a CFPA enforcement action ............................................ 13

        2. Any conduct before July 21, 2011 is not covered by the CFPA ................................. 14

        3. Count III fails to allege the elements of a claim for "unfair" practices ..................... 14

        4. Count IV fails to allege adequately that Defendants engaged in any abusive acts or
           practices ................................................................................................................. 18

II.  Counts III and IV Should Be Dismissed on Constitutional Grounds ........................................... 20

    A. The AG's Purported Authority to Bring CFPA Claims is Derived from an Unconsitutional
       Entity ....................................................................................................................... 20

        1. The CFPB is insulated from Executive branch oversight ........................................... 21

        2. The CFPB is also insulated from Legislate branch oversight ..................................... 22

    B. The AG Has No Authority Under the Illinois Consitution to Enforce Federal Law ............. 22

    C. Counts III and Count IV Violate the Due Process Clause Because Regulated Parties Lack
       Fair Notice of What Conduct is Prohibited ................................................................. 23

III. Section 10b(1) of the ILCFA Exempts the AG's Consumer Fraud Claims ............................... 26

CONCLUSION ..................................................................................................................... 28

## TABLE OF AUTHORITIES

**CASES**

*Adams v. City of Indianapolis*,
　742 F.3d 720 (7th Cir. 2014) ........................................................................ 13, 15-16

*Agnew v. NCAA*,
　683 F.3d 328 (7th Cir. 2012) ........................................................................ 7

*Ashcroft v. Iqbal*,
　556 U.S. 662 (2009) ........................................................................ 13, 17, 18, 20

Ass'n of Am. Railroads v. U.S. Dept. of Transp.,
　721 F.3d 666 (D.C. Cir. 2013) ........................................................................ 22

*Bank of Am., N.A. v. Knight*,
　725 F.3d 815 (7th Cir. 2013) ........................................................................ 7

*Barrington Press, Inc. v. Morey*,
　752 F.2d 307 (7th Cir. 1985) ........................................................................ 11

*Beler v. Blatt, Hasenmiller, Liebsker & Moore, LLC*,
　480 F.3d 470 (7th Cir. 2007) ........................................................................ 24-25

*Bell Atl. Corp. v Twombly*,
　550 U.S. 544 (2007) ........................................................................ 13, 18, 20

*Bober v. Glaxo Wellcome PLC*,
　246 F.3d 934 (7th Cir. 2001) ........................................................................ 26

*Buckley v. Valeo*,
　424 U.S. 1 (1976) ........................................................................ 22

*Cohen v. Am. Sec. Ins. Co.*,
　735 F.3d 601 (7th Cir. 2013) ........................................................................ 15

*Connally v. General Constr. Co.*,
　269 U.S. 385 (1926) ........................................................................ 23, 25

*Davis v. HSBC Bank Nev., N.A.*,
　691 F.3d 1152 (9th Cir. 2012) ........................................................................ 16

*DiLeo v. Ernst & Young*,
　901 F.2d 624 (7th Cir. 1990) ........................................................................ 7

*Dugan v. R.J. Corman R.R. Co.*,
　344 F.3d 662 (7th Cir. 2003) ........................................................................ 17

*Emery v. Am. Gen. Fin., Inc.*,
  134 F.3d 1321 ..........................................................................................................7

*Equity Capital Corp. v. Kreider Transp. Serv., Inc.*,
  967 F.2d 249 (7th Cir. 1992)..............................................................................9, 12

*F.T.C v. IFC Credit Corp.*,
  543 F. Supp. 2d 925 (N.D. Ill. 2008) ..................................................................17

*FCC v. Fox Television Stations, Inc.*,
  132 S. Ct. 2307 (2012) ............................................................................... 23-25

*Fergus v. Russel*,
  270 Ill. 304, 110 N.E. 130 (1915) ......................................................................23

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*,
  130 S. Ct. 3138 (2010) ......................................................................................21

*Gade v. National Solid Wastes Mgt. Assn.*,
  505 U.S. 88 (1992) ............................................................................................27

*Gates & Fox Co. v. OSHRC*,
  790 F.2d 154 (D.C. Cir. 1986) ..........................................................................25

*Harris v. Forklift Sys., Inc.*,
  510 U.S. 17 (1993) ............................................................................................24

*In re Chambers*,
  348 F.3d 650 (7th Cir. 2003) ..............................................................................18

*In re Roberson*,
  999 F.2d 1132 (7th Cir. 1993) ............................................................................19

*Jackson v. Bank of Am. Corp.*,
  711 F.3d 788 (7th Cir. 2013) ..............................................................................19

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
  134 S. Ct. 1377 (2014) ......................................................................................19

*Mart v. Gozdecki, Del Giudice, Americus & Farkas LLP*,
  910 F. Supp. 2d 1085 (N.D. Ill. 2012) ..............................................................14

*Molosky v. Washington Mut., Inc.*,
  664 F.3d 109 (6th Cir. 2011)..............................................................................14

*Mornar v. Pfizer*,
  No. 4 CH 21866, 2005 WL 5512991 (Cir. Ct. Cook Cty. Sept. 15, 2005) ....................27

*Morrison v. Olsen,*
  487 U.S. 654 (1988) ........................................................................................21

*Myers v. United States*,
  272 U.S. 52 (1926) ..........................................................................................21

*People ex. rel Hartigan v. E & E Hauling, Inc.*,
  153 Ill. 2d 473 (Ill. 1992) ...................................................................7, 23, 28, 29

*People v. Massarella*,
  72 Ill.2d 531, 382 N.E.2d 262 (1978) .............................................................23

*Peterson Indus., Inc. v. Lake View Trust & Sav. Bank*,
  584 F.2d 166 (7th Cir. 1978)...........................................................................11

*Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*,
  631 F.3d 436 (7th Cir. 2011) .............................................................................7

*Popp v. Cash Station, Inc.*,
  244 Ill. App. 3d 87 (Ill. App. Ct. 1992)............................................................8

*Price v. Philip Morris, Inc.*,
  219 Ill. 2d 182 (Ill. 2005) ...............................................................................26

*Robinson v. Toyota Motor Credit Corp.*,
  201 Ill. 2d 403 (Ill. 2002) ..........................................................................7, 12

*United States v. Williams*,
  553 U.S. 285 (2008) ........................................................................................24

*Ustrak v. Fairman*,
  781 F.2d 573 (7th Cir. 1986)...........................................................................24

*Weatherman v. Gary-Wheaton Bank of Fox Valley*,
  186 Ill. 2d 472 (Ill. 1999) ...............................................................................26

*Wilson v. Chism*,
  279 Ill. App. 3d 934 (Ill. Ct. App. 1996).....................................................27-28

*Yeftich v. Navistar, Inc.*,
  722 F.3d 911 (7th Cir. 2013)...........................................................................19

iv

## STATUTES

12 U.S.C. § 5481 ............................................................................................................15

12 U.S.C. § 5491 ............................................................................................................21

12 U.S.C. § 5492(b) ........................................................................................................22

12 U.S.C. § 5497 ............................................................................................................22

12 U.S.C. § 5531 .......................................................................................................*passim*

12 U.S.C. § 5536 ....................................................................................................12, 23

12 U.S.C. § 5552 ............................................................................................................21

12 U.S.C. § 5564 ............................................................................................................21

12 U.S.C. § 5481 .......................................................................................................5,13

12 U.S.C. § 5531(a) ........................................................................................................14

20 U.S.C. § 1001 ..............................................................................................................1

20 U.S.C. § 1002(b) ........................................................................................................2

20 U.S.C. § 1087 ......................................................................................................2, 16

20 U.S.C. § 1092 ....................................................................................................27, 28

20 U.S.C. §1094 ....................................................................................................*passim*

15 ILCS § 205/4 ............................................................................................................23

815 ILCS § 505/1 ............................................................................................................6

815 ILCS § 505/10b(1) ............................................................................................26, 28

## RULES

Fed. R. Civ. P. 9(b)................................................................................................7, 14, 15

Fed. R. Civ. P. 12(b)(6) ..........................................................................................6, 12

## REGULATIONS

12 C.F.R. § 1026.43(c)....................................................................................................16

34 C.F.R. § 668.171 ..................................................................................................26-27

34 C.F.R. § 685.301(a)(3) ................................................................................16

34 C.F.R. § 685.301(a)(8) ................................................................................16

34 C.F.R. § 600.10 ...........................................................................................26

34 C.F.R. § 600.20 ...........................................................................................26

34 C.F.R. § 668.11 ...........................................................................................26

34 C.F.R. § 668.23 ...........................................................................................26

34 C.F.R. § 668.171 .........................................................................................26

## OTHER AUTHORITIES

U.S. Const., Art II, Sec. 3..................................................................................21

Ill. Const. 1970, Art. V, Sec. 15 .......................................................................23

## <u>INTRODUCTION</u>

The Attorney General's ("AG's") Second Amended Complaint ("SAC") comes not in advance of discovery, when the failure to plead particular facts could be attributed to the plaintiff's lack of knowledge, but instead after the close of more than two years of discovery, during which time the parties deposed 77 fact witnesses and 12 experts and also exchanged hundreds of written discovery requests. In addition, the AG served multiple civil investigative demands on Defendants and had virtually unfettered discovery for over a year even prior to initiating this lawsuit.

The SAC does not merely amend the AG's pleading to conform to the evidence; rather, it omits literally dozens of "facts" alleged in the First Amended Complaint that had been proven through discovery to be false. The AG also added—after years of litigation and after the close of all discovery—two federal claims under the new and untested Consumer Financial Protection Act ("CFPA"), 12 U.S.C. §§ 5481, *et seq.* While this case is newly before this Court upon removal from the Circuit Court of Cook County, the AG's pleading must be evaluated in light of the years of litigation that have already transpired. The AG has had more than ample opportunity to develop the facts necessary to allege her claims with the required particularity, yet she still has failed to do so.

Pleading deficiencies aside, the Court should not countenance the AG's unprecedented extension of her authority. The AG is attempting to regulate, through the Illinois Consumer Fraud and Deceptive Practices Act ("ILCFA"), an institution of higher learning that is extensively regulated by the U.S. Department of Education ("USDOE"), the Illinois Board of Higher Education ("IBHE"), and the Accrediting Council for Independent Colleges and Schools ("ACICS"), a national accrediting body recognized by the USDOE. Section 10b of the ILCFA excludes from liability conduct that is authorized by applicable federal and state regulations—as Defendants' programs are—so Counts I and II should be dismissed. The AG's last-minute resort to the federal CFPA fails to salvage her claims, for she lacks authority to bring claims under the CFPA and her attempt to do so violates Defendants' due process because the newly enacted statute is

unconstitutionally vague. For these reasons, the Court should dismiss the SAC with prejudice.

## FACTUAL BACKGROUND

Westwood College has been providing quality, career-focused undergraduate and graduate programs to students since 1953.[1] (¶ 1; Ex. 13, p. 3.) Westwood's Illinois campuses offer fourteen degrees, but the AG's allegations target only the criminal justice program. Westwood's criminal justice program prepares students for careers in various fields, including "corrections officers, police or patrol officers, children's advocates, youth care counselors, victim's advocates, federal agents, crime scene investigators, forensic scientists, and coroners, border patrol agents, legal investigators, corporate investigators, private security providers, or customs agents." (¶¶ 193-94.)

As an "institution of higher education" under Title IV of the Higher Education Act ("HEA"), 20 U.S.C. §§ 1001, 1002(b), Westwood is subject to extensive federal and state oversight and must satisfy substantial monitoring, disclosure and reporting requirements to participate in Title IV federal financial aid programs. *E.g.,* 20 U.S.C. § 1094(a)(5), (a)(17). Among other things, the HEA requires that Westwood receive at least 10% of its revenue from nonfederal sources, 20 U.S.C. § 1094(a)(24), and its students may not exceed a specified rate of default on federally guaranteed loans. *Id.*, §§ 1085(a), 1087; ¶ 85. In addition, Westwood is extensively regulated by the USDOE, the IBHE, and ACICS.[2] At all times, Westwood has been nationally accredited. (¶ 141.)

In 2004, Westwood began the process of becoming regionally accredited by the Higher Learning Commission ("HLC"), a regional accreditor located in Chicago. (¶¶ 143-50.) That process involves a mandatory multi-year candidacy period during which the accreditor reviews the

---

[1] The following facts are taken from the SAC, which, if well-pled, must be taken as true for purposes of a motion to dismiss. Defendants do not admit to their veracity. References to allegations in the SAC are cited as "(¶ _)." References to the Exhibits attached to the SAC are cited as "(Ex.)."

[2] College institutional accreditation is a voluntary system of peer review conducted by non-governmental accrediting bodies to ensure uniform and quality education. (¶ 137.) For schools whose students receive funding under Title IV of the HEA, institutional accreditation is provided by regional and national associations. (¶ 139.) While the USDOE makes no distinction between national and regional accreditors, the AG claims certain employers and secondary degree programs prefer regional accreditation. (¶¶ 167, 233.)

institution to ensure that it meets the accreditor's standards. (¶ 151-52.) The earliest Westwood could have gained regional accreditation was October 2009. (¶ 153.) From 2007-2009, HLC evaluated Westwood, and Westwood proceeded toward regional accreditation. (¶¶ 150-57.) In November 2009, HLC issued a "Report of a Comprehensive Evaluation Visit for Initial Accreditation to Westwood College" (the "HLC Report") that commended the accuracy, openness, and completeness of Westwood's admissions practices and processes. (¶ 158; Ex. 13.) After an extensive review, HLC concluded that Westwood's admissions practices met HLC's accreditation requirements. (Ex. 13, pp. 10-11.) HLC found that:

- Westwood "fairly and accurately informs students, prospective students and the public with up-to-date information about admissions, credit transfer, costs, refunds, financial aid and accreditation status of the organization and programs." (*Id*. at 11.)

- Westwood's enrollment agreements "provide great clarity to students on their acceptance to the college, their area of study at the time of acceptance, the required curriculum, their charges for the term, and estimated charges for the entire program. The agreement and its use was strong evidence of Westwood College's interest and ability to deal fairly and honestly with its constituents." (*Id*. at 15, 17.)

- Admission staff is required to complete training before commencing their responsibilities; the team reviewed the training curriculum which provided further evidence of Westwood's sincere interest in promoting the College fairly and accurately to students. (*Id*. at 15.)

- "Students . . . reported that they were comfortable with the ways in which Westwood College approached them during the admissions process and kept them informed of their financial responsibilities." (*Id.*)

- "Tuition and fees are published on the web and as a hard copy addendum to the catalog. . . . The team's review of the institution's advertising and marketing materials confirmed the accuracy and fairness in their statements and process." (*Id.* at 17.)

The HLC Report included student satisfaction surveys that showed Westwood students' "level of satisfaction with instruction, course content, feedback about academic progress . . . and availability of faculty [was] as high as, or higher than, 4-year private school students included in the survey." (Ex. 13, p. 29.) The HLC Report did identify a few student complaints about Westwood, so HLC paid particular attention to those student complaints to determine their veracity. (¶ 158; Ex. 13, pp. 3, 4.) HLC found that students were "unanimously incredulous that students

3

would complain that they were uninformed, that loans were secured on their behalf, or that they were not aware of the tuition cost for which they were responsible." (Ex. 13, p. 15.) The HLC accreditation team concluded:

> the team's judgment is that Westwood College has made great strides in its quest for regional accreditation. . . . [T]he team recommends that Westwood College continue in candidacy and that the next comprehensive visit by [sic] scheduled for the 2010-2011 academic year. (*Id*. at 39.)

On February 10, 2010, HLC confirmed its decision to continue Westwood's candidacy. (¶ 160.) On November 1, 2010, however, Westwood voluntarily withdrew its application for regional accreditation. (¶ 161.)

## **APEX Financing**

Most college students pay tuition using federal student aid programs authorized by Title IV of the HEA, which provides grants, loans and work-study funds from the federal government to eligible students. (¶ 81.) After deciding to enroll in Westwood, students meet with a financial aid officer, who presents the total cost and sources of financial aid for each academic year. (¶ 74, Ex. 13, p. 14.) Federal loans and grants may not cover tuition, so students may need to secure other funding by, for example, taking out loans from private lenders. (¶¶ 72-73.) The HEA requires that Westwood receive at least 10% of its revenue from nonfederal sources. This rule is commonly referred to as the 90/10 rule. (¶ 85.) Thus, by law, there exists a shortfall between the amount of federal loans students may use to pay tuition and the total cost of tuition. If students are unable to use their own funds or find private loans to cover their full tuition, they can, as a last resort, finance a portion of their education through Westwood's institutional financing program, called APEX. (¶¶ 112, 459; Ex. 13, p. 14.) The APEX program provides financing for the portion of tuition charges that exceed all other forms of available aid and funding. (Ex. 13, p. 14.) Students who obtain APEX financing could not have paid the full tuition at Westwood College without such financing. (¶ 459.) The average amount financed for students who require APEX is approximately $1,400 per term and cannot exceed an annual maximum of $7,500. (Ex. 13, p. 14.) Not all students who use the APEX

4

program need the financing every term. (*Id.*)

Westwood uses a retail installment contract for APEX that "comports with federal truth-in-lending disclosures." (¶ 91, Ex. 13, p. 14.) When students are in school, they make small monthly payments, around $150, toward their APEX balance. (¶ 124; Ex. 13, p. 14.) If there are hardships, reduced amounts can be paid. (Ex. 13, p. 14.) The APEX contract provides that any balance remaining 90 days after graduation will be subject to an interest rate of 10-18 percent. (¶ 99, Ex. 13, p. 14.) Westwood, however, has not charged interest on APEX accounts since 2009. (¶ 105.)

### Internet Marketing

Westwood, like nearly every other institution of higher education (and practically every other business), advertises through various means, including the internet, to attract students. (¶299.) Westwood's regulatory group reviews and approves all advertising and major recruitment materials before they are used. (Ex. 13, p. 15.) To find students who may be searching for a school like Westwood on the internet, Westwood bids on certain search terms so that advertisements for the school are prompted when the search terms are entered by a prospective student. (¶¶ 301-02.) HLC reviewed Westwood's advertising and marketing materials and "confirmed the accuracy and fairness in their statements and processes." (Ex. 13, p. 15.)

### The AG's Allegations

The SAC asserts four counts—two under the ILCFA, 815 ILCS 505/1, *et seq.* and two under the CFPA, 12 U.S.C. §5481, *et seq.* Count I asserts that Westwood made certain misrepresen-tations to prospective and current students that constitute unfair and deceptive acts practices under the ILCFA. The alleged misrepresentations fall into four categories: (1) misstatements as to when Westwood would achieve regional accreditation (¶¶ 456 (i)-(j)); (2) misstatements about the criminal justice program and employment opportunities (¶¶ 456 (a)-(d), (g)-(h)); (3) misstatements and omissions about the effect a criminal background may have on a student's ability to pursue a career in the criminal justice field (¶ 456(e)); and (4) misstatements and omissions about APEX and

5

students' responsibility to repay their loans and the amounts financed. (¶¶ 456(l)-(q).)

Count II asserts that Westwood engaged in unfair and deceptive conduct under the ILCFA by offering its APEX financing program under onerous terms to students without regard to the students' ability to repay, without sufficient disclosures, and despite knowing in advance the high rate of default. (¶¶ 458-73.)

Count III asserts that Westwood's APEX program was "unfair" in violation of the CFPA because Westwood allegedly subjected "vulnerable" students to undue influence and coercion, provided APEX financing without regard to the students' ability to repay, and did not disclose the default rate of the APEX program. (¶¶ 474-84.)

Count IV asserts that Westwood engaged in "abusive" practices in violation of the CFPA by taking unreasonable advantage of students' reasonable reliance that Westwood would act in their interest, by materially interfering with students' ability to understand the terms of the APEX program, and by failing to provide complete information about APEX, including default rates and the fact that a majority of APEX borrowers were unlikely to repay their APEX debt. (¶¶ 485-93.)

Each of these claims fails as a matter of law and should be dismissed with prejudice.

## ARGUMENT

**I.     The SAC Should Be Dismissed With Prejudice Pursuant to Fed. R. Civ. P. 9(b) and 12(b)(6).**

### A.  Counts I and II Fail to Plead a Claim With Requisite Particularity.

"The elements of a claim under the [ILCFA] are: (1) a deceptive act or practice by the defendant; (2) the defendant's intent that the plaintiff rely on the deception; and (3) the occurrence of the deception during a course of conduct involving trade or commerce." *Robinson v. Toyota Motor Credit Corp.*, 201 Ill. 2d 403, 417 (Ill. 2002) (affirming dismissal of claims under the ILCFA as insufficiently pleaded) (citation omitted). "The complaint must state with particularity and specificity the deceptive manner of defendant's acts or practices, and the failure to make such averments requires the dismissal of the complaint." *Id.* at 419. A "bare assertion of unfairness

without describing in what manner the lack of disclosures either violate public policy or are oppressive is insufficient to state a cause of action . . . ." *Robinson,* 201 Ill. 2d at 421; *see also People ex. rel Hartigan v. E & E Hauling, Inc.*, 153 Ill. 2d 473, 491-92 (Ill. 1992) (affirming dismissal of ILCFA claims brought by Attorney General that were not pleaded with specificity).

All allegations that sound in fraud must be pleaded with specificity. Fed. R. Civ. P. 9(b); *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*, 631 F.3d 436, 446- 47 (7th Cir. 2011). Because Counts I and II fail to plead "the who, what, when, where, and how" of the supposed misstatements, they should be dismissed. *Bank of Am., N.A. v. Knight*, 725 F.3d 815, 818 (7th Cir. 2013) (quoting *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990)). The AG has had multiple opportunities to sufficiently plead a claim, but even after extensive discovery, she has failed to do so. Count I should therefore be dismissed with prejudice. *Emery v. Am. Gen. Fin., Inc.,* 134 F.3d 1321, 1322–23 (7th Cir. 1998) ("the plaintiff has had three chances over the course of three years to state a claim and the district judge was not required to give her another chance"); *Agnew v. NCAA,* 683 F.3d 328, 347 (7th Cir. 2012) ("a district court is not required to grant such leave [to amend a complaint] when a plaintiff has had multiple opportunities to state a claim upon which relief may be granted").

**1.      Count I does not allege a violation of the ILCFA with particularity.**

***a.   The AG does not allege with requisite particularity any false statement regarding accreditation.***

The SAC alleges that Defendants violated the Act by "misrepresenting . . . that Westwood College's Illinois institutions were to attain regional accreditation by a date certain, and omitting the material fact that regional accreditation was not attainable within the timeframe identified . . . ." (¶ 456(i).) To support that conclusion, the AG alleges that "[i]n 2009, Ms. Moore and several other instructors and administrators went to different classrooms to inform students that Defendants were in candidacy to be regionally accredited and should be regionally accredited by the end of 2009." (¶181.) The SAC does not identify the "several other instructors and administrators." The SAC does

7

not allege to which students, in which classrooms, or when in 2009 these statements were supposedly made. The AG cannot allege that Ms. Moore or the other unidentified speakers believed that their statements were false when they made them. Indeed, according to the SAC, Defendants *were in fact* in candidacy in 2009 to be regionally accredited and accreditation *was in fact* expected by the end of 2009. (¶¶ 150-53.) In other words, the AG's own allegations prove that the statements allegedly made by Ms. Moore and others were not false.

Similarly, the SAC alleges that Mr. Rasmussen informed "students that Defendants' institutions would be regionally accredited by the time the students graduated" and also told students that they would be "grandfathered in" once Westwood achieved regional accreditation. (¶¶ 187, 189.) But the SAC fails to identify the students to whom these statements were supposedly made, fails to allege when the statements were made, and fails to allege the necessary element that Rasmussen knew these statements were false when he made them.[3] Failure to plead that the defendant knew the statements were false when made warrants dismissal. *See Popp v. Cash Station, Inc.*, 244 Ill. App. 3d 87, 97 (Ill. App. Ct. 1992) (affirming dismissal of claims under the ILCFA because plaintiff failed to allege that defendants knew the statements were false when made). As stated above, during the relevant time period, Defendants were in candidacy for regional accreditation, and regional accreditation was expected by the end of 2009. (¶¶ 150-53.)

> **b. The AG does not allege with adequate particularity any false or misleading statement about students' criminal backgrounds.**

The allegations regarding the effect a criminal record would have on a student's future also lack specificity. The AG claims certain unnamed admissions representatives told students with criminal backgrounds that they could pursue careers in criminal justice fields or failed to tell such students that their criminal record might affect their ability to work in criminal justice fields. (¶¶ 276-77, 284-85.) The SAC does not allege who made these statements, when, to whom they were made, how they were conveyed, that the unnamed admissions representatives knew they were false

---

[3] Nor does the AG allege that the statement about being "grandfathered in" was not true.

at the time they were made, or even that the information conveyed was in fact false. Moreover, there is no allegation that the admissions representatives had a duty to disclose the virtually self-evident fact that a criminal background "might" adversely affect employability.[4] *Equity Capital Corp. v. Kreider Transp. Serv., Inc.*, 967 F.2d 249, 253 (7th Cir. 1992) (omissions cannot constitute fraud unless the "alleged defrauder owed a duty to disclose . . ."). While it might be logical to assume that a criminal background may impact employability in certain law enforcement jobs, the AG alleges no facts whatsoever to substantiate its assumption that a criminal history, particularly a minor one, would materially impair a graduate's ability to work as a victim's advocate, investigator, private security officer, or in any of the other fields of criminal justice. (*See* ¶¶ 193-94.) In short, the AG presumes (but cannot allege) that Westwood had a duty to disclose a fact which it presumes (but cannot allege) to be true. These allegations fall far short of sufficient to sustain a claim.

### c. The AG has not alleged with sufficient particularity that any false statement was made in connection with the student loan process.

The SAC alleges that Westwood misled students regarding student loans and their obligation to repay the loans, but it does not allege particular facts to support such allegations. For example, the SAC alleges that Westwood misrepresented the nature of "Defendants' APEX finance program" (¶ 456(m)), but it does not identify what actual statements were made, by whom, when, to which students, or how the statements were false. Instead, the SAC provides a few anecdotes about students who, years after the fact, expressed some confusion about the APEX program. D'Vonna Cobb said at her deposition six years after she received APEX financing that she did not recall anyone explaining terms to her. (¶ 128.) Latoya Hill testified, eight years after she took out APEX financing, that she did not recall taking out APEX financing until she started receiving correspondence, but she recalled having to make monthly payments. (¶ 129.) Eight years after enrolling in APEX, Carmella Sullivan admitted the financial aid officer provided her documentation

---

[4] The AG also ignores that students signed detailed disclosure forms telling them the very information that the AG claims was omitted—a fact of which the AG is well-aware from discovery.

on the APEX financing program, but she could not recall whether the officer explained the documents to her.[5] (¶ 130.) Eight years after he took out APEX financing, Paul Lindsey testified that some unnamed financial aid officer supposedly told him that taking out APEX financing and paying money towards it while in school would lower the amounts owed on private loans—which, of course, is true. (¶¶ 406-08.) Nine years after she took out APEX financing, Chartina Mason testified that she did not recall having taken out APEX financing until she received a notice in the mail. (¶¶ 446-49.) The SAC does not allege a single false statement that was made to any of these students. That a few students out of thousands expressed some confusion in depositions taken years after they enrolled in the APEX program cannot replace the requisite particularized allegations that a specific false statement was made to a specific person at a specific time and place which the speaker knew was false at the time it was made.

### d. The AG has not alleged with sufficient particularity that any false statement was made about law enforcement careers.

The SAC alleges that Defendants advertised that "Criminal Justice program graduates would find themselves prepared for careers in a variety of fields, including, but not limited to, positions as corrections officers, police or patrol officers, probation officers, children's advocates, youth care counselors, victim's advocates, federal agents, crime scene investigators, forensic scientists, and coroners, border patrol agents, legal investigators, corporate investigators, private security providers, or customs agents." (¶ 194.) The AG also alleges that certain TV ads depicted police officers, which supposedly led students to believe that they could become police officers with a degree from Westwood. (¶¶ 210-13.) While the AG does allege that for a period of time the Chicago Police and the Illinois State Police would not accept degrees from nationally accredited institution such as Westwood (¶¶ 218-22), there is not a single allegation that any advertisement ever represented that students could become Chicago police officers or Illinois state troopers or get other

---

[5] The SAC alleges that Ms. Sullivan testified that the financial aid representative did not explain the documents, but that's not actually what Ms. Sullivan said: "Q. Do you recall if that financial aid officer explained what this document is?  A. I don't recall." (¶ 130; Sullivan Dep., p. 92, ll. 4-6.)

jobs with either agency.[6] Moreover, the AG cannot allege that a Westwood graduate could not get a job as a police officer in a vast majority of cities in Illinois or elsewhere, or with the Cook County Sheriff's Department, or a number of county sheriff offices in other counties in Illinois or elsewhere, or as a state trooper in any other state. Nor can the AG allege that a Westwood graduate could not obtain a job in any of the other fields of criminal justice, such as those listed above and identified in Paragraph 194 of the SAC. While the AG alleges that certain employees of Defendants told students they could work for the CPD, the SAC does not allege who made such statements, when, to whom, and whether or not the speaker believed what he was saying was true. And, given that the CPD changed its policy in 2010 and now accepts degrees from Westwood and other nationally accredited schools, any such statement made after September 2010 would have been true.

### e. Any alleged misstatements are future projections, not fraud.

Even had the AG alleged her claims with the requisite particularity, the statements at issue are future projections and not actionable misstatements of fact. A "statement which is merely an expression of opinion or which relates to future or contingent events, expectations or probabilities, rather than to pre-existent or present facts, ordinarily does not constitute an actionable mis-representation" under Illinois law. *Peterson Indus., Inc. v. Lake View Trust & Sav. Bank*, 584 F.2d 166, 169 (7th Cir. 1978) (projections as to future profitability are not actionable); *Barrington Press, Inc. v. Morey*, 752 F.2d 307, 310 n.1 (7th Cir. 1985) ("projections cannot ground a fraud claim . . . because they are predictions or opinions . . ., not representations of pre-existing material facts").

Any statement that Westwood would be regionally accredited *in the future*, that students would qualify to be police officers *in the future*, or that students could get jobs *in the future* in the criminal justice field despite criminal backgrounds, are statements of opinion or future projections which, ever were they incorrect, cannot support a fraud claim as a matter of law.

---

[6] In 2010, the CPD changed its policy and now the CPD employs numerous Westwood graduates.

### 2.    Count II does not allege a violation of the ILCFA with particularity.

In Count II, the AG alleges that Defendants violated the ILCFA by "offering Illinois Criminal Justice students a product without regard to the ability to repay, without sufficient disclosure and discussion, with onerous terms, and with advanced knowledge that a majority will default . . . ." (¶ 467.) The SAC does not allege a single deception—which, of course, is the primary element of a claim under the ILCFA—much less identify one with particularity, as Rule 9(b) requires. *Robinson*, 201 Ill. 2d at 417. As stated above, the SAC does not identify any actual false statements about the APEX program, who made them, when they were made, to which students, or how the statements were false. The AG does not cite any authority for the proposition that a company offering financing must take into account a consumer's ability to repay lest that company violate the ILCFA. Nor does the AG identify which disclosures were inadequate—indeed, she carefully pleads around the myriad detailed disclosures that Defendants provided to students. She provides no context for the supposed onerous terms, other than a supposedly high interest rate, yet she begrudgingly admits that Defendants have not charged any interest since 2009. (¶ 105.) And she does not even allege a duty to disclose the rates at which other students default. *Equity Capital,* 967 F.2d at 253 (omissions not actionable absent a duty to disclose). Like Count I, Count II should be dismissed with prejudice pursuant to Fed. R. Civ. P. 9(b) and 12(b)(6) because it fails to state with any particularity a claim upon which relief can be granted.

### B.    Count III and Count IV Do Not Adequately Allege a Violation of the CFPA.

The AG has failed to alleged facts to show that Westwood is a proper subject of a CFPA enforcement action. The AG's assertions that Defendants violated the CFPA by engaging in "unfair" (Count III) and "abusive" (Count IV) conduct, 12 U.S.C. §§ 5531(a), 5536(a)(1)(B), are only "[t]hreadbare recitals of the elements of a cause of action" that are "not entitled to be assumed

true."[7] *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 681 (2009). Because no factual allegations allow the Court "to draw a reasonable inference that [defendants are] liable for the misconduct alleged," the CFPA counts should be dismissed. *Adams v. City of Indianapolis*, 742 F.3d 720, 728 (7th Cir. 2014); *Iqbal*, 556 U.S. at 678; *Bell Atl. Corp. v Twombly*, 550 U.S. 544, 570 (2007).

**1. Westwood is Not Subject to a CFPA Enforcement Action.**

A CFPA enforcement action can only be brought against a "covered person," which is defined as "any person that engages in offering or providing a consumer financial product or service." 12 U.S.C. § 5481(6)(A). A "financial product or service" is defined as "extending credit *and* servicing loans" or "providing financial advisory services . . . , including providing credit counseling. . . [or] services to assist . . . with debt management. 12 U.S.C. § 5481(15)(A)(i) and (viii). (¶ 487.) The AG's own allegation that Westwood never offered loans, but instead offered institutional financing, disproves the AG's claim that Westwood is a "covered person." (¶¶ 89, 91 ("despite being called a loan for a brief period of time, Defendants' institutional financing contracts . . . are structured as retail installment contracts").) Likewise, Westwood never provided credit counseling or debt management services—and the SAC never alleges that it did. The SAC thus fails to allege that Westwood is a "covered person."

Even were Westwood a "covered person" under the CFPA, as a "seller of nonfinancial goods or services" Westwood is excluded from CFPA enforcement actions. The CFPA expressly excludes companies that "exten[d] credit directly to . . . consumer[s]," so long as the credit extended is used to "enable[e] . . . consumer[s] to purchase . . . nonfinancial good[s] or service[s] directly from the merchant, retailer, or seller. 12 U.S.C. § 5517(a)(2)(A)(i). Any extensions of credits to students through the APEX program are excluded from the CFPA's jurisdiction because such financing enabled students to purchase the nonfinancial service of education directly from

_____

[7]While no court has yet addressed the pleading requirements under the CFPA, the statute, like the ILCFA, by its very nature targets consumer fraud and so the heightened pleading requirements of Fed. R. Civ. P. 9(b) should apply. Regardless, the AG's claims are inadequately pled even absent the application of Rule 9(b).

13

Westwood. The AG admits that the purpose of the institutional financing program is to allow students to pay for the balance of their tuition not covered by federal and private sources (¶ 112), and that without the APEX financing program, the students who obtained the financing could not have paid their full tuition. (¶ 459). These concessions prove that Westwood is exempt from the CFPA. 12 U.S.C. § 5517(a)(2)(A)(i).

### 2. Any conduct before July 21, 2011 is not covered by the CFPA.

To the extent that Counts III and IV rely on conduct prior to July 21, 2011, they should be dismissed because the CFPA does not cover conduct that occurred prior to that date.[8] The CFPA became effective July 21, 2011, and the Dodd-Frank Act is not retroactive. *See Mart v. Gozdecki, Del Giudice, Americus & Farkas LLP*, 910 F. Supp. 2d 1085, 1095 (N.D. Ill. 2012) ("Dodd–Frank does not have retroactive effect."); *Molosky v. Washington Mut., Inc.*, 664 F.3d 109, 113 n.1 (6th Cir. 2011) ("These provisions came into effect on July 21, 2011, and have no retroactive effect with regard to the issues in this appeal. There is no explicit statement from Congress that they are meant to be retroactive, suggesting no retroactivity."). Because the SAC does not identify a single student who took out APEX financing after July 21, 2011,[9] Counts III and IV must be dismissed.

### 3. Count III fails to allege the elements of a claim for "unfair" practices.

Under the CFPA, an act or practice is "unfair" where "(A) the act or practice causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers; and (B) such substantial injury is not outweighed by countervailing benefits to consumers or to competition." 12 U.S.C. § 5531(c)(1). The SAC fails to allege these elements.

#### *a. Count III fails to allege any unfair acts or practices.*

The SAC fails to allege that Defendants' acts or practices "cause[d] or [were] likely to cause" substantial injury to students. 12 U.S.C. § 5531(c). The AG claims Defendants "used their

---

[8] The AG appears to recognize this limitation as to Count IV (*see* ¶ 488), but not as to Count III (*see* ¶ 477).

[9] In fact, all of the students identified in the SAC had graduated by July 2010. (*See* ¶¶ 312, 323, 343, 356, 373, 396, 437.)

financial aid staff's control of the financial aid process, which is rushed, along with high-pressure tactics, to persuade and entice students to sign the Defendants [*sic*] institutional financing contracts." (¶ 477(a).) But the AG does not allege a single fact to support the conclusions that financial aid representatives controlled or rushed the process, or used high pressure tactics to persuade or entice students into loans they did not want or need. The SAC contains *no* allegation regarding the time spent by Defendants' employees discussing APEX financing, the materials given to students regarding APEX, or how much time students had to consider those materials.[10]

The AG asserts that defendants "misrepresent . . . the true cost of tuition as well as students' payment obligations . . . ." (¶ 477(b).) Yet the AG does not identify a single misstatement and provides instead only a few vague anecdotes about students whose ultimate loan balances ended up higher than they recall being told during their interview process. (*See* ¶¶ 350, 355; ¶¶ 384, 395.) But none of those anecdotes are alleged to have occurred after July 21, 2011, and even if they did, the AG never alleges any facts to support the missing link—that the estimated cost of tuition before a student begins school and the ultimate student debt incurred ought to be equal. *Adams*, 742 F.3d at 733 (affirming dismissal where there is a "complete lack of factual content directed at" the claim).

Finally, the AG alleges that "Defendants exploit the students expectations" about job opportunities after graduation. (¶477(c).) As explained above, the AG has not alleged any misstatement about job opportunities sufficient to support a claim under the ILCFA; those same vague allegations cannot support a claim under the CFPA, either.

### b. Count III fails to allege that students suffered "substantial injury."

The AG claims students suffered substantial injury because they "entered into loans or retail installment contracts that they could not afford, did not want, did not understand, or did not even

---

[10] The SAC also fails to allege that conduct by Defendants' financial aid staff amounted to "coercion," or that any students entered into APEX financing *because* of the asserted conduct. *Cohen v. Am. Sec. Ins. Co.*, 735 F.3d 601, 609 (7th Cir. 2013). It is not unfair or coercive to hold a contracting party to the terms of an agreement. *Cohen*, 735 F.3d at 609 ("insisting that a contract partner fulfill his contractual duties or face the agreed-upon consequences—is not coercion").

know they had." (¶ 479.) No factual allegation in the SAC supports those conclusions. The SAC fails to allege any facts about what students could or could not afford, did or did not want, did or did not understand, or did or did not know they had.[11] *Adams*, 742 F.3d at 728.

There is no authority that imposes on Defendants a legal duty to ensure that their students could "afford" financing they entered into. To the contrary, the USDOE *requires* schools to permit students to borrow up to the maximum amount of federal loans they can receive. 34 C.F.R. § 685.301(a)(3). "[A] statutory change would be required to allow an institution to directly limit or control student borrowing." 76 Fed. Reg. 34,386, 34,416 (June 13, 2011); *see also* 20 U.S.C. § 1087tt(c); 34 C.F.R. § 685.301(a)(8). There exists no standard against which Defendants, or this Court, could determine whether such financing is "affordable." The CFPB has a 213-page rule that attempts to define the affordability of a mortgage, 12 C.F.R. § 1026.43(c); 78 Fed. Reg. 6408 (Jan. 30, 2013), but there is no standard for measuring the affordability of a student loan.

The AG attempts to equate unaffordability with default rates (¶ 480) but never alleges that there exists a standard for determining what default rate is acceptable, never alleges how affordability is associated with projected or actual default rates, and never explains how an individual student is harmed by the past or future defaults of others who receive similar financing.

### c. *Count III fails to allege that any injuries were not "reasonably avoidable."*

Whether an injury is reasonably avoidable depends on the degree to which "consumers had a free and informed choice," or "have reason to anticipate the impending harm and the means to avoid it." *Davis v. HSBC Bank Nev., N.A.*, 691 F.3d 1152, 1168 (9th Cir. 2012) (internal quotations and citations omitted). The AG's conclusory claims of unavoidability are three-fold. First, the AG claims students did not understand the documents they signed. (¶ 481(a).) However, "[l]ong-standing principles of contract and sound public policy impose a duty on contracting parties to

---

[11] As discussed above, the only allegations are about a few students who expressed some confusion many years after the fact, and none of whom enrolled after the effective date of the CFPA. (§ I.A.1.c, *supra*.)

understand the obligations they are assuming, and if they do not, they cannot be heard to later complain about a lack of understanding." *F.T.C v. IFC Credit Corp.*, 543 F. Supp. 2d 925, 946 (N.D. Ill. 2008) (granting in part motion to dismiss). The SAC does not allege any facts to support the inference that students were prevented from reading and understanding the materials they were provided during the financial aid process. *IFC Credit*, 543 F. Supp. 2d at 946 ("there is no 'I didn't read it' defense, unless there was some obstacle" to review of the materials) (citing *Dugan v. R.J. Corman R.R. Co.*, 344 F.3d 662, 667 (7th Cir. 2003)).

Second, the AG claims that signing up for APEX financing was unavoidable because students "had insufficient income to pay the balance owed after applying available Title IV funds." (¶481(b).) Yet the SAC admits that students could satisfy the balance owed from other sources, including work study programs, Pell Grants, and veterans' benefits. (¶¶ 81-84.)

Third, the AG claims that "[f]or students without sufficient income, there was an expectation that completing Westwood College would allow them to earn enough money to avoid defaulting on the loans . . . ." (¶ 481(c).) The SAC does not attribute the expectation to Defendants, and even if it did, the SAC never alleges how an expectation of future could possible make a student's decision to enroll in APEX financing unavoidable.

### d. *Count III fails to allege that any harm was not outweighed by benefits to consumers.*

The SAC also fails to allege any facts to support the bald assertion that harm to students "was not outweighed by countervailing benefits" to consumers. (¶ 482); *see also Iqbal*, 556 U.S. at 678. It cannot be debated that APEX financing benefits students, given that it provides those students who otherwise could not afford to go to school an option to do so. The SAC does not allege that any student was in a worse position after obtaining a Westwood degree and entering into APEX financing than he would have been without both—even if APEX financing *were* their only finance

option.[12] Absent APEX financing, students in need of funds to cover the shortfall in their tuition may never have gone to college, or if the shortfall in funds arose part-way through their education, may have been unable to continue in their degree programs. *In re Chambers*, 348 F.3d 650, 658 (7th Cir. 2003) ("When students fail to pay tuition bills on time, institutions can withhold educational services until payment . . . .").

The AG's cursory allegations have not "nudged their claims across the line from conceivable to plausible," and therefore, Count III should be dismissed. *Twombly*, 550 U.S. at 570.

### 4. Count IV fails to allege adequately that Defendants engaged in any abusive acts or practices.

To state an abusive business practices claim under the CFPA, the AG must allege that Defendants took "unreasonable advantage" of students': (1) lack of understanding; (2) inability to protect their own interests; or (3) reasonable reliance on Defendants. 12 U.S.C. § 5531(d)(2). The AG has failed to allege any facts to support these elements.

#### *a. Count IV fails to allege that Defendants took "unreasonable advantage" of students.*

The AG has not adequately alleged that Defendants took unreasonable advantage of consumers—an essential element of the AG's novel theory that Defendants engaged in "abusive" acts or practices. 12 U.S.C. § 5531(d)(2); ¶¶ 485-97. The AG alleges that Defendants took unreasonable advantage of students by taking control of the financial aid process, misrepresenting the total cost of tuition and payment obligations, and pushing students into expensive, high risk loans that Defendants knew were likely to default. (¶ 491.) The AG alleges no facts to support those conclusions. *Iqbal*, 556 U.S. at 681 (legal conclusions are "not entitled to be assumed true."). There is no factual allegation that during the relevant timeframe (July 21, 2011 to the present) Defendants misrepresented or failed to inform any student of his or her obligation to repay APEX financing or

---

[12] The AG makes the absurd suggestion that "Westwood graduates do . . . worse than high school graduates." (¶249.) Even a substandard college education (which Westwood is not) cannot possibly cause a student to earn less than he or she would have made with no college at all.

the consequences of failing to pay outstanding balances when due. *Jackson v. Bank of Am. Corp.*, 711 F.3d 788, 793 (7th Cir. 2013) (challenge to home foreclosure was properly dismissed where no facts showed that plaintiffs did not understand the terms of the loan or the consequences of default).

Nor is there a single factual allegation to support the AG's theory that APEX financing was "abusive" because students defaulted at an allegedly "high" rate. (¶ 491(c) and (d).) The SAC fails to allege what the default rate was during the relevant timeframe, at what point a default rate becomes "high," or any basis for anyone to determine when a default rate becomes so high as to indicate an "abusive" practice. The AG also fails to plead that the student default rate was *caused* by Defendants—a necessary element of any theory of liability. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1390 (2014) (injuries must be proximately caused by defendant's violation of statute). More plausible causes are general economic conditions, socioeconomic factors, and even student choice. *In re Roberson*, 999 F.2d 1132, 1136 (7th Cir. 1993). Defendants cannot be punished for conditions they did not cause, and the SAC fails to cross "the line from a 'possible' to a plausible claim of entitlement to relief." *Yeftich v. Navistar, Inc.*, 722 F.3d 911, 917 (7th Cir. 2013).

**b.** ***Count IV fails to allege students' inability to protect their interests.***

Count IV also should be dismissed because it fails to allege that students were unable to protect their own interests in deciding whether or not to enter into APEX financing. An act or practice is not abusive if it does not take unreasonable advantage of "the inability of the consumer to protect the interests of the consumer in selecting or using a consumer financial product or service." 12 U.S.C. § 5531(d)(2)(B). Here, there is no allegation that these students had no other choice; indeed they did. They could have not gone to Westwood, or they could have financed their tuition through other means, such as work study, Pell Grants, and veteran's benefits, as the AG admits some students did. (¶¶ 81-84.) The SAC does not allege that Defendants limited the time students had to arrange other sources of funds, prevented students from paying with family funds, or

19

prevented students from taking time to work and then resume their education when they could pay.

    ***c. Count IV also fails to allege students' "reasonable reliance" on Defendants to act in their interests.***

   Count IV also fails to plead adequately that Defendants took "unreasonable advantage" of their students' "reasonable reliance" on Defendants' staff "to act in the interests of the consumer." 12 U.S.C. § 5531(d)(2)(C). Here, the AG alleges that students' reliance was reasonable because: (1) Defendants held themselves out as a school that would better students lives; (2) the financial aid staff made recommendations; (3) the financial aid staff solicited trust. (¶ 490.) But the AG alleges no facts within the relevant time period to support any of those conclusions. How does telling students that education will better their lives (which it will[13]) or making recommendations about financing options engender reliance? What did Defendants' financial aid staff do to solicit trust? Any facts to support these "[t]hreadbare recitals of the elements of a cause of action" are absent from the SAC. *Iqbal*, 556 U.S. at 678. Thus, the AG fails to plead "allegations plausibly suggesting (not merely consistent with)" students' reasonable reliance on Defendants' statements, and so Count IV should be dismissed. *Twombly*, 550 U.S. at 557.

**II. Counts III and IV Should Be Dismissed on Constitutional Grounds.**

  **A. The AG's Purported Authority to Bring CFPA Claims Is Derived from an Unconstitutional Entity.**

   While state law grants the AG authority to enforce state consumer protection laws, it was not until the enactment of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010—also known as the CFPA—that Congress purported to confer upon the fifty state AGs authority to bring an enforcement action under federal law.[14] In order to exercise that authority and

---

[13] The President repeatedly has said the same thing. *See, e.g.*, White House, Higher Education Webpage ("Earning a post-secondary degree or credential is no longer just a pathway to opportunity for a talented few; rather, it is a prerequisite for the growing jobs of the new economy."), http://www.whitehouse.gov/issues/education/higher-education.

[14] Indeed, this case represents the first time any state Attorney General has brought an action under the CFPA. *See* http://www.cfpbmonitor.com/2014/04/30/illinois-ag-seeks-leave-to-add-dodd-frank-udaap-count-to-complaint-against-for-profit-college/

pursue relief under the CFPA, the AG must provide notice of the action to the Consumer Financial Protection Bureau ("CFPB") [15] so as to provide the CFPB an opportunity to intervene. 12 U.S.C. § 5552 (b)(1)(A) and (b)(2)(A). Even if the CFPB elects not to intervene, it may "appeal any order or judgment to the same extent as any other party in the proceeding may." 12 U.S.C. § 5552 (b)(2)(C). In other words, the AG is the CFPB's proxy; her sole authority to bring CFPA claims rests with the CFPB. *Id*. However, the CFPB is an unconstitutional entity because it operates without any significant checks by the Executive or Legislative Branches.

## 1. The CFPB is insulated from Executive Branch oversight.

While the Constitution vests the Executive power in the President, who must "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3, the President cannot do so if he cannot oversee the faithfulness of the officers who execute them and have the power to remove [the subordinate] without delay." *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.,* 130 S. Ct. 3138, 3147 (2010); *see also Myers v. United States*, 272 U.S. 52, 134 (1926).

The Supreme Court has held that even a limited restriction on the Executive's power to remove officers, such as a "good-cause" requirement, restricts his ability to control Executive officers. *Free Enter. Fund*, 130 S. Ct. at 3147, 3152. The CFPB's Director, who serves a five-year term, may be removed by the President only "for inefficiency, neglect of duty, or malfeasance in office." 12 U.S.C. § 5491(c)(3). The Director purports to have broad jurisdiction and significant power over numerous industries without any check on his authority by the Executive and is purportedly authorized to sue in the name of the United States, a core Executive power. *Morrison v. Olsen,* 487 U.S. 654, 691 (1988); *see also* 12 U.S.C. § 5564. Without meaningful Executive control over the Director, the Director could initiate suits advancing his—and not the President's—views and interests. More remarkable is that the CFPA allows the Director to delegate any or all of his significant powers to *any* "duly authorized employee, representative, or agent." 12 U.S.C. §

---

[15] The CFPA established the CFPB to implement the statutory scheme and enforce through litigation the federal ban on unfair, deceptive, or abusive acts or practices. *See* 12 U.S.C. § 5491.

5492(b). This further undermines the President's control over Executive officials. *Buckley v. Valeo,* 424 U.S. 1, 136 (1976). And here, of course, federal law is being enforced by a state AG over whom the Executive has *no* oversight or control.

### 2. The CFPB is also insulated from Legislative Branch oversight

Congress has no meaningful oversight over the CFPB because it has no control over the CFPB's funding. Instead, the CFPB is funded by the Federal Reserve's budget with no Congressional review or approval.[16] 12 U.S.C. § 5497(a)(2)(C) ("the funds derived from the Federal Reserve System…shall not be subject to review by the Committees on Appropriations" of the House and Senate.). Because the budget of the Federal Reserve is exempt from Congress' appropriations process, Congress is left without even a derivative way to influence or "check" the Bureau's budget. *Id.* § 244. The CFPB thus holds unprecedented power over the regulation of private sector activity and exclusive control of more than half a billion dollars—all outside the appropriations process. *See also* U.S. Const. art. I, § 7, cl. 1. Likewise, the Illinois AG does not answer to Congress in any way and there is no oversight or check on the AG.

The absence of Executive and Legislative checks violates the Constitution's separation of powers and renders the CFPB an unconstitutional entity. Thus, the AG, as the CFPB's proxy, lacks power to bring any claims under the CFPA and Counts Three and Four must be dismissed. *Ass'n of Am. Railroads v. U.S. Dept. of Transp.*, 721 F.3d 666, 673 (D.C. Cir. 2013).

### B. The AG Has No Authority Under the Illinois Constitution to Enforce Federal Law.

Even putting aside the fact that the AG's purported authority to bring claims under the CFPA derives solely from that of an unconstitutional entity, the AG has no authority under the Illinois constitution to enforce federal law. The Illinois Constitution provides that "the Attorney General shall be the legal officer of the State, and shall have the duties and powers that may be prescribed by law." Ill. Const. 1970, art. V, § 15. The Illinois Supreme Court has interpreted the state

---

[16] The Bureau may unilaterally claim up to 12% of the Federal Reserve's budget (currently about half a billion dollars). 12 U.S.C. § 5497(a)(2)(C).

constitution as providing the AG with those powers and duties associated with the office at common law as well as with whatever additional powers and duties the state legislature provides. *E & E Hauling, Inc.*, 153 Ill.2d at 483; *People v. Massarella*, 72 Ill.2d 531, 534, 382 N.E.2d 262 (1978); *Fergus v. Russel*, 270 Ill. 304, 336, 110 N.E. 130 (1915); *see also* 15 ILCS 205/4 (listing the "additional powers and duties" of the AG). None of the enumerated powers and duties confers upon the AG the authority or duty to enforce federal laws. *See* 15 ILCS 205/4. And while the Illinois Supreme Court has found that the AG's powers under common law are "broad" and provide her "the competence to control all litigation on behalf of the State"[17] those powers are limited to enforcing state and common law -- not to enforcing federal law. None of the sources of the AG's power provides her the authority to pursue or enforce federal laws. As such, the AG cannot maintain an action under the CFPA.

### C. Counts III and IV Violate the Due Process Clause Because Regulated Parties Lack Fair Notice of What Conduct is Prohibited.

The AG asserts that Defendants violated federal consumer protection laws by engaging in "unfair" (Count III) and "abusive" (Count IV) acts or practices. 12 U.S.C. § 5536(a)(1)(B). Both on their face and as applied, those terms fail to provide sufficient notice of what is proscribed and therefore violate the Due Process Clause of the Fifth Amendment.

Due Process requires that laws "give fair notice of conduct that is forbidden or required." *FCC v. Fox Television Stations, Inc.*, 132 S. Ct. 2307, 2317 (2012) (the requirement of "clarity in regulation is essential to [Due Process] protections . . . . and requires the invalidation of laws that are impermissibly vague"); *Connally v. General Constr. Co.*, 269 U.S. 385, 391 (1926) ("a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must . . .guess at its meaning. . . violates the first essential of due process law"). The void for vagueness doctrine ensures that (1) "regulated parties…know what is required of them"

---

[17] See *E & E Hauling, Inc.*, 153 Ill.2d at 483; *Massarella,* 72 Ill.2d at 534.

and (2) there is sufficient "precision and guidance" such that "those enforcing the law do not act in an arbitrary or discriminatory way." *Fox Television Stations, Inc.,* 132 S. Ct. at 2317*; see also United States v. Williams*, 553 U.S. 285, 304 (2008). Here, the CFPA fails to provide fair notice of what conduct is "unfair" and "abusive." The prohibition on "abusive" acts has no analogue in state or federal law, and the Seventh Circuit has described the term "abusive" as "vague." *Ustrak v. Fairman*, 781 F.2d 573, 580 (7th Cir. 1986). While the CFPA attempts to define "abusive," it provides no meaningful guidance. The CFPA states that an "abusive" act or practice, in relevant part, is one that "takes unreasonable advantage of … the inability of the consumer to protect the interests of the consumer in selecting or using a consumer financial product or service, or … the reasonable reliance by the consumer on a covered person to act in the interests of the consumer." 12 U.S.C. § 5531(d). That these conditions depend on the subjective experience of the consumer only adds more uncertainty. *See Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 24 (1993) (Scalia, J., concurring) ("'Abusive'…does not seem to me a very clear standard—and I do not think clarity is at all increased by adding the adverb 'objectively' or by appealing to a 'reasonable person['s]' notion of what the vague word means").

The CFPB's Director has acknowledge the vagueness of the term "abusive," testifying that the word is "a little bit of a puzzle because it is a new term" and that the CFPB

> ha[s] been looking at it, trying to understand it, and we have determined that that is going to have to be a fact and circumstance issue…. Probably not useful to try to define a term like that in the abstract; we are going to have to see what kind of situations may arise where that would seem to fit the bill under the prongs.

*How Will the CFPB Function Under Richard Cordray: Hearing Before the Subcomm. On TARP, Financial Services and Bailouts of Public and Private Programs,* 112th Cong. 112-107, at 69 (2012). A "waiting to see what kind of situations may arise" approach is unconstitutionally vague.

A standardless bar on "unfair" acts and practices is no less vague. *Beler v. Blatt, Hasenmiller, Liebsker & Moore, LLC,* 480 F.3d 470, 474 (7th Cir. 2007). That vagueness is compounded by the CFPA, which provides that the CFPB has no authority to declare an act or

24

practice "unfair" unless there is a "reasonable basis to conclude" that "(A) the act or practice causes or is likely to cause substantial injury to consumers which is not reasonably avoided by consumers; and (B) such substantial injury is not outweighed by countervailing benefits to consumers or competition." 12 U.S.C. § 5531(c)(1). What constitutes "substantial injury" or is "reasonably avoidable" is as subjective as the term "unfair." The CFPB itself struggles to define the term with any precision, stating, for example, that "substantial injury" may take the form of "monetary harm," but also some "emotional impacts may amount to or contribute to substantial injury."[18]

As with "abusive," the CFPB has failed to provide meaningful guidance through regulation, instead asserting that its interpretation of "unfair" practices "may" be informed by case law, enforcement actions, and *ad hoc* policy statements. *See* CFPB Supervision and Examination Manual, at UDAAP 1 n.2. Such general guidance—which is not even binding on the CFPB, let alone the AG—provides no fair warning that by offering institutional lending, as do many other institutions in the highly-regulated field of education, Defendants could find themselves the target of an enforcement action by the Bureau, or by any of 50 state AG's or other "agents" of the CFPB.

The CFPB's "know it when I see it" approach is the antithesis of due process and fair notice and leaves regulated entities like Defendants "guess[ing] at its meaning and … application" and "encourages seriously discriminatory enforcement." *Connally*, 269 U.S. at 391; *see also Fox Television,* 132 S. Ct. at 2317. Accordingly, the CFPA claims alleged in Counts III and IV should be dismissed as unconstitutionally vague. *Gates & Fox Co. v. OSHRC*, 790 F.2d 154, 156 (D.C. Cir. 1986) (reversing agency's application of vague regulation).

---

[18] CFPB Supervision and Examination Manual, at UDAAP 2 (Oct. 2012), http://files.consumerfinance.gov/f/201210_cfpb_supervision-and-examination-manual-v2.pdf.

### III.    Section 10b(1) of the ILCFA Exempts the AG's Consumer Fraud Claims.

Section 10b(1) of the ILCFA excludes from liability "[a]ctions or transactions specifically authorized by laws administered by any regulatory body . . . acting under statutory authority of th[e] State or the United States." 815 ILCS 505/10b(1). Through this provision the ILCFA limits its own reach by "not imposing a higher disclosure requirement on parties than those that are sufficient to satisfy federal regulations . . . even if those statements may tend to be confusing or misleading and even if there is no express authorization for the making of such statement in the applicable federal regulations." *Bober v. Glaxo Wellcome PLC*, 246 F.3d 934, 940 (7th Cir. 2001) (consumer fraud claim excluded by federal law because the Act "protects companies from liability if their actions are authorized by federal law"); *Price v. Philip Morris, Inc.*, 219 Ill. 2d 182 (Ill. 2005) (consumer fraud claim against tobacco company was barred where company's manufacturing, distribution and marketing were authorized by federal law); *Weatherman v. Gary-Wheaton Bank of Fox Valley*, 186 Ill. 2d 472, 488-89 (Ill. 1999) (defendant's compliance with federal real estate regulations rendered it exempt from liability under the Act). If a party is "doing something specifically authorized by federal law," Section 10b(1) protects the party from liability under the Act. *Bober*, 246 F.3d at 941.

Here, Section 10b(1) bars the AG's attempt to hold Defendants to higher disclosure requirements than those imposed by applicable federal and state regulations. Defendants are part of a highly-regulated industry and must comply with layers of state and federal regulations to remain an authorized institution of higher education.[19] The USDOE, the IBHE, and ACICS collectively regulate each area about which the AG complains. Defendants' accreditation and continuing eligibility to participate in the Title IV programs are contingent on its compliance with regulations established by the USDOE and its accrediting agencies. These regulations include requirements

---

[19] *See, e.g.*, 20 U.S.C. §1094 (eligibility requirements for educational institutions to participate in Title IV); 34 C.F.R. §668.11 (noncompliance with standards established by HEA may lead to suspension or termination of eligibility to participate in Title IV or any other HEA program); *see also* 34 C.F.R. §§ 600.10, 600.20, 668.23, 668.171.

regarding the administration of the student loan programs, recruitment, admission and enrollment of

students, and disclosures that must be made at each step, including those regarding employment and

graduation statistics, as well as disclosure of "any other information necessary to substantiate the

truthfulness of the [school's] advertisements." *See, e.g.*, 20 U.S.C. §1094 (a)(3) and (8); 34 C.F.R.

part 668, subparts B and L.[20] Notably absent from the SAC is a single allegation that Westwood

violated any federal, state, or accrediting regulation applicable to institutions of higher learning.

Simply put, the AG impermissibly seeks to penalize Westwood notwithstanding that the

school's conduct is authorized by and falls within the boundaries of federal law and a multi-level

regulatory scheme. The power to determine whether Westwood's programs comply with the HEA

and other federal educational guidelines is vested solely with the U.S. Secretary of Education.

*Wilson v. Chism*, 279 Ill. App. 3d 934, 937 (Ill. Ct. App. 1996) (dismissing students' consumer

fraud claims as preempted by the federal regulatory scheme provided by the HEA); *see also Mornar*

*v. Pfizer*, No. 4 CH 21866, 2005 WL 5512991 (Cir. Ct. Cook Cty. Sept. 15, 2005) (consumer fraud

claims against maker of whitening gum were preempted by federal Food, Drug and Cosmetic Act).

In *Wilson*, students alleged that their school violated the Consumer Fraud Act by making

false certifications to the federal government relating to the students' eligibility for federal student

loans. *Wilson*, 279 Ill. App. 3d at 937-38. The appellate court held that the HEA preempted their

claims because the statutory language "supported the conclusion that a state claim is barred if it

involve[s] a dispute related to discharge of a loan." *Id*. (*citing Gade v. National Solid Wastes Mgt.*

*Assn.*, 505 U.S. 88, 100 (1992) and 20 U.S.C. 1087(c)(1) (1994)). The court explained that if the

---

[20] With respect to job placement advertisements that the AG alleges contain misrepresentations, the HEA requires Westwood to "make available to prospective students, at or before the time of application . . . the most recent available data concerning employment statistics, graduation statistics, and any other information necessary to substantiate the truthfulness of the advertisements . . . ." 20 U.S.C. §1094(a)(8). The Secretary of Education ensures compliance with this requirement and authorizes Westwood to make statements concerning its employment placement. 20 U.S.C. §1094(a)(3); *see also* 34 C.F.R., part 668, subparts B and L; and Brief, Ex. 2, ¶ 3. Likewise, with regard to the disclosure of loan information, the HEA requires Defendants to make detailed loan disclosures to all current and prospective students. 20 U.S.C. § 1092; *see also* 34 C.F.R. § 668.171.

plaintiffs' case were allowed to proceed, it would be "an obstacle" that would impede "Congress' goals and objectives because it would . . . lead to increased and prolonged litigation and could result in inconsistent findings of facts." *Wilson*, 279 Ill. App. 3d at 939.

In a case that mirrors the AG's consumer fraud claims, *Philips v. DePaul Univ.*, No. 12 CH 3523 (Cir. Ct. of Cook Cty 2012),[21] graduates of a local law school alleged that their alma mater violated the ILCFA by providing materially misleading information on employment outcomes to prospective and current students. Ex. A, pp. 1-2. Like Defendants, DePaul is required by the HEA to "provide prospective and enrolled students with information concerning employment and graduation statistics." *Id*. at 10; *see also* 20 U.S.C. §1092(a)(1)(R); 20 U.S.C. §1094(a)(8). Finding that DePaul's disclosure of employment data was in compliance with federal regulations, the court dismissed the students' claims for consumer fraud as being excluded under Section 10b(1). *Id*.

Here, the AG seeks to circumvent the extensive regulatory scheme provided by the HEA and the authority vested in the U.S. Secretary of Education. As a result, Section 10b(1) excludes the AG's consumer fraud claims from the purview of the ILCFA and Counts I and II must be dismissed.

## **<u>CONCLUSION</u>**

For the foregoing reasons, Counts I and II of the SAC should be dismissed with prejudice as inadequately pleaded and because they are excluded from the purview of the ILCFA. Counts III and IV of the SAC should be dismissed on constitutional grounds and because they are inadequately pleaded.

---

[21] The unpublished decision in *Phillips v. DePaul Univ.*, is attached hereto as Exhibit A.

Dated: June 16, 2014

Respectfully submitted,

ALTA COLLEGES, INC.; WESTWOOD
COLLEGE, INC.; WESGRAY
CORPORATION; ELBERT, INC.; and EL
NELL, INC.


By: /s/ *Mariah E. Moran*

Joseph J. Duffy
William P. Ziegelmueller
Mariah E. Moran
Henry M. Baskerville
STETLER, DUFFY & ROTERT, LTD.
10 South LaSalle Street, Suite 2800
Chicago, Illinois 60603
Telephone: (312) 338-0200
Fax: (312) 338-0070
jduffy@sdrlegal.com
wziegel@sdrlegal.com
mmoran@sdrlegal.com
hbasker@sdrlegal.com