**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 14-cv-03786 |
| vs. | ) | |
| | ) | |
| ALTA COLLEGES, INC., a Delaware Corporation; | ) | Hon. Ronald A. Guzman |
| WESTWOOD COLLEGE, INC., a Colorado | ) | Mag. Judge Geraldine |
| Corporation d/b/a Westwood College and | ) | Soat Brown |
| Westwood College Online; WESGRAY | ) | |
| CORPORATION, a Colorado corporation d/b/a/ | ) | |
| Westwood College-River Oaks and Westwood | ) | |
| College-Chicago Loop; ELBERT, INC., a Colorado | ) | |
| Corporation d/b/a Westwood College-DuPage; and | ) | |
| EL NELL INC., a Colorado corporation d/b/a | ) | |
| Westwood College-O'Hare Airport; | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S SECOND AMENDED COMPLAINT FOR**
**INJUNCTIVE AND OTHER RELIEF**

**NOW COMES** the Plaintiff, THE PEOPLE OF THE STATE OF ILLINOIS, by LISA

MADIGAN, Attorney General of the State of Illinois, and brings this action against Defendant

ALTA COLLEGES, INC. (hereinafter referred to as "ALTA"); WESTWOOD COLLEGE, INC.

(hereinafter referred to as "WESTWOOD"); WESGRAY CORPORATION (hereinafter referred

to as "WESGRAY"); ELBERT, INC. (hereinafter referred to as "ELBERT"); and EL NELL,

INC. (hereinafter referred to as "EL NELL"); for violations of the Consumer Fraud and

Deceptive Practices Act, 815 ILCS 505/1, *et seq*., for violations of the Consumer Financial

Protection Act of 2010, 12 U.S.C. §5552 (a)(1) *et seq*., and through her common law authority as

Attorney General to represent the People of the State of Illinois.

## NATURE OF THE CASE

1.     Westwood College is a for-profit post-secondary institution with four campuses in Illinois that purports to provide students with a career-focused education.  According to its mission statement, "Westwood College is dedicated to preparing students with the knowledge, skills and training needed for meaningful employment."  See http://www.westwood.edu/why-westwood/about-us.  An online counterpart of Westwood College operates in Illinois under the name Westwood Online.

2.     Consistent with its mission statement, Westwood College and Westwood Online marketed and continues to market to Illinois consumers that students who enroll and complete a Criminal Justice program would graduate with a bachelor's degree and the knowledge, skills, and training needed for meaningful employment in that chosen field.  The cost of the three-year program is now in excess of $75,000, and has never been less than $50,000.

3.     Defendants – who own and operate Westwood College and Westwood Online – engaged and continue to engage in deceptive, unfair, and abusive practices in the marketing and selling of their Criminal Justice program.  By misrepresentation and omission of material fact, Defendants misled and continue to mislead students about nearly every important aspect of the career-focused degree in Criminal Justice – from the financing and cost of the program to the likelihood of a positive employment outcome after the student departs the school.

4.     In the course of marketing the Criminal Justice program to Illinois consumers, Defendants touted future careers in law enforcement – as police, sheriff officers, and FBI agents – and corrections.  In reality, only 3.8% of graduates were employed as sworn law enforcement officers or correctional officers.  The two most common jobs for graduates of Defendants' Criminal Justice program were security guard (18%) and retail (8.9%) – positions which typically require only a high school diploma or equivalency degree.  Remarkably, graduates of

Defendants' Criminal Justice program have had a median starting salary below the median salary of a 25-year old with a high school diploma. Not surprisingly, Defendants do not promote these poor outcomes for graduates. Instead, Defendants have misrepresented and omitted key and material information from prospective and enrolled students.

5.     Defendants have also misrepresented and obfuscated material information about their accreditation. Westwood College and Westwood Online are nationally accredited. Between 2004 and the present, none of Defendants' Illinois institutions or programs, including Defendants' online programs, have ever been regionally accredited.

6.      Despite Defendants' representations to the contrary, the fact that Westwood College and Westwood Online were not regionally accredited impacts each potential outcome desired by an enrolling student: (a) to obtain employment in law enforcement, (b) to transfer credits earned at Defendants' institution to another undergraduate institution, and (c) to use the bachelor's degree in Criminal Justice to obtain entry in a master's program or other advanced degree program. For example, graduates of Westwood College or Westwood Online are not eligible for employment with the Illinois State Police, the DuPage County Sheriff, the Will County Sheriff, and other area law enforcement entities. From 2004 until 2010, students were also not eligible for employment with the Chicago Police Department. The fact that a Westwood degree from the Criminal Justice program was insufficient for some of the largest law enforcement employers in the Chicago area is a material fact that should have been shared directly and clearly with prospective students. Further, prospective students were not informed that a majority of schools in Illinois would not accept a transfer of credits earned at a nationally accredited school or that a majority of advanced degree programs would not accept students who had a degree from a nationally accredited school.

7.     Defendants compounded these misrepresentations by misleading students about

the magnitude of the financial burden associated with obtaining their degree. For example, at certain times, prospective students were provided only the cost of enrollment by term. Unstated was that unlike most colleges, Westwood College had five terms in a calendar year, not two. Further, Defendants offered students a "last resort" institutional financing for those students who lacked the resources to meet the school's tuition that was couched in misrepresentation and omission. In truth, the institutional financing was a structurally unsound product that preyed on students. Notably, by maintaining an allowance for bad debt that exceeded 50% and reached as high as 70% at some campuses, Defendants themselves knew that the majority of students they provided with institutional financing would default.

8.     As a result of Defendants' conduct, Illinois consumers who tried to improve their lives and their earning potential by enrolling in Defendants' Criminal Justice program instead found themselves saddled with substantial debt and limited opportunities.

### PUBLIC INTEREST

9.     The Illinois Attorney General believes this action to be in the public interest of the citizens of the State of Illinois and brings this lawsuit pursuant to Section 7(a) of the Consumer Fraud Act, 815 ILCS 505/7(a) and the Consumer Financial Protection Act of 2010, 12 U.S.C. §5552 (a)(1).

### JURISDICTION AND VENUE

10.     This action is brought for and on behalf of the PEOPLE OF THE STATE OF ILLINOIS, by LISA MADIGAN, ATTORNEY GENERAL OF THE STATE OF ILLINOIS, pursuant to the provisions of the Consumer Fraud and Deceptive Business Practices Act (hereinafter "Consumer Fraud Act"), 815 ILCS 505/1, *et seq,* and the Consumer Financial Protection Act of 2010, 12 U.S.C. §5552 (a)(1), and her common law authority as Attorney General to represent the People of the State of Illinois.

11.     Venue for this action properly lies in Cook County, Illinois, pursuant to Sections 2-101 and 2-102(a) of the Illinois Code of Civil Procedure, 735 ILCS 5/2-101, 735 ILCS 5/2-102(a), because Defendants are doing business in Cook County, Illinois, and some transactions complained of herein occurred and continue to occur in Cook County, Illinois, and the surrounding counties.

## PARTIES

12.     Plaintiff, THE PEOPLE OF THE STATE OF ILLINOIS, by LISA MADIGAN, the Attorney General of the State of Illinois is authorized to enforce the Consumer Fraud Act, 815 ILCS 505/7(a).

13.     Plaintiff, THE PEOPLE OF THE STATE OF ILLINOIS, by LISA MADIGAN, the Attorney General of the State of Illinois, has timely provided a copy of the complete complaint and written notice describing such action or proceeding to the Consumer Financial Protection Bureau, as required by The Consumer Financial Protection Act of 2010, 12 U.S.C. §5552(b)(1)(A) and (b)(1)(C).

14.     Defendant Alta Colleges, Inc., is the parent company of Defendant Westwood Colleges, Inc., and is incorporated in the State of Delaware.  Its principal place of business is 7604 Technology Way, Suite 400 in Denver, Colorado, which is in Denver County.  Defendant Alta owns and operates Defendant Westwood College, Inc.

15.     Defendant Alta is a privately held for-profit education company based in Denver, Colorado.

16.     A Boston private equity firm, Housatonic Partners, was the largest shareholder of Defendant Alta as of 2010.  *See* Ex. 1, S. Rep. No. 112-37, Vol. II, at 206 (2012) *(For Profit Higher Education: The Failure to Safeguard the Federal Investment and Ensure Student Success* by the Committee on Health, Education, Labor and Pensions ("HELP" Committee Report)).  On

information and belief, Housatonic Partners remains the largest individual or corporate shareholder of Alta Colleges, Inc.

17.     Although Defendant Alta resides in Denver County, the acts at issue in this Complaint were conducted in the State of Illinois.

18.     At all times relevant to this Complaint, Defendant Alta formulated, directed, and controlled the acts and practices of Defendant Westwood College, Inc. and its subsidiaries, employees and agents.

19.     Defendant Alta owns the registered trademark "WESTWOOD," under which Defendants market and sell the educational services relevant to this case.

20.     Defendant Alta targets Illinois consumers through internet marketing.

21.     Defendant Westwood College, Inc., is a business operating in the State of Illinois and is incorporated in the State of Colorado.  Its principal place of business is 7604 Technology Way, Suite 400 in Denver, Colorado, which is in Denver County, Colorado.

22.     Defendant Westwood College, Inc. owns and operates separate corporations.  The subsidiaries owned and operated by Defendant Westwood include, but are not limited to, WESGRAY CORPORATION, ELBERT, INC., and EL NELL, INC.

23.     Although Defendant Westwood College, Inc., resides in Denver County, the acts and practices at issue in this Complaint were conducted or completed in the State of Illinois.

24.     At all times relevant to this Complaint, Defendant Westwood formulated, directed, and controlled the acts and practices of Defendants WESGRAY, ELBERT, and EL NELL; and their employees and agents.

25.     Defendants WESGRAY, ELBERT, and EL NELL are registered to do business in the State of Illinois.

26.     Defendant Wesgray Corporation is a business operating in the State of Illinois and

is incorporated in the State of Colorado. Its principal place of business is 7604 Technology Way, Suite 400 in Denver, Colorado, which is in Denver County.

27.    Defendant Wesgray owns and operates two Westwood College branch locations: Westwood College – River Oaks campus, located at 80 River Oaks Center, Calumet City, Illinois; and Westwood College – Loop campus, located at 1 North State Street, Chicago, Illinois.

28.    Defendant Wesgray also operates Westwood College Online. Westwood College Online is located in Broomfield, Colorado and is considered a "branch campus" included within the Wesgray entity.

29.    Defendant Elbert, Inc., is a business operating in the State of Illinois and is incorporated in the State of Colorado. Its principal place of business is 7604 Technology Way, Suite 400 in Denver, Colorado, which is in Denver County.

30.    Defendant Elbert owns and operates one Westwood College main campus location: Westwood College – DuPage campus, located at 7155 James Avenue, Woodridge, Illinois.

31.    Defendant El Nell, Inc., is a business operating in the State of Illinois and is incorporated in the State of Colorado. Its principal place of business is 7604 Technology Way, Suite 400 in Denver, Colorado, which is in Denver County.

32.    Defendant El Nell owns and operates one Westwood College campus location: Westwood College – O'Hare campus, located at 8501 W. Higgins Road, Chicago, Illinois.

33.    Although Defendants Wesgray, Elbert, and El Nell reside in Denver County, the practices, methods, abuses, and unfair or deceptive acts at issue in this Complaint largely occurred in the State of Illinois.

34.    For purposes of this Complaint for Injunctive and Other Relief, any references to

the acts and practices of "Defendants" or "Westwood College" shall mean that such acts and

practices are by and through the acts of Defendants Alta Colleges, Inc., Westwood College, Inc.,

Wesgray Corporation, Elbert, Inc., and El Nell, Inc., and their collective officers, members,

employees, representatives, or other agents and all persons or entities in active concert or

participation with Defendants.

## TRADE AND COMMERCE

35.     Section 1(f) of the Consumer Fraud Act, 815 ILCS 505/1(f), defines "trade" and

"commerce" as follows:

> The terms 'trade' and 'commerce' mean the advertising, offering for sale, or
> distribution of any services and any property, tangible or intangible, real,
> personal, or mixed, and any other article, commodity, or thing of value
> wherever situated, and shall include any trade or commerce directly or
> indirectly affecting the people of this State.

36.     Defendants were at all times relevant hereto, engaged in trade and commerce in

the State of Illinois.

37.     At all times relevant hereto, Defendants have advertised, offered for sale, sold,

and solicited Illinois consumers to enroll in educational courses and degree-granting programs at

Westwood College's Illinois campuses, including but not limited to, the Criminal Justice

Program at Westwood College's Illinois campuses and at Westwood College Online.

38.     At all times relevant hereto, Defendants offered Illinois consumers enrolled at its

institutions the option to finance part of the consumer's Westwood College education using

Defendants' institutional financing program, including, but not limited to, the APEX financing

program.

## DEFENDANTS' COURSE OF CONDUCT

39.     As described below, in the course of trade or commerce in the State of Illinois,

Defendants have engaged in acts or practices that violate both Illinois and federal law.

Defendants' conduct is ongoing and has the potential to impact any Illinois consumer who purchases Defendants' products or services, including Defendants' institutional financing programs.

40.     At all relevant times, Defendants have solicited Illinois consumers through radio advertisements, radio spots, television commercials, magazine advertisements, newspaper advertisements, billboards, direct mailings to consumer's homes, school and job fair booths, online advertisements, and through Defendants' websites, including but not limited to, www.westwood.edu, www.go.westwood.edu, www.westwood.edu/online-learning and www.westwoodsuccess.com.

I.     **Defendants' Aggressive Marketing and Recruiting Practices Target Vulnerable Consumers in an Effort to Enroll as Many Students as Possible, as Quickly as Possible.**

41.     Defendants used television, internet, and radio advertising to interest Illinois consumers in Defendants' Criminal Justice program at Defendants' Chicago-area campuses and for Defendants' online Criminal Justice program.

42.     There is a divide between for-profit and not-for-profit schools in the area of expenditures.  Generally speaking, for-profit schools spend more on marketing, advertising, and division of profits (to shareholders or owners).

43.     Defendants' "marketing" expenditures include Defendants' recruiting expenses, the salaries of the recruiters, advertising space, and "leads" from third-party telemarketing and internet firms. *See* Ex. 1 at 212.

44.     According to Defendants' 2009 "Book of Operations," Defendants utilize "an aggressive marketing plan to produce media leads [students] from a variety of sources including television and internet."  *See* Ex. 2, 2009 Book of Operations (ALTA_00005497-5547).

45.      In 2009, Defendant Alta Colleges, Inc., spent 29.1% of its revenue—$110.8

million—on marketing and recruiting efforts. *See* Ex. 1 at 211.

46.    For much of the time that the Criminal Justice program has been offered in Illinois, Defendants' aggressive marketing practices included enrollment-based compensation bonuses for admissions representatives who were incentivized to persuade prospective students to enroll, regardless of the suitability of a student for Westwood College's programs. *See* Ex. 1 at 217-218.

47.    For example, in 2009, Westwood College's admissions representative Compensation Plan detailed points-based compensation, whereby recruiters that enrolled at least 66-75 students a year could achieve a bonus. Ex. 1 at 218. *See also* Ex. 3, Westwood College Representative Compensation Plan, at 6 (May 15, 2009) (ALTA_00005839-5859).

48.    When prospective students meet with Defendants' admissions representatives, they are intentionally led to believe that they are interacting with college admissions advisors whose job is to help guide them to the most appropriate educational program to achieve their career goals.

49.    In actuality, Defendants' admissions representatives are salespeople trained to mimic a mentoring relationship with prospective students (to whom Defendants refer as "leads" and "prospects") by gaining their trust and building a rapport.

50.    Admissions representatives are trained to ask prospective students probing questions to determine their "drivers," which include their career interests, family support, motivation, schedule, and current work situation.

51.    Admissions representatives are also trained to document each prospective student's "drivers" and "motivators" and then use this information to close the deal with the prospective student/consumer, or convince the prospective student to sign Westwood's enrollment agreement.

52.     Westwood College's training materials instruct that admissions representatives are to "create a sense of urgency" with their leads, and to "work the lead" as soon as possible by phone and e-mail until an on-campus enrollment interview appointment is set.  *See* Ex. 4, Key Responsibility #2: Lead Development, Maintaining High Conversion Rates," at 7 (ALTA_0000941-970).

53.     The aggressive sales pitch continues in person, where admissions representatives are trained to uncover all of the possible obstacles that would discourage prospective students from making an immediate decision to enroll.  *See* Ex. 5, Close and Affirmation: Writing an Applicant who will Graduate (ALTA_000000921-940).

54.     Defendants' training documents provide the following technique to avoid consumer objections:

> **Step 9: Welcome**. "_____ (prospect), I know you are very excited about going (back) to college and you will be anxious to talk to people about your decision. You will come across those people who are 'cheerleaders' and those who are 'dream-killers'. The cheerleaders are those who support your decision about college, like _____ (those individuals they mentioned during the interview i.e. mom, sister, etc….). However, the dream-killers will give you negative reactions. Generally, these reactions come from people that are envious of your decision, What I need to know from you is what are you going to say when you get negative feedback from one of the dream-killers? (Role play with them so they feel comfort with their responses)."

*See* Ex. 6, Admissions 110CN – New Hire Classroom Training Agenda and Workbook, Rev. 01.20.10, at 52 (Senate HELP Committee Doc. No. 26).

55.     Westwood College's admissions representatives have also been trained to give the following response to prospective students who request additional time to think about enrolling at Westwood or suggest enrolling in the next term:

> **Script**: Didn't you say the reason you are interested in school is for better opportunities, challenge, pay and advancement" (Use their drivers and motivators).  The quicker you get started the more realistic those goals will become.  Don't you agree?

*See* Ex. 6 at 57.

56.     As part of the sales pitch to the student, Westwood's admissions representatives

are trained and instructed to create the impression that students were undergoing an evaluation

for admission to a selective college – not open enrollment – and to emphasize the selectivity,

reputation, and competitiveness of Westwood's programs.  *See* Ex. 5, Close and Affirmation:

Writing an Applicant who will Graduate at 4 (ALTA_0000924).

57.     For example, admissions representatives have been instructed to state the

following during the "Vow and Promise Finalization":

> **Script**: "Now (prospect name), as I mentioned before, in order for you to
> move forward, it is a requirement that I recommend you to my Director of
> Admissions. If you were an Admissions Representative, or we were to trade
> places briefly, what would you say to my Director on your behalf?"

*See* Ex. 6 at 17.

58.     In order to further persuade prospective students, Defendants' admissions

representatives have represented to prospective students that Criminal Justice class sizes were

limited, that the student could not be admitted absent a positive recommendation from the

admissions representative, or that Westwood's admissions ratio was highly selective, admitting

only a fraction of the prospective students who apply.

59.     In one recorded phone call with a prospective student, an admissions

representative told the prospective student that only a very small portion of interested students

will be recommended for admission, giving rise to cause for celebration among Westwood

employees:

> You know, I want you to know that on a day-to-day basis, we probably interview
> maybe 50 to 60 students.  And out of those 50 to 60 students, we probably are
> able to, you know, on a good day recommend five to six.  And you heard the
> celebration -- you heard the celebration of everybody, you know, when we were
> able to recommend a student.

*See* Ex. 7, Transcript of ALTA_CALLS_0000011 (70:11-18).

60.    In reality, there is no required or formal recommendation process. According to a senior Alta Colleges, Inc., employee, each student determines whether he or she has met the admission requirements by showing proof of high school graduation or equivalency, and then either meeting the requirements of the placement test or submitting prior examination results.

61.    Despite the representations of selectivity, prospective students often apply for admission and filled out enrollment forms for Westwood's Illinois institutions simultaneously, before receiving any sort of "recommendation" or "acceptance" letter from Westwood College.

62.    In an effort to maximize enrollment numbers, Westwood College admissions representatives are specifically trained and instructed to conduct "trial closes" throughout the enrollment interviews.

63.    If a student raises an objection to signing an enrollment agreement, Defendants recommended the following steps to overcome any objections that a prospective student might have: "(1) Listen, (2) Verify, (3) Isolate, (4) Resolve, (5) Gain Agreement, and (6) Re-close." *See* Ex. 6 at 8.

64.    Admissions representatives are trained to "assume" the sale using the following script:

> **Script:** Great, let's get started (pull out the Enrollment Paperwork and fill in name). What is your current address (fill in on application)? How would you like to take care of your application fee today? We accept cash, credit card, or check (accept payment). I will get you a receipt, and then we will meet with a Financial Aid Representative so they can go over your packet with you. Next, we will schedule you for testing, which is when you will bring in your completed financial aid forms, and your Proof of Graduation.

*See* Ex. 6 at 15.

65.    If a prospective student continues to express concern about enrolling immediately, Westwood College admissions representatives are trained to manipulate the consumer: "gather

up all the enrollment paperwork, pile it all together, and put it away," and say "[m]y mistake. I thought that you were ready to get started." *See* Ex. 6 at 18.

66.     In their hurry to "close" and enroll prospective students, Westwood's admissions representatives often fail to fully explain the enrollment agreement presented to consumers for signature, and in this environment students often sign the enrollment agreement without reading or fully understanding all contractual provisions contained in it.

## II.    Defendants Misrepresent The Total Cost of the Criminal Justice Program In Order Persuade Prospective Students to Enroll Quickly.

67.     Defendants take advantage of students' lack of experience with the financial aid process by downplaying the financial burden associated with attending Defendants' programs.

68.     For example, admissions representatives sometimes provided the cost per term while concealing the fact that the bachelor's program in Criminal Justice has 5 terms per year, unlike the majority of other colleges that have two terms per year.

69.     For example, during one phone call between a prospective student and a Westwood College Admissions Representative, the representative made the following statement:

> Like I said, what it's going to run you, I was meaning to mention this earlier, you're only looking at 4703, $4,703 per term, okay? So that's huge, okay? If you were to look at this type of degree in a university, you're looking at well over a hundred thousand dollars, okay? Now, with this, you're looking only at $4,703 per term, okay? A lot of that is, you know, like I said, most of that -- I would say all of that, depending on what financial door we go down -- excuse me -- we can actually, you know, take care of that, and, you know, like I said, it's just kind of in the steps I told you earlier. But again, what I was mentioning to you is financial aid, you know, is -- you know, there's really no out-of-pocket expenses.

*See* Ex. 7, Transcript of ALTA_CALLS_0000011 (72:15-73:3.)

70.     Westwood College admissions representatives were also instructed to use certain tactics to dodge and generally avoid addressing the questions and concerns posed by prospective students.

71.     For example, if a prospective student asked about the cost of Defendants' tuition, a 2010 admissions representative training manual instructed admissions representatives to: (1) acknowledge that the lead asked the question, i.e. "that's an excellent question"; (2) provide a non-responsive response, i.e. "I am going to write your question down"; and (3) reassure the prospective student that the admissions representative will eventually address the students' question, i.e. "I have a whole section on that which I will be covering a little later on in the interview." *See* Ex. 6 at 16. *See also* Ex. 8, "Answering Prospect Questions" (ALTA_00001460).

72.     However, federal student loans often can not cover 100 percent of the cost of Westwood's Illinois degree programs, and students are generally required to find additional funding in order to stay in the program.

73.     This often required finding private loans, and thus filling out additional loan applications.

74.     Once an admissions representative persuades a prospective student to enroll, the admissions representative then arranges a meeting with a financial aid officer so that the prospective student may apply for federal grants, federal loans, and private loans to cover the cost of attendance.  The financial aid officers share responsibility for closing the sale.

75.     The training materials recommended that admissions representatives explaining the financial aid process should "[i]ncrease energy and enthusiasm – Financial Aid is Easy and Affordable." *See* Ex. 9, "Psychology of the Phone Script and Seven-Step Interview" at 27 (ALTA_0000150616-ALTA_0000150646).

76.     Defendants' training materials instructed the admissions representatives how to "close" when discussing tuition and financial aid.  *See* Ex. 9; *see also* Ex. 10, "The Art of Closing Without Closing."

77.     According to the training materials, admissions representatives were to finish the financial aid discussion by asking: "Do you see that Westwood can help make this [the cost of Defendants' programs] affordable and obtainable financially through our financial aid process?" *See* Ex. 10 at 10.

78.     For example, the training materials that Defendants provided to their admissions representatives instructed the admissions representatives to stress that "EVERYTHING is charged to a student account that we set up for you. (Identify pain point and dig)." *See* Ex. 10 at 8 (emphasis in original).  The materials further stress that financial aid assists with paying the student account.

## III.     Defendants' Institutional Financing Program Is Unfair, Deceptive and Abusive, and Designed to Manipulate Federal Regulations and Target Vulnerable Demographics.

### A.     Defendants' revenue is dependent upon student tuition payments and funding from federal student aid programs.

79.     Defendants' revenue comes almost exclusively from the tuition payments of its students.

80.     Defendants' business model relies on using aggressive marketing practices in order to take advantage of the students who lack sophistication when it comes to financial aid and the costs of higher education.

81.     Nearly all of Defendants' enrolled students pay their tuition using federal student aid programs authorized by Title IV of the Higher Education Act of 1965, which provides grants, loans and work-study funds from the federal government to eligible students enrolled in college or career school.

82.     In 2010, Defendant Alta Colleges, Inc. reported to the Senate HELP Committee that 83.9% of its revenue—$338 million—came from Title IV Federal financial aid programs. *See* Ex. 1 at 208.

83.     In 2010, Defendant Alta Colleges, Inc. also reported to the HELP Committee that approximately 4.6% of its revenue—$17.5 million—came from the Department of Defense Tuition Assistance and post-9/11 GI bill funds.  *See* Ex. 1 at 208.

84.     Defendant Alta Colleges, Inc. has more than tripled the amount of Pell grant funds it has collected, from $25.4 million in 2007 to $87.6 million in 2010.  *See* Ex. 1 at 210.

**B.      A federal regulation known as the 90/10 Rule applies to nationally accredited, career-focused colleges such as Westwood College.**

85.     To qualify to receive federal student aid revenues under federal law, for-profit schools like Defendants are generally required to derive no more than 90% of their revenue from federal student aid. The remaining 10% must come from private sources, such as private loans or cash payments from students.  Institutions that exceed this 90/10 ratio risk losing federal money. This benchmark disqualifier is generally referred to as the "90/10 Rule."

86.     In this context, the measure of value of a for-profit school's educational program is gauged by the willingness of non-governmentally affiliated market participants to undertake a degree of investment risk.

87.     Because Defendants earn the lion's share of their revenue from federal student aid, in order to preserve access, maximize revenue and ensure profitability, Defendants must ensure adequate non-federal cash flow.

88.     One way that for-profit schools like Defendants can ensure non-federal cash flow is by using 'institutional financing' to fill whatever gap exists between available federal aid and the cost of tuition.

89.     At least as early as 2002, Defendants designed and implemented their in-house institutional financing program.  Initially, it was referred to as the Westwood Loan, then later on as the Supplemental Student Financing program. It is now referred to as the "APEX" program.

90.     On paper, Defendants lose money on the APEX program. But repayment on institutional loans is only a secondary concern. Defendants use institutional financing as a 'loss-leader' to bring federal aid through the door. The overall losses that Defendants sustain on the institutional financing loans are more than offset by federal student aid dollars they receive. For each dollar of student revenue that Defendants create using institutionally-funded loans, Defendants are able to leverage up to nine dollars in federal student aid revenue.

### C. Defendants' institutional financing products are sales contracts.

91.     Despite being called a loan for a brief period of time, Defendants' institutional financing contracts, including the APEX financing program, are structured as retail installment sales contracts.

92.     The format of Defendants' APEX retail installment sales contract is generic and uniform.

93.     Defendants' sales contract describes the Seller as "ALTA COLLEGES / dba Westwood College (the 'school')."

94.     Defendants' sales contract describes the student borrower as the "Buyer."

95.     Defendants' sales contract variously refers to the goods or services sold as "Criminal Justice" or "Bachelors in Criminal Justice" or "9LCJB1."

96.     Necessarily, Defendants' sales contract provides for a "Cash Price" in the amount required to cover the funding gap between federally-underwritten financial aid and the cost of Westwood tuition.

97.     Defendants' sales contract provides that while in school, students must make payments of approximately $150 a month.

98.     Defendants' sales contract provides that while in school, no interest accrues on the loan as long as a student remains current with their monthly APEX payment.

99.     Defendants' sales contract provides that if a balance remains 90 days after graduation or after separation from the school, the unpaid balance is financed at rates of interest as high as 18%.

100.     Defendants' APEX sales contract also explicitly defines the term "Default."

101.     A borrower defaults if he or she fails to make a full payment when due, goes bankrupt, dies, or leaves school for any reason other than graduation.

102.     A student who does not make the monthly payment is in default pursuant to the terms of Defendants' installment sales contract, but Westwood treats the student as current so long as the student is enrolled.

103.     If a student ceases paying on the APEX obligation while in school, at the discretion of the campus president the student may be removed from a class, removed from the school, or allowed to continue his or her studies.

104.     Students who are declared in default on their in-school APEX payments may be reported to the credit reporting agencies, face collection activity, face disciplinary action in school, or face legal action in arbitration.

105.     While Defendants claim that since 2009 they have not assessed interest as provided under the terms of their retail installment contracts, if students default on their APEX payments, their accounts are referred to a third party collection agency.  Only after the third-party collection efforts fail to produce do Defendants abandon their collection efforts.

106.     Defendants -- or any subsequent holder of Defendants' sales contract, by assignment, purchase, or by operation of law -- may accelerate the obligation and require immediate payment of the entire unpaid balance without notice or demand.

**D.     Defendants target vulnerable student populations with their institutional loan programs.**

107. Defendants focus their enrollment efforts on prospective students from a select market niche, exploiting a particularly disadvantaged and vulnerable population that suffers a history of limited product familiarity and market access.

108. For-profit schools, and Westwood in particular, are much more likely to enroll students who receive Pell grants (financial aid for low income students). According to Westwood's own expert in this litigation, this suggests that Westwood students are more disadvantaged than even the average for-profit student in terms of socioeconomic background.

109. Students at for-profits colleges are less likely to have parents with a bachelor's degree than students at public or private not-for-profit schools. Westwood students are particularly disadvantaged when it comes to having a parent with a bachelor's degree. According to Westwood's own expert in this litigation, only 34.1 percent of Westwood students report this characteristic.

110. For-profit schools like Defendants are much more likely to serve students from racial and ethnic minority groups. Westwood's Illinois campuses serve an even higher fraction of Black and Hispanic students than the average for-profit college.

111. The socioeconomic disadvantages faced by many Westwood College students make it more likely that Westwood College students will be less knowledgeable about higher education choices and financial aid, and therefore an easy mark for unfair and abusive predatory lending practices.

      **E.**     **Defendants misrepresent or conceal how APEX works, what obligations borrowers will incur, and the high likelihood that borrowers will default.**

112. Students who are unable to pay the balance of their tuition with their own funds or through private sources are frequently enrolled in the APEX financing program or one of its predecessors.

113.    Defendants retain data indicating that, on a regular basis, more than 50% of APEX loans made to Criminal Justice students will default.

114.    In some years, the default rate on APEX financing agreements or loans made to students in the Criminal Justice program has exceeded 90%.

115.    In spite of Defendants' knowledge of these outcomes, Defendants encourage students to borrow these funds so that Defendants can maximize their Title IV federal loan revenue.

116.    Defendants never disclose to students the fact that a majority of APEX borrowers have historically defaulted on their loans.

117.    In failing to disclose that a majority of APEX borrowers will default, Defendants take advantage of the trust that students place in Defendants' admissions and financial aid representatives.

118.    Defendants also make misrepresentations and fail to disclose certain terms of Defendants' institutional financing programs, including the APEX financing program.

119.    For example, Defendants train their admissions representatives to emphasize that students will have to pay only $150 per month.

120.    Admissions representatives do not discuss, however, the fact that interest will accrue on any balance remaining 90 days after separation from the school.

121.    Defendants also create confusion about APEX through their misleading description of the nature of the program.

122.    For instance, one of Defendants' representatives assured a prospective student that Westwood would "pick up the difference" between federally-underwritten financial aid and the cost of Westwood tuition: "…Westwood will pick up the difference for you, and then we'll

set you up on a monthly payment plan…" *See, e.g.,* Ex. 7, Transcript of ALTA_CALLS_11 (67:9-16).

123.   During the same recorded phone call, Defendants' representatives said, "You know, when you don't have the money, we kick in the difference. And it's not based off of a credit decision. It's based off of good faith. It's based on the fact that you're going to be a good student." *See*, *e.g.,* Ex. 7, Transcript of ALTA_CALLS_0000011 (71:7-11).

124.   Additionally, Defendants' admissions representatives and financial aid counselors will emphasize that students will have to pay only relatively small payments, generally $150 per month or less:

> "Westwood College has a means where we actually go through a bank. We work in conjunction with a bank to give you a loan for school where you can make payments on that -- on your education that will only -- you know, while you're going to school."

> "The payment will never exceed $150 a month, okay?"

*See*, *e.g.*, Ex. 11, Transcript of Call 14a_rcd_13b5e6f95c7200ab_3de4ebc (59:10-16).

125.   Representing the program in this manner conceals the material fact that any balance remaining after graduation can be subject to interest rates of up to 18%.

126.   The predictable result of the misleading ways in which APEX is described is that students misunderstand the nature of the program.

127.   In particular, they have led students to believe that, upon graduation, their previously made payments in total are sufficient to meet their obligations under APEX.

128.   For example, at her deposition, former Criminal Justice student D'Vonna Cobb testified that she recalled a monthly payment of $150, but that she did not recall anyone explaining the terms of the loan to her. Ms. Cobb further testified that "the only thing that [her admissions representative] explained was that $150 a month." (Cobb Dep. 98:15-102:8 and 108:3-18).

129.     Another former student, Latoya Hill, when questioned about her student loans, testified that she had not heard of APEX until she started receiving correspondence from them and did not understand what it was. Ms. Hill also testified that she understood that she was receiving federal government loans but did not understand that she had received financing outside of federal loans.  (Hill Dep. 124:19-125:22).  Ms. Hill testified that she was told that she would have to pay a monthly fee and that she did not recall signing up for APEX financing. (Hill Dep. 165:17-168:10).

130.     Carmella Sullivan, a former Criminal Justice student at Defendants' Loop campus, testified at her deposition that she signed a document for the Westwood Financing Program and that the Financial Aid representative provided her the document without explaining the terms of the financing agreement. Ms. Sullivan also testified that she thought that she would only have to pay $110 per month while she was enrolled in school. The financial aid officer did not explain that the $110 per month were loan payments to the school. The financial aid officer did not explain that she took out a loan with Westwood. The financial aid officer did not explain that Ms. Sullivan would be obligated repay the remaining balance at 18% interest after graduation. (91:11-95:09 and 95:22-97:20)

131.     Because of the inconsistent and incomplete information they receive, students are unable to make an informed decision about whether to sign up for APEX.

132.     Students' confusion is amplified by the environment in which Westwood markets APEX. Students report feeling rushed through the financial aid process, unable to review or comprehend key documents concerning their obligations.

133.     Defendants, meanwhile, demonstrate indifference toward the APEX program's high rate of default and the impact of that default rate on students.

134.    Those students who default—a majority—face collection efforts both in school and out of school.

135.    Defendants are aware of the dismal performance of the APEX program and the resulting harm to their students. Defendants track the level of reserves on APEX for students in school, track the payment delinquency status for students who are no longer in school, allow for doubtful APEX accounts, and estimate what level of losses they expect to experience on APEX receivables.

136.    In spite of their knowledge that a majority of students will default, and in spite of the harm to those students who do, Defendants continue to direct students into APEX financing.

IV.    **Defendants Misrepresent the Meaning of Westwood Colleges' Existing Accreditation and the Attainability of Additional Accreditation.**

A.    **Defendants' Illinois Institutions Have Been at All Times Nationally Accredited, not Regionally Accredited.**

137.    Accreditation is a voluntary system of peer review conducted by non-governmental accrediting bodies to determine and ensure uniform and quality higher education.

138.    Accrediting associations are recognized by either the Council for Higher Education Accreditation (CHEA) or the U.S. Department of Education (DOE) as authorities as to the quality of postsecondary education within the meaning of the Higher Education Act.

139.    Institutional accreditors evaluate and accredit an entire educational institution. Institutional accreditation is provided by regional and national associations.

140.    The majority of regionally accredited colleges and universities require that credits be earned at another regionally accredited institution in order for the credits to be transferable.

141.    All of Defendants' Illinois institutions, including Westwood Online, are nationally accredited by the Accrediting Council for Independent Colleges and Schools (ACICS).

142.   Defendants' Illinois institutions, including Westwood Online, have never been regionally accredited.

143.   There are six regional associations that are recognized as accrediting bodies by CHEA and DOE.  The North Central Association, Higher Learning Commission (HLC), located in Chicago, Illinois, is the regional accreditation body that accredits degree-granting institutions of higher education in Illinois.

144.   In 2004, Defendants sought affiliation and accreditation with HLC through HLC's Candidacy Program.

145.   In November 2004, Defendants started HLC's candidacy Self Study process.

146.   In March 2005, Defendants submitted its Preliminary Information Form to the Higher Learning Commission, which is the first step in the process of obtaining initial accreditation status.

147.   In February 2006, HLC approved Defendants' Preliminary Information Form.

148.   In March 2007, Defendants submitted their Self-Study Report to HLC in support of their application for accreditation.

149.   On September 24, 2007, HLC's Review Committee issued a report granting Defendants' candidacy application, but also noting that the "default rate for student loans is high and increasing" and that despite high levels of spending on recruiting, Westwood had "less than a 50% retention rate."  *See* Ex. 12, HLC Review Committee Report (Sept. 24, 2007).

150.   On October 12, 2007, HLC sent a letter to Defendants, confirming that HLC Board of Trustees ratified the Review Committee's recommendation that Defendants be granted candidacy status.

151.   HLC requires that all applicants hold candidacy status for at least two years.

152.   The candidacy period lasts for a maximum of four years.

153.     Thus, the earliest that Defendants could have possibly attained regional accreditation was October 2009.

154.     HLC never promised Defendants that any of Defendants' Illinois institutions were sure to or guaranteed to receive regional accreditation from HLC.

155.     Any statement made by Defendants or Defendants' representatives implying with certainty that Defendants would or could be accredited by HLC before October 2009 would have been false.

156.     The granting of candidacy status with the HLC does not guarantee that an entity will be granted regional accreditation.

157.     HLC's Evaluation Team conducted on-site visits during May and June 2009.

158.     The Evaluation Team's report noted that the HLC had received student complaints alleging "(a) deceptive or incomplete institutional information related to cost of attendance, the ability to transfer credits and the role of accreditation, (b) fraudulent handling of student aid programs, alternative loan programs or interest rates related to such programs, . . . (c) the credentials, role and expertise of admissions representatives and/or (d) quality of instruction by faculty and the rigor of the curriculum." *See* Ex. 13, HLC's Evaluation Report at 4 (Nov, 18, 2009).

159.     The Evaluation Team's report includes a recommendation that Defendants remain in candidacy status, stating that "the team recognizes that Westwood College has made significant progress toward becoming accredited, but it is also the team's judgment that the college would be best served to remain in candidate status while it deals with the numerous issues identified in this report." *See* Ex. 13, p. 35.

160.     On February 17, 2010, HLC's Board of Trustees issued a letter confirming its decision to continue Defendants' candidacy and attached a Statement of Affiliation Status which

states Defendants were in candidacy for accreditation. *See* Ex. 14, Ltr from HLC to G. Burnett, Westwood College (Feb. 17, 2010).

161.    On November 1, 2010, Defendants withdrew their candidacy application with HLC. *See* Ex. 15, Letter from George Burnett, Westwood College, to Sylvia Manning, HLC (Nov. 1, 2010).

**B.    Defendants' admissions representatives omitted material information concerning Defendants' accreditation and misrepresented Defendants' accreditation status to current and prospective Criminal Justice students.**

162.    During the relevant time frame, potential Criminal Justice students met with or spoke with Defendants' admissions representatives to learn more about Westwood College, take a tour of one of Defendants' campuses, take a placement exam, or complete enrollment paperwork.

163.    Prospective Criminal Justice students were encouraged to discuss their career goals and motivations for considering Westwood with admissions representatives.

164.    During such discussions, Defendants' admissions representatives persuaded prospective students to enroll in Westwood by making the following misrepresentations or omitting the  material and true facts about Defendants' accreditation status:

      a.    That Defendants were both nationally and regionally accredited;

      b.    That Defendants were "accredited" or "fully" accredited, either without disclosing the significance of the difference between national and regional accreditation or by misrepresenting the meaning of regional and/or national accreditation;

      c.    That Defendants were in the process of becoming regionally accredited and would attain regional accreditation by a date certain;

      d.    That Defendants were in the process of becoming regionally accredited and would attain regional accreditation by the time the inquiring student was scheduled to

graduate; and

    e. That if the student graduated before Defendants were regionally accredited, then the student's degree would be automatically deemed regionally accredited as well.

165. Some prospective Criminal Justice students specifically asked admissions representatives or other campus representatives whether the student would be able to obtain a master's degree or law degree after completing a Westwood bachelor's degree program.

166. In response, admissions representatives typically assured these students that they would be able to pursue higher degrees based on their Westwood bachelor's degree.

167. Defendants' representatives failed to inform such students that further educational opportunities, such as master's degrees, law degrees, or doctoral programs, were limited for students who applied with only a bachelor's degree from a nationally accredited college or university. Defendants failed to inform students of the limited opportunities to pursue master's degrees, doctorates, or law degrees with the intent that students rely on Defendants' omission and enroll or stay enrolled at Westwood. The fact that further educational opportunities may be limited for someone whose only bachelor's degree is from a nationally accredited college or university would have been considered a material fact for many students with ambitions to pursue graduate degrees.

168. Some prospective students specifically asked admissions representatives about their credit transferability options in case they needed to transfer to another college or university.

169. In response, Westwood College Admissions Representatives often assured these prospective students that Westwood's credits were just as likely to transfer, or not to transfer, as credits from any other college or university because each school determines its own policy. Even when directly asked, Defendants failed to fully explain how the credit transfer process works, or to explain that credits from nationally accredited institutions are unlikely to transfer to

a regionally accredited institution.

170.    In fact, if a student seeks to transfer credits or to seek a master's degree, regionally accredited schools usually will not accept or recognize credits from a nationally-accredited school.

**C.  Defendants' instructors and staff further misrepresented Defendants' accreditation status to Criminal Justice students.**

171.    Once students were enrolled in Defendants' program, some students continued to ask Defendants' instructors and administration about Defendants' accreditation.

172.    Approximately ten students expressed their concern to Criminal Justice instructor Eric Reynolds while he was employed as an instructor at the Chicago Loop Campus.  Students expressed concern to Mr. Reynolds that they were unable to transfer to schools such as Chicago State University, Roosevelt University, Northeastern University, and DePaul because those schools would not accept Defendants' credits.

173.    In addition, between 2004 and 2008, there was discussion among Criminal Justice students at Defendants' Illinois campuses regarding accreditation. Specifically, former Westwood Criminal Justice students informed enrolled students that other colleges would not accept Westwood credits and that law enforcement agencies would not accept Westwood's nationally accredited degree.

174.    In response to student concerns, Defendants' faculty and administration made assurances to students regarding regional accreditation after students expressed concern about accreditation issues.

175.    In some instances, Defendants' faculty and administration falsely represented to students that Defendants would obtain regional accreditation by a certain date.

176.    In other instances, Defendants' faculty and administration falsely represented to

students that, upon graduation, students would be "grandfathered in" and considered to have a regionally accredited degree once Defendants had attained regional accreditation.

177.    Defendants' practice of making misrepresentations regarding their accreditation status, including the time by which Defendants would attain regional accreditation, was intended to prevent students from withdrawing from Defendants' Criminal Justice program, which would have resulted in a loss of revenue for Defendants.

### i. Accreditation Misrepresentations at the DuPage Campus

178.    Students enrolled at Defendants' DuPage in October 2007 were told during the admissions process that Westwood would be regionally accredited "next year" or in 2008.

179.    In or about 2008, Defendants' DuPage campus President, Kelly Moore ("Ms. Moore") made several classroom visits for the purpose of addressing accreditation rumors.

180.    In 2008, Ms. Moore also spoke at a student assembly and told students that Defendants would be regionally accredited by the time the students graduated.

181.    In 2009, Ms. Moore and several other instructors and administrators went to different classrooms to inform students that Defendants were in candidacy to be regionally accredited and should be regionally accredited by the end of 2009.

182.    When students expressed concern regarding accreditation, Ms. Moore repeated her assertion that Defendants would be accredited by the end of 2009.

183.    Ms. Moore also stated that if Defendants became regionally accredited after students had graduated, students could come back, take another course, and receive a new regionally accredited diploma.

### ii. Accreditation Misrepresentations at the Chicago Loop Campus

184.    Students at Defendants' Chicago Loop campus routinely asked instructors and administration about Defendants' accreditation, job opportunities and transfer of credits.

185.    Between 2005 and 2007, there were discussions among students at Defendants' Chicago Loop campus regarding accreditation and transfer of credits.

186.    Specifically, former Westwood students informed enrolled students that other colleges would not accept Westwood credits, and that the Chicago Police Department would not hire Westwood graduates because Westwood was not regionally accredited.

187.    In response, Defendants' agents, including, but not limited to Defendants' Chicago Loop campus Academic Dean, Dillon Rasmussen, assured students that Defendants institutions would be regionally accredited by the time the students graduated.

188.    In some instances, Defendants' agents, including, but not limited to Mr. Rasmussen, told students that if they graduated before Defendants obtained regional accreditation, their diplomas would be "that much more valuable to employers" and that no employers would check the students' graduation date.

189.    In at least one instance, Mr. Rasmussen told students that Defendants were in the process of obtaining regional accreditation and that even those who had graduated before Westwood became accredited would be "grandfathered in" and their "degrees would be worth the same" as students who had graduated after Defendants became accredited.

**V.     Defendants Made Misrepresentations and Omitted Material Facts about the Employment Outcomes for the Criminal Justice Program.**

190.    At all relevant times, Defendants' Westwood College offered educational courses and a bachelor's degree in Criminal Justice.

**A.     Defendants falsely advertised the eligibility of Westwood College graduates to secure employment in the Criminal Justice field.**

191.    Defendants began offering a bachelor degree in Criminal Justice to students in Illinois in 2004.

192.     Defendants' website marketed the Criminal Justice program, including the potential careers that would be launched by a degree from Westwood College.  For years, Defendants' website marketed to prospective and enrolled students that a bachelors' degree from Westwood College would lead to a career in law enforcement, corrections, or border control.  To the extent Defendants advertised other careers in Criminal Justice, Defendants touted work as private detectives, corporate investigators, and, later, youth counselors.

193.     Defendants' advertisements suggest that students who graduate with a Westwood degree in Criminal Justice will be eligible to obtain positions within the Criminal Justice field based on their Westwood diploma and education.

194.     Defendants represent that Criminal Justice program graduates would find themselves prepared for careers in a variety of fields, including, but not limited to, positions as corrections officers, police or patrol officers, probation officers, children's advocates, youth care counselors, victim's advocates, federal agents, crime scene investigators, forensic scientists, and coroners, border patrol agents, legal investigators, corporate investigators, private security providers, or customs agents.

195.     In 2005 and 2006, Defendants' website advertised "Potential Career Paths" that listed 6 titles:

- Criminal Investigator
- Border Patrol Agent
- Crime Scene Technician
- Private Detectives
- Corporate Investigators
- Detectives

*See, e.g.,* http://web.archive.org/web/20051028122852/http://westwood.edu/degrees/criminal-justice/criminal-justice-degree.asp  and http://web.archive.org/web/20060207065606/http://www.westwood.edu/degrees/criminal-justice/criminal-justice-degree.asp

196.     In January 2007, Defendants' website advertised "Some of the Criminal Justice jobs that Westwood College students can qualify for include" and listed just three categories: "Correctional Officer" "Law Enforcement Officer" and "Border Patrol Agent."

*See, e.g.*, http://web.archive.org/web/20071013203528/http:/westwood.edu/degree-programs/criminal-justice-online/career.asp

197.      Defendants described law enforcement positions as follows: "Law enforcement officers maintain regular patrols and respond to calls for service. They may direct traffic at the scene of an accident, investigate a burglary, or give first aid to an accident victim. Officers are usually assigned to a specific type of duty."

198.     At the same time, Defendants used photos of police officers and referenced television shows to market the Criminal Justice program online.

199.     In 2007, the "Overview" page for Defendants' Criminal Justice program featured a photograph of a police officer next to a squad car. Under it, Defendants stated "Why are there so many TV shows about the Criminal Justice system? Because it's exciting. All the dynamic elements that make for great TV also make for a great career. It's challenging, stimulating and constantly evolving. Learn the techniques, study the technologies and take the first step toward a dynamic career in Criminal Justice with a degree from Westwood College."

200.     Defendants also claimed that students could "Enter a growing field with your Westwood degree. Police and Sheriff's Patrol Officer jobs are predicted to increase 15.5% between 2004-2014."

*See, e.g.*, http://web.archive.org/web/20071009104852/http://www.westwood.edu/degree-programs/criminal-justice-online/degree.asp

201.     In 2008, Defendants amended the list of "Criminal Justice jobs that Westwood students can qualify for" to include "Investigator" "Children's Advocate" "Youth Care Counselor" "Youth Treatment Counselor" and "Community Relations Manager." That listing

remained into 2009.  Defendants also cited the purported employment of their graduates:

"Graduates from Westwood College have secured career titles including Corrections Officer and

Investigator. Other graduates have gone on to become Youth Treatment Counselors and

advocates within the justice system."

*See, e.g.*, http://web.archive.org/web/20090312061722/http://www.westwood.edu/degree-programs/criminal-justice-online/career.asp  and
http://web.archive.org/web/20090312061722/http://www.westwood.edu/degree-programs/criminal-justice-online/career.asp

202.    Defendants also claimed that the focus of the curriculum would aid the students in

their career path.  "At Westwood College students are able to focus their studies on the topics

that interest them most.  This means that the vast majority of credit hours required for graduation

are taken within the career major." The course curriculum was covered on the website: "Basic

Criminal Justice courses include Introduction to Criminal Justice I & II, Criminology I & II,

Juvenile Justice I & II, Criminal Law I & II, Criminal Procedure I & II, and Criminal

Investigation I & II.  Other related courses include Probation and Parole, Terrorism, and more.

These courses are designed to be useful in careers after graduation, meaning that your education

is truly valuable in the workplace."

*See e.g.*, http://web.archive.org/web/20080918235006/http://www.westwood.edu/degree-programs/criminal-justice-online/courses.asp

203.    Nearly all of the students who graduated from Defendants' Criminal Justice

program on or before September 30, 2012 would have been enrolled on or before September 30,

2009.

204.    In 2009, Defendants created the School of Justice, which housed the Criminal

Justice program as well as a paralegal program.  Thus, in 2009, the Criminal Justice program

touted that "Once you graduate, you will be fully prepared to begin your career as an

investigator, corrections officer, children's advocate or youth care counselor. And with your

help, justice will prevail."

*See, e.g.*,
http://web.archive.org/web/20090405104337/http://www.westwood.edu/programs/school-of-justice/criminal-justice/

205.    By August 2012, Defendants had revised the website for Criminal Justice to

reflect the actual career path of most graduates.  Thus, in August 2012, Defendants' website for

the School of Justice stated that "Whether you are interested in the correctional system, youth

advocacy, private security or law enforcement, a Criminal Justice degree from Westwood can

help you launch the career you desire."  Defendants had expanded the Criminal Justice program

to include "majors" with a focus on "administration," "corrections," and "investigations."

Defendants also offered an associate's degree in Criminal Justice.  In Illinois, however,

Defendants offer a bachelor's degree in Criminal Justice with a "Major in Administration."

*See e.g.*,
http://web.archive.org/web/20120826115919/http://www.westwood.edu/programs/school-of-justice

206.    "A Westwood College Criminal Justice: major in administration degree will

prepare you for entry-level careers in a variety of Criminal Justice areas, including victim

assistance, youth counseling and the court system."  The website further suggested career fields

open to students in this major:

> WHERE COULD YOUR CRIMINAL JUSTICE: MAJOR IN ADMINISTRATION
> DEGREE TAKE YOU?
> Our Criminal Justice: major in administration bachelor's degree program provides the
> educational background and hands-on experience necessary to successfully begin a career
> in Criminal Justice. Take a look at a few of the career fields that may be available to
> graduates of this program:*
> - Corrections
> - Criminal Justice
> - Juvenile justice
> - Security

\*Graduates without experience in the field will likely start in entry-level positions.

*See e.g.*,
http://web.archive.org/web/20120826191627/http://www.westwood.edu/programs/school-of-justice/criminal-justice-major-in-administration

207. By August 2012, Defendants had begun to identify selected employers of graduates from the School of Justice. In August 2012, that list included security companies, such as Allied Barton Security, as well as U.S. Department of Homeland Security.

208. Defendants solicit consumers to apply to Defendants' Criminal Justice Program through direct e-mail marketing. *See, e.g.,* Ex. 16, Email from Westwood College to Joshua Hanewinkel (May 15, 2010).

209. These direct e-mails advertised the Westwood College School of Justice as a place to prepare for a career as a law enforcement officer.

210. Defendants also solicited Illinois consumers to apply to Defendants' Criminal Justice Program through television advertising.

211. For example, one of Defendants' television advertisements promoting their Criminal Justice Program touts:

> Passionate about justice? A degree in Criminal Justice from Westwood College is your key to a rewarding career. High paying jobs in Criminal Justice are growing faster than average with exciting job opportunities; like law enforcement officer, legal investigator, youth probation officer, and more.
>
> Call now for Westwood's free career success kit with the latest Criminal Justice salary information.
>
> Westwood provides all the tools you need to get your career going fast.
>
> Faculty with real-world experience. . .
>
> Hands-on training. . .
>
> Field demonstrations in the classroom. . .

Plus, a bachelor's degree in only three years, so you can make a difference sooner. . .
Westwood College; a place where you can succeed.

Call now for Westwood's free career success kit.

212. Another television advertisement promoting Defendants' Criminal Justice Program states as follows:

I always wanted a career serving others but this [dish washer pictured] wasn't what I had in mind.

Then I decided to give Westwood College a call. With a degree in Criminal Justice, there are tons of opportunities to really make a difference, like being a youth care counselor, a law enforcement officer, or a children's advocate.

With my degree from Westwood, I went from this [dish washer pictured] to this [woman in suit with child pictured].

So call Westwood now and start your career.

Get your bachelor's degree from Westwood in just three years. Start today with your free career success kit.

213. Some of Defendants' television advertisements for the Criminal Justice Program also contain repeated dramatic images of police officers investigating crime scenes and apprehending criminals. *See* Ex. 17, Screenshots of Westwood Television Commercial Advertisements.

214. During the same time frame during which Defendants' advertisements appeared, a number of Illinois law enforcement agencies and municipalities required applicants for law enforcement positions to have a bachelor's degree from a regionally accredited university.

215. Despite knowing that many prospective students wanted to be law enforcement officers, Defendants' advertisements and email communications failed openly and clearly to inform their students that that a number of Illinois law enforcement agencies did not accept Westwood's credits or degree.

216.    Defendants advertised the availability of careers as law enforcement officers despite knowing that an extremely small percentage of Defendants' Criminal Justice program graduates in Illinois have become law enforcement officers.

**B.      Defendants' Representatives Made Misrepresentations and Material Omissions about Westwood Criminal Justice Graduates' Eligibility to Secure Employment in Law Enforcement.**

217.    Prospective Westwood Criminal Justice students frequently informed Defendants of their desire to become law enforcement officers, and specifically mentioned employment with the Chicago Police Department and the Illinois State Police.

218.    Defendants' Criminal Justice program was never granted regional accreditation and therefore did not meet the requirements for employment for the Chicago Police Department (until 2010), the Illinois State Police  and other law enforcement agencies.

219.    The Chicago Police Department set the following minimum educational requirements for persons applying for a Police Officer position during the November 2003 hiring cycle:

>    Applicants must have at least 60 semester (or 90 quarter) hours of credit, prior to January 31, 2004, from a college or university **accredited by one of the six regional accrediting bodies** responsible for evaluating two and four year institutions that grant Associate's and Bachelor's degrees.

*See* Ex. 18, Chicago Police Department 2003 Job Update press release.

220.    The Chicago Police Department set the following minimum educational requirements for persons applying for a Police Officer position during the June 2006 hiring cycle:

>    Applicants must have at least 60 semester (or 90 quarter) hours of credit, prior to August 31, 2006, from a college or university **accredited by one of the six regional accrediting bodies** responsible for evaluating two and four year institutions that grant Associate's and Bachelor's degrees. … Also acceptable are applicants  …  who have completed 30 semester (or 45 quarter hours from a college or university accredited by **one of the six regional accrediting bodies** responsible for evaluating two and four year institutions that grant Associate's and

> Bachelor's degrees and one year of continuous active duty in the armed forces of
> the United States . . .

*See* Ex. 19, 2006 City of Chicago Police Officer Examination Announcement (emphasis added).

221.    The Chicago Police Department did not accept a Westwood bachelor's degree as

meeting its educational requirements until sometime in late 2010.

222.    With limited exceptions not related to education, throughout the relevant time

period, the Illinois State Police Merit Board required persons applying for positions as an Illinois

State Trooper to have a post-secondary degree from an institution accredited by one of the

following regional accrediting agencies:

> Middle States Association of Colleges and Schools
> North Central Association of Colleges and Schools
> New England Association of Schools and Colleges
> Northwest Association of Schools and Colleges
> Southern Association of Colleges and Schools
> Western Association of Schools and College

*See* Ex. 20*,* Illinois State Merit Board Pre-Employment Requirements,

223.    The Schaumburg Police Department specifically requires that applicants possess a

"Bachelor's Degree from a North Central College Association [regionally] accredited college at

the time of the written exam."  *See* Ex. 21, Schaumburg Police Department Pre-Employment

Requirements.

224.    The Will County Sherriff's Office specifically requires that applicant's for Deputy

Sheriff possess an associate's degree or minimum 60 semester hours from a regionally accredited

colleges.   *See* Ex. 22, Will County Sherriff's Office Employment Requirements.

225.    Defendants withdrew their candidacy application for regional accreditation on

November 1, 2010, and at no point prior to that were ever regionally accredited.

226.    Degrees conferred by Defendants between 2004 and 2009 did not meet the

minimum educational requirements posted for employment as a police officer with the Chicago

Police Department, as posted by the Chicago Police Department in November 2003 and June 2006.

227.    Degrees conferred by Defendants do not meet the minimum educational requirements for persons applying for an Illinois State Trooper position.

228.    Degrees conferred by Defendants do not meet the minimum educational requirements posted for employment as a police officer with the Schaumburg Police Department.

229.    Degrees conferred by Defendants do not meet the minimum educational requirements posted for employment as a police officer with Will County Sheriff's Office.

230.    Degrees conferred by Defendants do not meet the minimum educational requirements posted for employment as a police officer for many other County and suburban police departments.

231.    Despite the fact that Defendants did not meet the minimum educational requirements for employment with the Chicago Police Department ("CPD") until late 2010, members of Defendants' faculty and staff told current and  prospective students that they could secure employment with the CPD upon graduating from Westwood.

232.    Defendants failed to clearly inform prospective and current students in the Criminal Justice Program they would not be eligible to become officers of the Chicago Police Department based on credits earned at Westwood's Illinois institutions, with the intent that students rely on Defendants' misrepresentations and omissions and enroll or stay enrolled in Westwood's Criminal Justice program.

233.    Defendants also failed to inform such students that career opportunities as police or patrol officers with other law enforcement agencies were limited because of Westwood's accreditation, with the intent that students rely on Defendants' omissions and enroll or stay enrolled in the program.

234.    In other situations, Defendants did not deny that the Chicago Police Department and the Illinois State Police did not view Westwood's degree, standing alone, as a sufficient educational background.

235.    However, in order to ensure that students did not drop out of Defendants' Criminal Justice Program, Defendants told students that they might be able to get a job as a suburban police officer and then easily transfer to the Chicago Police Department.

236.    This representation was false. The Chicago Police Department does not accept lateral transfers from other jurisdictions.

237.    Defendants made misrepresentations concerning eligibility to secure employment with law enforcement agencies in order to continue enrolling new students and also to retain students already enrolled. Defendants touted the availability of careers as law enforcement officers despite knowing that very few graduates of Defendants' Criminal Justice program in Illinois have become law enforcement officers.

238.    The fact that a number of law enforcement agencies in the Chicago area did not and do not recognize degrees from nationally accredited institutions would have been material to any student who applied to Westwood, particularly if the student had expressed his or her interest in pursuing a law enforcement career in the Chicago area.

239.    In April 2009, Defendants held at least three town hall-style meetings at Defendants' Chicago Loop campus and there addressed student concerns that the Chicago Police Department only hired graduates from regionally accredited schools.

240.    During one such meeting, Defendants' Chicago Loop campus Academic Dean, Dillon Rasmussen ("Mr. Rasmussen"), explained to students that because Defendants were not regionally accredited, they could not become Chicago police officers.

241.     Many students responded that their admissions representatives had lied to them by telling them that Defendants were "fully accredited" and that the students could become Chicago police officers and their credits would transfer to other institutions.

242.     Mr. Rasmussen acknowledged that Defendants' admissions representatives had misled the students by apologizing for the admissions representatives' actions.

243.     Mr. Rasmussen nevertheless advised disappointed students to not withdraw from Westwood.

**C.     Contrary to Defendants' Misrepresentations and Omissions, Most Graduates From Defendants' Criminal Justice Program Fail to Secure Employment In Their Chosen Field.**

**1.     Defendants misrepresent salaries and employment rates for Criminal Justice graduates and omit material facts.**

244.     Defendants' marketing and disclosures concerning their Criminal Justice program mislead students about the poor outcomes for students who enroll in Defendants' program.

245.     For example, Defendants provide prospective and current students with the Career Success Kit with the intent that the students rely on the information provided therein, and enroll in Westwood, at significant cost to the students.

246.     The Career Success Kit states that individuals with a bachelor's degree earn an average income of $53,976 and suffer only a 5.4% rate of unemployment.  *See* Ex. 23, Career Success Kit, at 8.

247.     Similarly, Westwood's marketing materials have cited statistics that the median annual income for individuals with bachelor's degrees is $50,856.

248.     Westwood touts the fact that graduates with bachelor's degrees earn, on average, $20,000 more annually than people with only a high school diploma.

249.    In fact, Westwood graduates do far worse than the average bachelor's degree recipient and, in fact, worse than high school graduates as well.

250.    Since 2006, the median starting salary for a Westwood Criminal Justice graduate has never exceeded $23,920, and in the most recent reporting year stands at $22,048.

251.    This is not only lower than the salary figures presented to students in the Career Success Kit but is actually lower than the median salary for a 25 year-old high school graduate, which according to Westwood's own expert is $25,000.

252.    Even these subpar figures, however, overstate Westwood's performance for most students.

253.    The vast majority of students who enroll at Westwood never graduate at all.

254.    Defendants' Criminal Justice program in Illinois enrolled 15,496 prospective students from 2004 through 2013. Of those enrollees, only 7,530 were still enrolled two weeks into a term. Those 7,530 "starts" incurred at least some tuition cost for their tenure in Defendants' Criminal Justice program.

255.    By year, Defendants' Criminal Justice program – for all four campuses and online in Illinois – had the following starts by calendar year:

| Year | Starts |
|------|--------|
| 2004 | 576 |
| 2005 | 739 |
| 2006 | 806 |
| 2007 | 883 |
| 2008 | 916 |
| 2009 | 1334 |

| | |
|---|---|
| 2010 | 937 |
| 2011 | 757 |
| 2012 | 348 |
| 2013 | 234 |
| **Total** | **7,530** |

256.    The Criminal Justice program is intended as a three-year program.  Accordingly, students enrolled as of 2009 who remained on track should have graduated by 2013.

257.    As of June 30, 2013, Defendants had graduated 1,241 students from their Criminal Justice program in Illinois. That equates to 23.6% of the 5,254 students who started the program through 2009, and 16.5% of all 7,530 starts.

**2. Defendants' misrepresent employment statistics for Criminal Justice graduates and omit material facts.**

258.    Defendants' employment rate disclosures, which track the percentage of their graduates employed in their field of study, mislead students about employment outcomes.

259.     Defendants regularly tout their programs as having an employment rate of 60% or higher, and provide prospective students with disclosures that indicate the same.

260.    Furthermore, Defendants' marketing and representations imply that such employment frequently occurs in such careers as law enforcement officers, legal investigators, or youth probation officers.

261.    In fact, the majority of Westwood graduates since 2006 were not employed in the Criminal Justice field at all.

262.    An even smaller fraction of Westwood graduates found jobs in law enforcement.

263.     Defendants' own calculation of post-graduate employment found that, out of 1,241 Westwood graduates, only 27 were employed in sworn law enforcement positions during the applicable ACICS reporting period. Those 27 graduates comprise 2.2% of graduates and 0.5% of all students who started the program in or before 2009.

264.     Another 16 graduates found employment with a law enforcement agency – but not as sworn officers. These 16 graduates comprise just 1.3% of graduates of the graduates of Defendants' Criminal Justice program in Illinois.

265.     Accordingly, the total percentage of graduates employed in law enforcement is 3.5%.

266.     Graduates fared no better in finding employment in the correctional field. By Defendants' own calculation, just 20 graduates found employment in corrections (in any position). Those 20 graduates are just 1.6% of the graduates of Defendants' Criminal Justice program in Illinois.

267.     The largest field in which Westwood graduates are employed is private security.

268.     Defendants include any graduate employed in a security-related position as in-field employment.  According to Defendants, graduates obtained the following "in-field" positions in security:

| Position | Graduates | Percent of All Graduates |
|---|---|---|
| Armed Security Guard | 10 | 0.8% |
| Security Guard | 231 | 18.6% |
| Corporate | 57 | 4.6% |
| Non-Guard Security | 25 | 2.0% |
| **Total** | **323** | **26.0%** |

269.    Defendants' calculation included armed security guards, unarmed security guards, corporate security positions working for a company rather than a security firm, and graduates employed with security firms in a non-security guard role. Combined, these 323 graduates comprised 26% of all graduates. Unarmed security guard was the most common employment of all graduates.

270.    These security-related positions rarely require more than a high school diploma or equivalency degree. The vast majority of the 323 graduates who obtained employment in the security field would have been eligible for those positions even without a single credit hour at Westwood College. In order to bolster the employment rate that they tout to students and the public, Defendants consider numerous jobs even further removed from Criminal Justice. According to Defendants' own calculation, 111 graduates—8.9% of all graduates—were employed in retail positions, yet still considered employed in Criminal Justice positions. These positions—which also rarely required college credits—were not related to the curriculum of Defendants' Criminal Justice program or to the field of Criminal Justice.

271.    Other positions that Defendants designate "Criminal Justice" include the following:

Child Care Worker

Shift Manager at McDonald's

Caretaker

Assistant Manager at Walgreens

Sales Associate and Payless Shoes

Certified Nursing Assistant

*See* Ex. 24, Defendants' GDER Charts.

272. By counting these and other positions as successful in-field employment, Westwood's disclosures misleadingly overstate the percentage of graduates employed in their field of study.

273. For example, in the 2011-2012 reporting period, Westwood reported that 60% of its graduates were employed in their field or related field of study, when in fact only 42% were employed in the Criminal Justice field. In the 2009-2010 reporting period, Westwood reported that 66% of its graduates were employed in their field or related field of study, when in fact only 34% were employed in the Criminal Justice field. In only one reporting period—2007-2008— were a majority of Westwood graduates employed in the Criminal Justice field. Even these subpar statistics do not account for the more than 75% of Westwood enrollees who never graduate.

274. Westwood's disclosures, therefore, mislead students about their likelihood of obtaining jobs in the Criminal Justice field.

**D. Defendants misrepresented and omitted material facts concerning the impact and relevance of prospective students' criminal backgrounds.**

275. In some instances, prospective students with criminal backgrounds have asked Defendants' admissions representatives whether or not their criminal backgrounds would be a problem because they wanted to attend Westwood in order to become police officers.

276. In many instances, Defendants (including admissions representatives, financial aid advisors, faculty and/or staff) have failed to inform prospective and current students in the Criminal Justice Program who have criminal records that they would not be able to obtain, or would have a difficult time obtaining, employment in the law enforcement field due to their criminal backgrounds.

277.     In other instances, Defendants' admissions representatives told prospective students interested in becoming police officers not to be concerned about their criminal backgrounds.

278.     For example, from October 2005 to January 2008, Melissa Williams was employed as an adjunct Criminal Justice instructor at Defendants' Chicago Loop campus.

279.     Ms. Williams observed that approximately four students per class had been convicted of a crime.

280.     Many students with criminal histories expressed concerns about their job prospects in law enforcement to Ms. Williams.

281.     From June 2005 to December 2007, Eric Reynolds (hereinafter "Mr. Reynolds") was employed as a Criminal Justice instructor at Defendants' Chicago Loop campus.

282.     Mr. Reynolds observed that between ten and fifteen percent of his Criminal Justice students had criminal records.

283.     Mr. Reynolds did not want to lose his job by telling students that they couldn't obtain the job they wanted so he told them to contact the agency for which they wanted to work and inquire about that agency's specific hiring criteria.

284.     Defendants' employees did not plainly and openly inform prospective students that a criminal background would likely prevent them from becoming police officers in many cities, counties and states, even after graduating with a degree from Defendants' Criminal Justice Program.

285.     Defendants' employees also failed to plainly and openly inform prospective students that employment opportunities in the Criminal Justice field may be limited for any graduate who has a criminal record, and especially for those who have a felony conviction on his or her record.

286.    For example, the Illinois State Police explicitly states in its hiring criteria that applicants "cannot have been convicted of a felony." *See* Ex. 20, Illinois State Merit Based Pre-employment Requirements.

287.    Additionally, all prospective employees of the Chicago Police Department must have a valid Firearm Owner's Identification (FOID) Card at the time of hire. *See* Ex. 25, Chicago Police Department Hiring Criteria.

288.    According to the Firearm Owners I.D. Act, 430 ILCS 65/1 *et seq.*, an applicant is generally deemed ineligible to receive a FOID card if he/ she is or was:

| | |
|---|---|
| i. | convicted of a felony under the laws of any jurisdiction, 430 ILCS 65/4(2)(ii). (However, an appeal procedure is available in accordance with 430 ILCS 65/10); |
| ii. | convicted of domestic battery/ domestic violence, 430 ILCS 65/4(2)(ix); |
| iii. | convicted within the past five years of batter, assault, aggravated assault, or violation of an order of protection, in which a firearm was used or possessed. 430 ILCS 65/4 (2)(viii); |
| iv. | subject to an active Order of Protection prohibiting possession of a firearm, 430 ILCS 65/4 (s)(vii); |
| viii. | prohibited from acquiring or possessing firearms by any Illinois statute or federal law, 430 ILCS 65/8(n). |

289.    Applicants of the Schaumburg Police Department must also not have any felony convictions or have been convicted of certain misdemeanors. *See* Ex. 21, Schaumburg Police Department Hiring Criteria.

290.    To work as an unarmed employee of a licensed Private Detective, Private Alarm Contractor, Private Security Force or Locksmith Agency in Illinois, the employee must possess a Permanent Employee Registration Card (PERC). *See* 225 ILCS 447/1 *et seq*.

291.    In order to obtain a PERC, a personal must not be convicted of any felony in any jurisdiction or at least 10 years must have elapsed since the time of full discharge from a sentence imposed for a felony conviction.

292.     Once students with criminal backgrounds enrolled in Defendants' Criminal Justice Program, they began learning from classmates and Westwood graduates that many police departments, including the Chicago Police Department and the Illinois State Police, would not hire anyone with a criminal background.

293.     In many instances, those students then asked Criminal Justice faculty members and administrators, including DuPage campus President, Kelly Moore, whether their criminal backgrounds would in fact be a problem despite what they had been told by Defendants' admissions representatives.

294.     Defendants' employees, including Ms. Moore, assured these students that they might be able secure jobs in the Criminal Justice field despite having criminal backgrounds.

295.     Defendants' made misrepresentations and omissions concerning the relevance of criminal backgrounds with the intent that consumers rely on the representations or omissions and enroll, or remain enrolled, at Westwood College.

296.     Many prospective students decided to enroll in Westwood's Criminal Justice program based on these misrepresentations or omissions by admissions representatives, faculty members, and administrators.

297.     The truth concerning the employment opportunities actually available to Westwood graduates would have been material to students with any history of arrests or conviction. A student would reconsider investing in a $50,000-plus career-focused education if the student has a criminal history and was aware that employment opportunities in the criminal justice field could be limited by such a history.

298.     Many Westwood Criminal Justice students decided to remain in Westwood's Criminal Justice Program after hearing these reassurances from Westwood's faculty members and administrators.

**VI.**     **Defendants Employed False and Deceptive Internet Advertising.**

299.     Defendants employ an internet advertising agency to maximize the internet exposure of their programs in defined geographic regions, including Illinois.

300.     Defendants' internet advertising campaign targets geographic regions where Defendants maintain ground campuses, including Illinois.

301.     Through its internet advertising agency, Defendants bid on certain internet search terms that prompt advertisements for the school when consumers search internet search engines using specified search terms and in certain geographic regions, including Illinois.

302.     Thus, when an Illinois consumer enters certain search terms into an internet search engine from a computer located in Chicago, Illinois, Defendant' internet marketing campaign aims to prompt advertisements for Defendants' programs.

303.     Defendants' practice of bidding on search terms could mislead or confuses Illinois consumers.

304.     For example, Defendants have bid on variations of the term "FBI."

305.     This means that an Illinois consumer who searched Google for terms that include "FBI" would likely view an advertisement for Westwood College.

306.      However, no Westwood graduate in Illinois has ever been employed at the FBI after graduation, a fact not disclosed on Westwood's website.

307.     Similarly, in another advertising campaign targeted at Chicagoland, Defendants bid on variations of the term "state trooper."

308.     This means that an Illinois consumer who searched Google with terms that include "state trooper" would likely view an advertisement for Westwood College.

309.     In fact, because of Westwood's accreditation, Westwood graduates cannot obtain employment as a State Trooper in Illinois, a fact not disclosed on Westwood's website.

310.    Defendants' marketing, therefore, misleads or has the capacity to mislead consumers about outcomes for Westwood graduates.

**VII.    The Testimony of Former Westwood Criminal Justice Students Illustrates Defendants' Unfair and Deceptive Acts or Practices.**

311.    To date, several consumers have filed complaints against Defendants with the Office of the Illinois Attorney General.  The following allegations in Paragraphs 312 through 451 are pled as examples of Defendants' unlawful business practices and are not meant to be exhaustive.  The unlawful conduct of Defendants is ongoing and continuous.  Plaintiff reserves the right to prove that additional consumers, other than those who have complained to the Office of the Attorney General and other than the illustrative examples below, have been subject to Defendants' unlawful business practices.

### A.  Todd Brown

312.    From August 2006 until May 2009, Todd Brown (hereinafter "Mr. Brown") was enrolled in Defendants' School of Justice at its DuPage campus.

313.    After talking with one of Defendants' admissions representatives by telephone, Mr. Brown arranged to meet with the representative at Defendants' DuPage campus.

314.    During the meeting, Mr. Brown took a campus tour with Defendants' admissions representatives and members of Defendants' Criminal Justice Program faculty.

315.    During Mr. Brown's on-campus visit, he told Defendants his plans to become a police officer.

316.    Defendants told Mr. Brown that Westwood was the best school for him because Defendants could easily place Mr. Brown with a police department upon graduation.

317.    Defendants failed to explain to Mr. Brown that he would not be able to apply to certain police departments with a bachelor's degree from Defendants' institution because they were not regionally accredited.

318.    In May 2009, Mr. Brown graduated from Defendants' School of Justice with a bachelor's degree in Criminal Justice.

319.    Shortly after graduation, Mr. Brown discovered that the Illinois State Police was hiring police officers and applied for a position.

320.    Mr. Brown passed the written and physical tests required as part of the Illinois State Police hiring process.

321.    After passing the written test, physical test, and participating in several more interviews, the Illinois State Police contacted Mr. Brown and informed him he could no longer participate in their hiring process because his degree Westwood was not from a regionally accredited institution.

322.    Mr. Brown took out over $52,000 in student loans to attend and complete Defendants' Criminal Justice degree.

### B.    *Ricardo Rivera*

323.    From October 2004 until August 2007, Ricardo Rivera (hereinafter "Mr. Rivera") was enrolled in Defendants' School of Justice at their Chicago Loop campus.

324.    In or about September 2004, after viewing Defendants' television advertisements promoting their Criminal Justice Program, Mr. Rivera contacted one of Defendants' admissions representatives by telephone to inquire about the program.

325.    After Mr. Rivera completed the enrollment documents, the admissions representative asked him about his career goals upon completing the Criminal Justice Program.

326.    Mr. Rivera responded that he intended to become a police officer with the Chicago Police Department, and then later, planned to attend law school.

327.    The admissions representative replied that Mr. Rivera could become a police officer with the Chicago Police Department and that he could enroll in law school with a Criminal Justice degree from Westwood.

328.    The admissions representative asked whether Mr. Rivera had been convicted of any felonies, because if he had, then he would not be able to carry a pistol, thereby limiting his career prospects in law enforcement.

329.    Mr. Rivera responded that he had been arrested "a few times" for trespassing, but that he had not been convicted of any felonies.

330.    The admissions representative replied that Mr. Rivera's arrests would be "overlooked" by law enforcement agencies.

331.    During Mr. Rivera's second year as a Westwood student, he observed the Criminal Justice Program graduating class of Fall and Winter 2006 complaining that the Chicago Police Department did not accept applications from Westwood graduates.

332.    The Criminal Justice Program graduating class of Fall and Winter 2006 also complained that they could not apply to graduate school or transfer to other schools because almost no schools were accepting credits from Westwood due to Westwood's national accreditation.

333.    After hearing the complaints from the Criminal Justice Program 2006 graduating class, Mr. Rivera and his classmates asked their instructors about the Chicago Police Department's hiring criteria.

334. Mr. Rivera's instructors replied that although they would not be able to become Chicago police officers, they could always apply to suburban police departments and then transfer to Chicago at a later time.

335. Approximately four of Mr. Rivera's instructors explained that there was no real difference between national and regional accreditation, and that it was all very "political".

336. Mr. Rivera and his classmates also expressed their concerns about Westwood's accreditation to Defendants' Chicago Loop Academic Dean, Dillon Rasmussen, and Criminal Justice instructor, Carl Cooper.

337. Mr. Rasmussen and Mr. Cooper reassured Mr. Rivera by saying that they knew that Westwood students had been "caught off guard by Westwood's national accreditation", but that should "not stop the students from going around that obstacle and achieving their goal."

338. In the summer of 2007, Mr. Rivera was unable to register for his last term because he needed to visit the Financial Aid Office.

339. A Financial Aid Officer told Mr. Rivera that he was "out of money" and needed to take out another private Sallie Mae loan to register for his last term.

340. During the months leading up to Mr. Rivera's graduation in May 2007, Mr. Rasmussen and Mr. Cooper told Mr. Rivera and his classmates that Defendants were in the process of obtaining regional accreditation and that even those who had graduated before Westwood became accredited would be "grandfathered in" and their "degrees would be worth the same" as students who had graduated after Defendants became accredited.

341. Mr. Rivera paid approximately $60,000 for his degree at Westwood.

342. Mr. Rivera was never able to secure employment that relates to law enforcement or Criminal Justice.

### C. Justin Chandler

343.    From August 2007 until July 2010, Justin Chandler was enrolled in Defendants' School of Justice at their DuPage campus.

344.    In 2007, after viewing Defendants' television advertisements promoting their Criminal Justice Program, Mr. Chandler contacted one of Defendants' admissions representatives by telephone to inquire about the program.

345.    During their conversation, Mr. Chandler asked the admissions representative whether he would be able to obtain a higher degree at a different college upon completing Defendants' Criminal Justice Program.

346.    The admissions representative replied that Mr. Chandler could earn a master's degree from any school with a Westwood bachelor's degree.

347.    During the meeting on-campus in or about July 2007, Mr. Chandler asked the admissions representative whether Defendants were accredited and whether he would be able to transfer to another school.

348.    The admissions representative replied that Westwood was accredited, that Mr. Chandler could transfer to any school, and that he could obtain a master's degree based upon undergraduate coursework at Westwood.

349.    Mr. Chandler disclosed his goal of becoming a parole officer for Will County with a bachelor's degree from Westwood.

350.    When Mr. Chandler inquired about the cost of the Criminal Justice Program, the admissions representative replied that the program would cost $50,000.

351.    In or about July 2010, Mr. Chandler graduated from Defendants' Criminal Justice Program.

352.    In January 2011, Mr. Chandler contacted Will County Sheriff's Office about applying for a Deputy Sheriff's position.

353.    A representative of the Will County Sheriff's Office informed Mr. Chandler that he could not apply or take the written examination because Will County only considers applicants who earned at least 60 credit hours from a regionally accredited school.

354.    After his graduation from Westwood, Mr. Chandler applied to Governor State University's Master's degree program, but GSU would not accept Defendants' credits or degree because Defendants were not regionally accredited.

355.    Mr. Chandler has incurred over $60,000 in federal and private student loan debt from attending Defendants' institution.

### D.  Elisa Velasquez

356.    From 2005 until 2008, Elisa Velasquez was enrolled in Defendants' School of Justice at their Chicago Loop campus.

357.    Ms. Velasquez contacted Defendants after viewing their television advertisements promoting their Criminal Justice Program.

358.    On or about September 5, 2005, Ms. Velasquez went to the Loop campus to take a placement test, pay her application fee, and sign an enrollment agreement.

359.    Not long thereafter, a financial aid officer assisted Ms. Velasquez with completing the FAFSA, but did not explain any of the financial aid paperwork to Ms. Velasquez.

360.    Ms. Velasquez believed that she had signed documents for federal student loans only.

361.    Ms. Velasquez has since received letters indicating that she signed up for the APEX financing program.

362.    In or about 2008, Ms. Velasquez heard that some of her classmates had attempted to transfer to different schools and discovered that their Westwood credits would not transfer.

363.    In approximately the summer of 2008, shortly before Ms. Velasquez was scheduled to graduate, Ms. Velasquez inquired of Defendants' Career Services Office whether Defendants' accreditation status would affect her chances of being hired at the Chicago Police Department.

364.    Ms. Velazquez received assurances that she would not have a problem with the application process based on Westwood's accreditation.

365.    One of the Career Service Officers replied that Defendants were in the process of becoming regionally accredited and that Defendants should be accredited by the time Ms. Velasquez had completed CPD's hiring process.

366.    In October 2008, Ms. Velasquez took and passed the CPD written examination.

367.    Ms. Velasquez also passed the CPD physical examination and psychiatric evaluation.

368.    As part of the CPD hiring process, Ms. Velasquez was required to submit her academic transcripts.

369.    Upon review of Ms. Velasquez' Westwood transcripts, a CPD investigator contacted Ms. Velasquez to inform her that she could not progress further because Defendants' Illinois institution was not regionally accredited.

370.    Ms. Velasquez called Defendants for approximately two weeks to inquire about Defendants' accreditation and to demand an explanation about why she was unable to pursue a career with the CPD after Defendants had promised her that she could.

371.    After two weeks, Ms. Velasquez was able to speak to Sylvia, a Career Services Officer, who explained that it takes between two and three years for a school to attain regional accreditation and that Defendants were still in the candidacy process.

372. Ms. Velasquez has incurred over $45,000 in private and federal student loan debt from attending Defendants' institutions.

### E. Malissa Peloquin

373. From approximately March 2005 until October 2007, Malissa Peloquin was enrolled in Defendants' Criminal Justice program at the DuPage campus.

374. In or about January 2005, after viewing one of Defendants' online advertisements, Ms. Peloquin electronically requested additional information about the Defendants' Criminal Justice Program.

375. In or about February 2005, approximately one week after being contacted by Defendants' admissions representative, Billy Swisher, Ms. Peloquin met with Mr. Swisher at the school.

376. When Ms. Peloquin expressed interest in Criminal Justice, Mr. Swisher told her that the Chicago Police Department was not currently accepting applicants from Westwood due to the school's lack of regional accreditation, but he assured her that Westwood would be regionally accredited within two years.

377. Ms. Peloquin and Mr. Swisher then discussed the fact that she was more interested in being a juvenile probation officer than a police officer.

378. Mr. Swisher verbally assured Ms. Peloquin that she could become a juvenile probation officer with a Westwood degree.

379. Mr. Swisher told Ms. Peloquin that the total cost of her degree would be about $58,000.

380. Mr. Swisher provided Ms. Peloquin with an enrollment agreement and other paperwork to sign.

381.    Mr. Swisher only briefly explained the documents he told Ms. Peloquin to sign, and he did not explain any disclosures to her.

382.    Mr. Swisher simply told Ms. Peloquin to sign and initial the paperwork, and he said she needed to do it during the meeting.

383.    During her second meeting with a financial aid officer at Westwood's campus, Defendants' financial aid officer completed Ms. Peloquin's FAFSA for her online.

384.    The financial aid officer then told Ms. Peloquin that she was approved for $56,000 in federal student loans, which had been quoted as the approximate price of Ms. Peloquin's Criminal Justice bachelor's degree.

385.    Subsequently, a financial aid officer also instructed Ms. Peloquin to fill out paperwork applying for a $10,000 Signature loan from Sallie Mae.

386.    Defendants' financial aid officer assured Ms. Peloquin that the Signature loan was needed "just in case" something was not covered.

387.    Based on these assurances by Defendants' financial aid officer, Ms. Peloquin was led to believe that the Signature loan would not be used unless she needed it.

388.    When registering for her third term, a financial aid officer reminded Ms. Peloquin to fill out her FAFSA, and also told Ms. Peloquin that she needed to apply for a $10,000 Signature Sallie Mae loan.

389.    The financial aid officer again told Ms. Peloquin that this loan was "just in case" something was not covered.

390.    Ms. Peloquin again assumed that any surplus funds from her "just in case" loan would be returned to the lender.

391.    In October 2007, Ms. Peloquin graduated with a bachelor's degree in Criminal Justice.

392.    After graduating and upon entering repayment of her loans, Ms. Peloquin expected to owe slightly more than $56,000.

393.    In April 2008, approximately six months after graduation, Ms. Peloquin called Sallie Mae seeking information concerning what her monthly loan payments would be.

394.    At that time, Ms. Peloquin was told that she had multiple loans of varying amounts with interest rates ranging from 2.9% to 11.9%.

395.    Ms. Peloquin was told that the total amount she owed on her student loans was approximately $76,000; that no surplus amounts had been returned to any of her lenders; that she could not return any of the $10,000 "just in case" loans that Defendants' financial aid office had convinced her to take; and that her monthly payments toward her student debt would be $598 per month for twenty-five years.

### F.    Paul Lindsey

396.    From August 2005 until July 2008, Paul Lindsey (hereinafter, "Mr. Lindsey") was enrolled in Defendants' School of Justice at their Chicago Loop campus.

397.    Mr. Lindsey had knowledge of Westwood from viewing Defendants' television advertisements promoting their Criminal Justice Program.

398.    Defendants' admissions representatives also visited Mr. Lindsey's high school during Mr. Lindsey's junior or senior year.

399.    Ultimately, Mr. Lindsey met with admissions representative Thomas Cole on several occasions.

400.    Mr. Lindsey told Mr. Cole that he wanted to become a police officer with the Chicago Police Department.

401.    Mr. Cole never told Mr. Lindsey that the Chicago Police Department would not recognize Defendants' degree or credits.

402.    Mr. Cole approximated that cost for a bachelor's degree in Criminal Justice would be $30,000.

403.    Mr. Cole told Mr. Lindsey only that Defendants were accredited without specifying or explaining that Defendants were only nationally accredited.

404.    In August 2005, Mr. Lindsey enrolled in Defendants' School of Justice.

405.    After enrolling, Mr. Lindsey met with one of Defendants' Financial Aid Officers.

406.    The financial aid officer convinced Mr. Lindsey to secure a private, unsecured loan through Defendants' APEX financing program.

407.    The financial aid officer told Mr. Lindsey that paying this amount while he attended classes would reduce the amount he would owe in private loans.

408.    Mr. Lindsey understood that he would pay $110 per month toward his combined student loan debt.

409.    During Mr. Lindsey's enrollment at Westwood, rumors circulated that the Chicago Police Department did not recognize Defendants' Criminal Justice degree.

410.    On or about June 2006, the Director of Defendants' Criminal Justice Program, Richard Holloway, told a group of students including Mr. Lindsey that the rumors about the Chicago Police Department were "half true."

411.    Mr. Holloway told the group of students that the Chicago Police Department did not recognize Defendants' degrees or credits, but that Defendants had many contacts in suburban police departments and that after a year or two in a suburban police department students could transfer to the Chicago Police Department with "no problem."

412.    Mr. Lindsey chose to stay at Westwood based in part on Mr. Holloway's misrepresentation.

413.    In or about December 2007, Mr. Lindsey applied for a position with the Illinois Department of Corrections.

414.    On or about July 2008, Mr. Lindsey was offered a position with the Illinois Department of Corrections.

415.    Mr. Lindsey left Westwood with one term remaining before graduation to accept the position offered with the Illinois Department of Corrections.

416.    After Mr. Lindsey joined the Illinois Department of Corrections, he learned about the State of Illinois Upward Mobility Program.

417.    Mr. Lindsey asked whether the Upward Mobility Program would pay for him to finish his last term at Westwood.

418.    At that time, Mr. Lindsey learned that not only would the Upward Mobility Program not pay for his last term at Westwood, the Illinois Department of Corrections would not recognize Defendants' degree if Mr. Lindsey personally paid to finish his last term because Defendants' Criminal Justice Program was not regionally accredited.

419.    Mr. Lindsey's current position as Officer with the Illinois Department of Corrections requires only a high school diploma or GED.

420.    The time, effort, and money Mr. Lindsey spent in Defendants' Criminal Justice Program did not aid him in obtaining his employment with the Illinois Department of Corrections.

### G.    Michelle Moore Ashton

421.    From 2004 until 2007, Michelle Moore' Ashton (hereinafter, "Ms. Ashton") was enrolled in Defendants' School of Justice at their Calumet City campus.

422.    In 2004, Ms. Ashton was working at the Chicago Police Department ("CPD") as a Senior Data Entry Operator.

423.    After viewing Defendants' television advertisements promoting their Criminal Justice Program, Ms. Ashton visited Defendants' Calumet City campus and met with an admissions representative to learn more about the Criminal Justice Program.

424.    Ms. Ashton was interested in becoming a Chicago Police Officer, and believed that attending Defendants' Criminal Justice Program would allow her to apply to become a Chicago Police Officer.

425.    Ms. Ashton told the admissions representative that she already worked at the CPD in a civilian position but that she wanted to become a Chicago Police Officer.

426.    The admissions representative told Ms. Ashton that earning a degree from Defendants' Criminal Justice program would allow her to become a Chicago Police Officer or a police officer in any other jurisdiction.

427.    Ms. Ashton also asked the admissions representative about when Defendants would obtain regional accreditation.

428.    The admissions representative told Ms. Ashton that the school was "working on getting regional accreditation," and that they would be getting it soon.

429.    Ms. Ashton enrolled in Defendants' Criminal Justice Program during her initial visit to the campus.

430.    After enrollment, Ms. Ashton asked the Director of the Criminal Justice Department at the Calumet City campus when the school would become regionally accredited.

431.    The Director of the Criminal Justice Department at the Calumet City campus told Ms. Ashton that the school would not obtain regional accreditation soon, but that her degree would be grandfathered once they were regionally accredited.

432.    Soon before her graduation, Ms. Ashton learned that the Chicago Police Department would not recognize her degree from Westwood College and that she could not

become a Chicago Police Officer.

433.     Ms. Ashton graduated from Defendants' Criminal Justice Program in 2007.

434.     Ms. Ashton has incurred over $64,000 in debt from attending Defendants'
institution.

435.     Ms. Ashton is currently working the same job—Senior Data Entry Operator at the
Chicago Police Department—that she had prior to attending Defendants' Criminal Justice
Program.

436.     Defendants promote Ms. Ashton's experience online as a "Westwood Success"
story.

### H.     Chartina Mason

437.     In or about April 2004, Chartina Mason ("Ms. Mason") met Admissions
Representative, John Corrao ("Mr. Corrao"), at Defendants' Chicago Loop campus to discuss
Defendants' Criminal Justice Program.

438.     During their initial enrollment interview, Ms. Mason disclosed that her goal upon
graduation was to become a police officer with the Chicago Police Department.

439.     Mr. Corrao replied that Ms. Mason could secure employment with the CPD, the
Illinois State Police, and the FBI.

440.     Mr. Corrao told Ms. Mason that the CPD only required 60 credit hours of higher
education, and encouraged Ms. Mason to apply to the CPD upon earning 60 credit hours at
Westwood.

441.     In 2006, Ms. Mason called the CPD to inquire about taking the written exam.

442.     A CPD Human Resources representative replied that Ms. Mason could not take
the written exam because the CPD not consider credits earned at nationally accredited schools
like Westwood.

443.    During her time at Westwood, Ms. Mason received assurances from faculty and staff that Westwood would be regionally accredited by the time she graduated.

444.    Ms. Mason remained enrolled at Westwood based on those assurances.

445.    Ms. Mason paid for her Westwood education, in part, by using financial aid.

446.    In addition to her student loans, Ms. Mason participated in the Westwood Loan Program.

447.    Ms. Mason did not realize that she had taken a Westwood Loan until she received APEX collection notices after graduation.

448.    Ms. Mason was unaware that she had taken out a Westwood loan until Ms. Mason received collection APEX notices after her graduation.

449.    The APEX collection notices that Ms. Mason received after graduation indicated an overdue balance of $4,393.74.

450.    Ms. Mason believed that the monthly out-of-pocket payments she made during her years as Westwood were being applied to the federal financial aid balance, not to a Westwood Loan.

451.    Ms. Mason has not worked in law enforcement since graduating from Westwood.

**APPLICABLE STATUES**

452.    Section 2 of the Consumer Fraud Act, 815 ILCS 505/2, provides:

Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment of any practice described in section 2 of the "Uniform Deceptive Trade Practices Act," approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been mislead, deceived or damaged thereby. In construing this section consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5(a) of the Federal Trade Commission Act.

453.    The Consumer Financial Protection Act of 2010, 12 U.S.C. § 5531(c)(1)(A) and

(B), provides that an act or practice is "unfair" where it:

> causes or is likely to cause substantial injury to consumers which is not
> reasonably avoidable by consumers; and (B) such substantial injury is not
> outweighed by countervailing benefits to consumers or competition.

454.    The Consumer Financial Protection Act of 2010, 12 U.S.C. § 5531(d), provides

that an act or practice is "abusive" where it:

> (1) materially interferes with the ability of a consumer to understand a term or
> condition of a consumer financial product or service; or

> (2) takes unreasonable advantage of—

>> (A) a lack of understanding on the part of the consumer of the material
>> risks, costs, or conditions of the product or service;

>> (B) the inability of the consumer to protect the interests of the consumer in
>> selecting or using a consumer financial product or service; or

>> (C) the reasonable reliance by the consumer on a covered person to act in
>> the interests of the consumer.

## VIOLATIONS OF ILLINOIS LAW

## COUNT I

## CONSUMER FRAUD AND DECEPTIVE PRACTICES ACT

455.    Defendants incorporate Paragraphs 1 through 454 of the Second Amended

Complaint as if fully set forth herein.

456.    As set forth above, Defendants have engaged in a course of trade or commerce

which constitutes unfair and deceptive acts or practices declared unlawful under Section 2 of the

Consumer Fraud Act, 815 ILCS 505/2, including but not limited to the following

misrepresentations and omissions of material fact, with the intent that prospective and enrolled

students rely upon said misrepresentations and omissions:

>       a.   misrepresenting that a Criminal Justice degree from Westwood would help

students get jobs as police officers, and omitting the material fact that a number of police departments will hire only graduates from regionally accredited schools, and Westwood's Illinois institutions are not regionally accredited;

b.   misrepresenting that a Criminal Justice degree from Westwood would help students become City of Chicago police officers, and omitting the material fact that until late 2010 the Chicago Police Department's hiring criteria specifically required a degree from a regionally accredited college or university;

c.   misrepresenting that a Criminal Justice degree from one of Westwood's Illinois institutions would help students secure employment as Illinois State Police Officers, and omitting the material fact that the Illinois State Police's hiring criteria specifically requires a degree from a regionally accredited college or university;

d.   misrepresenting that a Criminal Justice degree from one of Westwood's Illinois institutions would help students secure employment as police officers in suburban police departments, and omitting the material fact that a number of suburban police departments' hiring criteria require a degree from a regionally accredited college or university;

e.   misrepresenting that a Criminal Justice degree from one of Westwood's Illinois institutions would help prospective and current students with criminal backgrounds secure employment as police officers, and omitting the material fact that students with criminal backgrounds are very unlikely to obtain such employment;

f.   misrepresenting to prospective and current students regarding the status and prospects of the accreditation of Westwood College's Illinois institutions;

g.   misrepresenting to prospective and current students the potential job prospects for Criminal Justice graduates, and omitting the material fact that the vast majority of Westwood Criminal Justice program enrollees will not graduate at all.

h.   misrepresenting to prospective and current students the potential salaries, placement or employment rates for Criminal Justice graduates, and omitting the material facts that  (1) the average salary for a Westwood Criminal Justice graduate is less than the median salary of a 25 year old high school graduate;  (2) the largest field in which Westwood Criminal Justice graduates are employed is private security; and (3) the total percentage of Westwood Criminal Justice graduates employed in law enforcement is less than 5%.

i. misrepresenting to prospective and current students that Westwood College's Illinois institutions were to attain regional accreditation by a date certain, and omitting the material fact that regional accreditation was not attainable within the timeframe identified by Defendants;

j.   misrepresenting to current students that if Westwood College's Illinois institutions had obtained regional accreditation after the students had graduated, they would be "grandfathered in" and their Westwood degree would reflect regional accreditation;

k.   misrepresenting to prospective and current students that academic course credits from one of Westwood's Illinois institutions were just as likely as credits from any other college or university to be transferable to other institutions of higher learning, and omitting the material fact that there are a limited number of institutions that accept course credits from Westwood's Illinois institutions;

l.   misrepresenting to prospective and current students that graduates of Westwood College's Illinois institutions would be able to pursue graduate degrees at other institutions of higher learning with a bachelor's degree from Westwood, and omitting the material fact that there are a limited number of institutions that accept a bachelor's degree from Westwood's Illinois institutions as a qualifying prerequisite for their graduate programs;

m.   misrepresenting to students the nature of Defendants' APEX financing program, including representing that APEX was merely a source of additional funding, or that APEX was merely a program allowing students to reduce overall loan debt by making monthly payments while in school, as opposed to being an additional and separate payment obligation on a loan or retail installment contract that, in most cases, extended beyond graduation or separation from the school;

n.   misrepresenting to prospective and current students who secured student financing through the APEX financing program that the students would ultimately be responsible to repay the loan balance remaining after graduating or separation from school;

o.   failing to inform prospective and current students who secured student financing through the APEX financing program of the material fact that the students would ultimately be responsible to repay the loan balance remaining after graduating from or leaving Defendants' institutions;

p.   misrepresenting individual financial aid packages and the projected cost of an individual student's Westwood education;

q.   failing to inform prospective and current students of the material fact that a majority of students who received APEX financing defaulted on such financing;

    r.   bidding on internet search terms in a manner intended to mislead or confuse Illinois consumers concerning the types of employment available to Criminal Justice Program graduates; and

    s.   misrepresenting the selectivity of admissions to Westwood's Criminal Justice program at Westwood College's Illinois institutions.

457.    Therefore, Defendants violated the Consumer Fraud Act, 815 ILCS 505/2.

## COUNT II

## UNFAIR AND DECEPTIVE CONDUCT IN VIOLATION OF THE CONSUMER FRAUD ACT

458.    Defendants incorporate Paragraphs 1 through 454 of the Second Amended Complaint as if fully set forth herein.

459.    As described above, Defendants have offered, and continue to offer an in-house financial product known as APEX to students as a "last resort." Students who obtained this APEX financing could not have paid the full tuition at Westwood College absent this financial product.

460.    Defendants offer the financial product, now called the APEX program, to Illinois Criminal Justice students with incomplete and inadequate explanation, despite the product's importance to the enrollment of the student and the students' acceptance of a contractual obligation to repay.

461.    Defendants' institutional financing contains onerous terms, including, but not limited to, high interest rates.

462.    Defendants' institutional financing product also defaults at an alarmingly high rate among Illinois Criminal Justice students.

463.     Defendants established an allowance for bad debt for each Illinois campus and the online program.  The allowance for bad debt was as high as 70% at some Illinois campuses and exceeded 50% at each campus.  That is, Defendants fully anticipated – at the time the financing was provided – that as much as 70% of the amount financed would not be repaid.

464.     Consistent with Defendants' expectations, the default rate for the institutional financing product is exceptionally high. More than 50% of institutional financing contracts with Illinois Criminal Justice students resulted in default.  In some years at some campuses, the default rate on the Criminal Justice students' contracts has exceeded 90%.

465.     Illinois Criminal Justice students who default on the institutional financing may be subjected to substantial injury.  Students have accepted a contractual obligation to repay a debt.  Students have been and can be charged interest at a rate of up to 18%, referred to a collection agency, reported to a credit bureau, and otherwise harmed by the incurrence of the debt.

466.     Defendants intended that Illinois Criminal Justice students rely on Defendants' unfair and deceptive acts and practices, so that prospective students would enroll and would remain enrolled at Westwood College, thus ensuring Defendants revenue from federal loans and increasing profitability.  Further, Defendants used the institutional financing to inflate their non-federal revenue as designated by the 90/10 Rule.

467.     By offering Illinois Criminal Justice students a product without regard to the ability to repay, without sufficient disclosure and discussion, with onerous terms, and with advanced knowledge that a majority will default, Defendants engaged in unfair and deceptive conduct that caused significant harm to the public.

468.     Defendants' conduct is immoral, unethical, oppressive and unscrupulous.

469.     Governments at the state and federal level have evidenced a desire to avoid onerous financial products and minimize consumer default.  Governments have further sought to ensure for-profit institutions provide a quality education to its students.

470.     For example, for-profit schools such as the one operated by Defendants must comply with cohort default rate regulations.  Such regulations seek to minimize default rates on student loans and, in the process, seek to raise the quality of the school and the affordability of the institution.

471.     The 90/10 Rule was similarly imposed as a proxy for evidence of the quality of a school's educational product by requiring at least 10% of revenue derive from non-federal sources.

472.     By accounting for APEX receipts as non-federal revenue under the 90/10 Rule, Defendants maximized their receipt of federal dollars and evaded the intent behind the rule.  Further, Defendants have offered a financial product without regard to the ability to repay, with onerous terms, and with the awareness and understanding that a majority of contracts will end in default.  Accordingly, Defendants conduct offends public policy.

473.     Therefore, Defendants violated the Consumer Fraud Act, 815 ILCS 505/2.

## COUNT III

## VIOLATIONS OF THE CONSUMER FINANCIAL PROTECTION ACT OF 2010-- UNFAIR BUSINESS PRACTICES

474.      Defendants incorporate Paragraphs 1 through 454 of the Second Amended Complaint as if fully set forth herein.

475.     Defendants are covered persons and service providers under the CFPA. 12 U.S.C. §§ 5481(6) and (26).

476.    Defendants' institutional financing products are consumer financial products. Offering and providing Defendants' institutional financing programs and offering and providing financial advisory services are consumer financial services. 12 U.S.C. §§ 5481(5), (15)(A)(i), and (15)(A)(viii).

477.    From 2004 through the present, Defendants have induced Illinois Criminal Justice students to sign Defendants' institutional financing contracts through a variety of unfair acts and practices designed to interfere with the consumers' ability to make informed choices. These unfair acts and practices included the following, at or around the time Illinois Criminal Justice students signed up for Defendants' institutional financing products, including the APEX program:

   a.  Defendants use their financial aid staff's control of the financial aid process, which is rushed, along with high-pressure tactics, to persuade and entice students to sign the Defendants institutional financing contracts;

   b.  Defendants misrepresent to students, withhold facts, or otherwise obfuscate the true cost of tuition as well as the students' payment obligations upon completion of the Criminal Justice program; and

   c.  Defendants exploit the students' expectations, which Defendants' representations created, that, upon completion of a the Westwood College Criminal Justice program, students were likely to have job opportunities and sufficient earnings capacity to enable them to repay any debt from financing the students' education, in order to persuade and entice the students to enter the Defendants' institutional financing contracts.

478.     Defendants engage in these unfair acts and practices in order to increase their income. Defendants also benefit from the use of their institutional financing to pay tuition gaps,

since regardless whether that financing defaulted and was not repaid, the federal financing that the institutional financing enabled improved Defendants' financial statements by increasing income and cash on hand.

479.     These acts and practices have caused substantial injury to Illinois consumers. As a result of being pressured into doing so by Defendants, many Illinois Criminal Justice students entered into loans or retail installment contracts that they could not afford, did not want, did not understand, or did not even know they had.

480.     A majority of Defendants' Illinois Criminal Justice students who took out Defendants' institutional financing contracts have defaulted or are expected to default.

481.     The injury caused by Defendants' unfair practices is not reasonably avoidable by consumers because:

   a.   Due to Defendants' handling of the financial aid process, many students either did not understand the loan obligations or were not even aware they had signed the Defendants' institutional financing contracts;

   b.   The vast majority of Westwood College students had insufficient income to pay the balance owed after applying available Title IV funds, other than through the Defendants' institutional financing; and

   c.   For students without sufficient income, there was an expectation that completing Westwood College would allow them to earn enough money to avoid defaulting on the loans they had already incurred.

482.     The injury to the Westwood College students who took out Defendants' institutional financing was not outweighed by countervailing benefits to consumers or to competition.

483.    Defendants have engaged in unfair practices under Dodd-Frank, 12 U.S.C.

5531(c)(1)(A) and (B) based on the following:

    a.    As structured and administered, Defendants' institutional financing programs, including the present iteration, called the APEX program, is a recipe for student default and is unfair to Illinois consumers.

    b.    Defendants have full knowledge of probable default by student borrowers because Defendants track student payment behavior for the purpose of assessing revenue and write-offs during accounting periods.  According to Westwood's own APEX program data, more than 50% of Criminal Justice students who sign up for APEX financing will not repay the amount borrowed.

    c.    Defendants systematically and routinely engage in a pattern and practice calculated to induce vulnerable students to take on APEX financing.

    d.    Defendants do not disclose to students or prospective students that they purchasing an institutional financing product on which a majority of students will default.

    e.    Defendants provide APEX loans to students without regard to, or in disregard of, the students' ability to repay or otherwise meet the obligations imposed on them by the Defendants' institutional financing.

    f.    Once students predictably default on APEX loans, they suffer substantial, immediate economic injury and ongoing harm. Students face collection efforts, both in school and out of school, and live under a cloud of student debt that is generally non-dischargeable in bankruptcy without a special showing of undue hardship.

g.   Defendants' lending conduct, in structuring, offering and administering the APEX loan program, caused and causes substantial injury and harm to consumers, and it threatens to continue to cause substantial future harm if not enjoined. The injury and harm Defendants cause is neither reasonably avoidable by consumers nor outweighed by countervailing benefits to the consumers or to competition in the marketplace, in violation of 12 U.S.C. §5531(c)(1)(A) and (B).

484.   Therefore, Defendants violated the CFPA by engaging in unfair practices, as defined in 12 U.S.C. 5531(c).

## COUNT IV

## VIOLATIONS OF THE CONSUMER FINANCIAL PROTECTION ACT OF 2010 -- ABUSIVE BUSINESS PRACTICES

485.   Defendants incorporate Paragraphs 1 through 454 of the Second Amended Complaint as if fully set forth herein.

486.   Defendants are covered persons under the CFPA. 12 U.S.C. § 5481(6).

487.   Defendants' institutional financing programs are consumer financial products. Offering and providing Defendants' institutional financing programs and offering and providing financial advisory services are consumer financial services. 12 U.S.C. §§ 5481(5), (15)(A)(i), and (15)(A)(viii).

488.   From 2011 through the present, Defendants took unreasonable advantage of Illinois Criminal Justice students' reasonable reliance on Defendants to act in their interests.

489.   Westwood College Illinois Criminal Justice students relied on Defendants' admissions and financial aid staff to act in their interests when they signed up for their financial aid packages, including the Defendants' institutional financing programs, such as the APEX financing program.

490. The reliance by the students on Defendants to act in their interests was reasonable because:

    a. Defendants held themselves out as schools that would help students better their lives;

    b. The admissions and financial aid staff advised and made recommendations to the students about financial aid; and

    c. The admissions and financial aid staff solicited students' reliance and trust.

491. Defendants did not act in the students' interests. Instead, they took unreasonable advantage of the students' reasonable reliance to act in their interests by:

    a. Taking control of the complex financial aid process;

    b. Misrepresenting the total cost of tuition and payment obligations of students upon completion of the program;

    c. Pushing students into expensive, high-risk loans that Defendants knew were likely to default; and

    d. Pushing students into expensive, high-risk loans Defendants' knew the majority of students would default on for the purpose of enabling federal funding to support Defendants' revenue stream.

492. Defendants have engaged in abusive practices as defined by 12 U.S.C. § 5531(d)(1) and §§5531(d)(2)(A), (B) and (C), based on the following:

    a. Defendants take unreasonable advantage of students who are put in a position calculated to foster an inability to protect their own interests in selecting or using APEX loans.

    b. Defendants sow confusion and misunderstanding among students and prospective students about the terms of, and conditions incident to APEX financing by

making incomplete, inconsistent or misleading descriptions of the APEX loan program.

c.  Defendants materially interfere with the ability of consumers to understand the terms and conditions of the APEX loan program in violation of 12 U.S.C. §5531(d)(1) because of the rushed, high-pressure enrollment tactics and the inconsistent and incomplete information the Defendants provide students and prospective students about APEX financing, including but not limited to Defendants' failure to disclose to students that the majority of them will default on the APEX financing, rendering students unable to make informed decisions about material terms and conditions of APEX financing, or whether to undertake the substantial burdens, obligations and liabilities that accompany the APEX program.

d.  By providing inconsistent and incomplete information to students and prospective students about APEX financing, including but not limited to Defendants' failure to disclose to students that the majority of them will default on the APEX financing, the Defendants' admissions and financial aid representatives take unreasonable advantage of a lack of understanding on the part of students about the material risks, costs and conditions of the APEX loans program, in violation of 12 U.S.C. §5531(d)(2)(A).

e.  Defendants admissions and financial aid representatives take unreasonable advantage of students by way of their failure to disclose to students or prospective students the fact that, according to Defendants' own accounting estimates, the majority of APEX borrowers are not likely to repay their APEX debts, are likely to default, and are thereafter likely to live under the pall of APEX debt

indefinitely. Defendants' failure to disclose these material facts renders students unable to protect their interest in selecting or using APEX loans in violation of 12 U.S.C. §5531(d)(2)(B).

      f.    Defendants' admissions and financial aid representatives abuse the trust and confidence of students, and take unreasonable advantage of students who reasonably rely on Defendants' admissions and financial aid representatives to act in their interest. Instead, students are led to participate in the APEX program without regard to, or in disregard of, their ability to repay or otherwise meet the obligations imposed on them by the Defendants' APEX program, and the fact that the majority of them will default on the APEX financing, in violation of 12 U.S.C. §5531(d)(2)(C).

493.    Therefore, Defendants violated the CFPA by engaging in abusive practices, as defined in 12 U.S.C. § 5531(d).

## REMEDIES

494.    Section 7 of the Consumer Fraud Act, 815 ILCS 505/7, provides:

> a.    Whenever the Attorney General has reason to believe that any person is using, has used, or is about to use any method, act or practice declared by the Act to be unlawful, and that proceedings would be in the public interest, he may bring an action in the name of the State against such person to restrain by preliminary or permanent injunction the use of such method, act or practice. The Court, in its discretion, may exercise all powers necessary, including but not limited to: injunction, revocation, forfeiture or suspension of any license, charter, franchise, certificate or other evidence of authority of any person to do business in this State; appointment of a receiver; dissolution of domestic corporations or association suspension or termination of the right of foreign corporations or associations to do business in this State; and restitution.

b.    In addition to the remedies provided herein, the Attorney General may request and this Court may impose a civil penalty in a sum not to exceed $50,000 against any person found by the Court to have engaged in any method, act or practice declared unlawful under this Act.  In the event the court finds the method, act or practice to have been entered into with intent to defraud, the court has the authority to impose a civil penalty in a sum not to exceed $50,000 per violation.

495.    Section 10 of the Consumer Fraud Act, 815 ILCS 505/10, provides:

In any action brought under the provisions of this Act, the Attorney General or the State's Attorney is entitled to recover costs for the use of this State.

496.    The Consumer Financial Protection Act of 2010, 12 U.S.C. §5565(a)(2), provides:

Relief under this section may include, without limitation—

(A) rescission or reformation of contracts;
(B) refund of moneys or return of real property;
(C) restitution;
(D) disgorgement or compensation for unjust enrichment;
(E) payment of damages or other monetary relief;
(F) public notification regarding the violation, including the costs of notification;
(G) limits on the activities or functions of the person; and
(H) civil money penalties, as set forth more fully in subsection (c).

497.    The Consumer Financial Protection Act of 2010, 12 U.S.C. §5565(b), provides:

(b) Recovery of costs

In any action brought by the Bureau, a State attorney general, or any State regulator to enforce any Federal consumer financial law, the Bureau, the State attorney general, or the State regulator may recover its costs in connection with prosecuting such action if the Bureau, the State attorney general, or the State regulator is the prevailing party in the action.

## **PRAYER FOR RELIEF**

WHEREFORE, the Plaintiff prays that this honorable Court enter an Order:

A.    Finding that Defendants have engaged in trade or commerce within the meaning

of Section 2 of the Consumer Fraud Act;

B.      Finding that Defendants have violated Section 2 of the Consumer Fraud Act, 815 ILCS 505/2, by, but not limited to engaging in the unfair or deceptive acts and practices alleged herein;

C.      Preliminarily and permanently enjoining the Defendants from engaging in the deceptive or unfair acts and practices alleged herein;

D.      Declaring that all contracts entered into between the Defendants and Illinois consumers by the use of methods and practices declared unlawful are rescinded and requiring that full restitution be made to said Illinois consumers;

E.      Revoking, forfeiting or suspending the Defendants' licenses, charters, certificates, or other evidence of authority to operate a Criminal Justice Program in this state;

F.      Assessing a civil penalty in the amount of Fifty Thousand Dollars ($50,000) per violation of the Act if the Court finds the Defendants have engaged in methods, acts or practices declared unlawful by the Act with the intent to defraud; if the Court finds Defendants have engaged in methods, acts or practices declared unlawful by the Act without the intent to defraud, then assessing a statutory civil penalty of Fifty Thousand Dollars ($50,000), all as provided in Section 7 of the Consumer Fraud Act, 815 ILCS 505/7;

G.      Requiring the Defendants to pay all costs for the prosecution and investigation of this action, as provided by section 10 of the Consumer Fraud Act, 815 ILCS 505/10;

H.      Finding that Defendants have violated 12 U.S.C. §§ 5531(c)(1) and (d)(1) and (2);

I.      Awarding injunctive relief under the Consumer Financial Protection Act of 2010 prohibiting the unlawful acts and practices set forth above;

J.      Ordering rescission of all APEX contracts with Illinois Criminal Justice students under the Consumer Financial Protection Act of 2010;

K.      Ordering disgorgement against Defendants under the Consumer Financial Protection Act of 2010; and

L.      Providing such other and further equitable relief as justice and equity may require.

Respectfully Submitted,

THE PEOPLE OF THE STATE OF
ILLINOIS, by LISA MADIGAN,
ATTORNEY GENERAL OF ILLINOIS

*/s/ Gary Caplan*

BY:     _____
               GARY CAPLAN
               Assistant Chief Deputy Attorney General

Attorney No. #99000

**LISA MADIGAN**
Illinois Attorney General

**DEBORAH HAGAN**
Division Chief, Consumer Protection Division

**GARY CAPLAN**
Assistant Chief Deputy Attorney General
312-814-5661

**SUSAN ELLIS**
Chief, Chicago Consumer Fraud Bureau

**THOMAS JAMES**
Senior Assistant Attorney General, Consumer Fraud Bureau

**JOHN WOLFSMITH**
Assistant Attorney General, Special Litigation Bureau

**CECILIA ABUNDIS**
**SAMUEL LEVINE**
**KHARA COLEMAN WASHINGTON**
**OSCAR PINA**
**JOSEPH SAUNDERS**

Assistant Attorneys General, Consumer Fraud Bureau

## CERTIFICATE OF SERVICE

I, **KHARA COLEMAN WASHINGTON**, an Assistant Attorney General, certify that on **September 30, 2014**, I caused a true and correct copy of the attached **PLAINITFF'S SECOND AMENDED COMPLAINT** to be filed and served via the CM/ECF system to all attorneys of record on the system in this matter, including:

Joseph Duffy
William P. Ziegelmueller
Mariah Moran
Henry Baskerville
**Stetler Duffy & Rotert, LTD**
Counsel for Defendants
10 S. LaSalle Street, Suite 2800
Chicago, Illinois 60603

*/s/ Khara Coleman Washington*

_____

Khara Coleman Washington
Assistant Attorney General
Consumer Fraud Bureau
100 W. Randolph Street, 12th Floor
Chicago, Illinois 60601
312-814-3786
kwashington@atg.state.il.us