IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | |
| Plaintiff, | ) | Hon. Ronald A. Guzman |
| | ) | |
| v. | ) | Mag. Judge Geraldine Soat Brown |
| | ) | |
| ALTA COLLEGES, INC., et al., | ) | Case No. 14-cv-3786 |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' LOCAL RULE 56.1 STATEMENT OF MATERIAL
FACTS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

Defendants Alta Colleges, Inc., Westwood College, Inc., d/b/a Westwood College and Westwood College Online, Wesgray Corporation, d/b/a Westwood College-River Oaks and Westwood College-Chicago Loop, Elbert, Inc., d/b/a Westwood College-DuPage, and El Nell, Inc., d/b/a Westwood College-O'Hare Airport (collectively, "Defendants"), respectfully submit this Statement of Material Facts in Support of Their Motion for Summary Judgment pursuant to Local Rule 56.1.

**I.     Jurisdiction and Venue**

1.      This Court has federal question jurisdiction over Counts III and IV, pursuant to 28 U.S.C. § 1331, and supplemental jurisdiction over Counts I and II, pursuant to 28 U.S.C. §1367(a). (Dkt. 53, Memorandum Opinion and Order, pp. 11-13.)

2.      Venue is proper in this Court under 28 U.S.C. § 1391(b) and (d) because defendants conduct business here and a substantial portion of the events and conduct giving rise to the AG's claims occurred in the Northern District of Illinois. (Dkt. 57, Second Amended Complaint "SAC," ¶ 11.)

## II.     **Defendants**

3.     Defendants own and operate Westwood College, which is an undergraduate institution that provides student with a career-focused education.  Westwood College has four ground campuses in Illinois – all in the Chicagoland area – along with an online school, Westwood College Online.  (SAC, ¶ 1; Exhibit A, Affidavit of William Ojile, ¶ 2.)

4.     Westwood is a nationally accredited school.  (SAC, ¶ 5.)

5.     Defendants' Illinois campuses offer fourteen degree, (Exhibit A, Affidavit of William Ojile, ¶ 2), however, the AG's claims only target the criminal justice program. (SAC, *passim*.)

6.     Westwood's criminal justice program is the equivalent of a four year bachelor's degree program.  (SAC, ¶ 2; Exhibit A, Affidavit of William Ojile, ¶ 2.)

7.     As an "institution of higher education" under Title IV of the Higher Education Act ("HEA"), 20 U.S.C. §§ 1001, 1002(b), Westwood is subject to extensive federal and state regulatory oversight and must satisfy substantial monitoring, disclosure and reporting requirements.  In addition, to participate in the Title IV federal financial aid programs Westwood must maintain accreditation by an accrediting body approved by the United States Department of Education ("USDOE").  Westwood's campuses in Illinois have accreditation with the Accrediting Council for Independent Colleges and Schools ("ACICS"). (Exhibit A, Affidavit of William Ojile, ¶¶ 4-5.)    Finally, Westwood's campuses in Illinois must maintain authorization by the Illinois Board of Higher education ("IBHE"), and is governed by that body's regulations. (*Id.*, Affidavit of William Ojile, ¶ 6.) Combined, the regulations promulgated by USDOE and IBHE, and the ACICS accrediting standards, cover all aspects of Westwood's operations, including marketing of the school and its financial aid program. (*Id.*, ¶ 7.)  Defendants have never been found to be out of compliance by USDOE, IBHE or ACICS with respect any of the areas alleged by the AG in the

2

Second Amended Complaint ("SAC"). (*Id.*, ¶ 9.)

8.  Westwood, like nearly every other institution of higher education (and practically every other business), advertises through various means, including the internet, to attract students. (SAC, ¶¶ 1, 40-41.) Westwood's regulatory group reviews and approves all advertising and major recruitment materials before they are used. (Exhibit A, Affidavit of William Ojile, ¶ 8; Exhibit B, Schiffner Dep. 27:17-28:5; 49:7-25; 73:15-74:23.)

9.  Defendants maintain a website located at www.westwood.edu. (SAC, ¶ 40.) The AG has never suggested that Defendants' website contains any incorrect or misleading information. (SAC, *passim.*)

10.  Like millions of other businesses, Defendants use a Google product called "AdWords" in an effort to drive traffic to their website. (SAC, ¶ 301.)

### III.  Google Ad Words

11.  AdWords is Google's "pay-per-click" advertising program through which advertisers may bid on "keywords" (which may be words or phrases), which could increase the likelihood that Google will display its advertisement when the keyword is used in a Google search entered by an internet user. (Exhibit C, Stricchiola Report at 6-10 and Exs 1-2.); *see also* Brad Geddes, *Advanced Google AdWords*, 2d ed. 2012;

12.  Hundreds of thousands of businesses advertise using Google AdWords. http://www.wordstream.com/blog/ws/2012/08/13/google-adwords-facts (last visited December 4, 2014); http://www.quora.com/How-many-advertisers-are-using-Google-AdWords (last visited December 2, 2014). In 2012, Google realized more than $43.5 billion (96% of its total revenues) from advertising alone. (Exhibit C, Stricchiola Report at 8, Ex. 2.)

13.  As part of Google AdWords, an advertiser "bids" on keywords. An advertiser's bid on a keyword constitutes its agreement to pay a specified fee to Google each time an internet user clicks on the advertiser's link after having searched using the keyword. (*Id.*, Stricchiola Report at

3

6.)

14. The advertiser also provides Google with an advertisement (*i.e.,* the text that will be displayed to the internet user as a search result when the keyword is entered) and a link to the advertiser's "landing page" (the website the internet user will go to if they click on the advertisement link). (*Id*., Stricchiola Report at 8); *see also* https://support.google.com/adwords/answer/14086?hl=en (last visited December 12, 2014).

15. An advertisement is not displayed simply because the advertiser bid on a keyword. Google prioritizes relevance over monetization of advertising revenues because it wants to ensure a positive user experience so the internet user will continue to use Google as his or her search engine. (*Id*., Stricchiola Report at 8.)

16. As a result, Google systematically compares the keyword to the advertisement and landing page, and calculates a "Quality Score" to determine whether to display the advertisement when the keyword is entered by a user. (*Id*., Stricchiola Report Exhs 5, 6.)

17. If the AdWords system determines that the advertisement's relevance (Quality Score) is low, that will cause the advertisement to be shown at a lower frequency, at a lower position, or not at all on the results page. (*Id*., Stricchiola Report at 6, 9.)

18. Bidding on keywords that are poorly tailored to an advertiser's product is undesirable because if a customer clicks on a website and finds information or a product he or she is not interested in, the advertiser will have to pay Google a fee without generating additional sales. (Exhibit D, Claypool Dep. 16:5-17:21; Exhibit E, Stricchiola Dep. 103:10-17.)

**IV.** **Westwood's Internet Marketing and Use of Google AdWords**

19. Westwood's Google AdWords campaign uses a variety of terms designed to reach consumers who might be interested in educational programs relating to criminal justice or law enforcement. For example, it includes keywords relating to "police," "FBI," "state troopers," and "criminal justice." (Exhibit E, Stricchiola Dep. Exhs 284, 285.)

4

20. The AG claims that Westwood's advertising campaign is fraudulent because it bid on key terms relating to "FBI" and "state trooper." (SAC ¶¶ 299-310.) The AG claims this is fraudulent because "no Westwood graduate in Illinois has ever been employed at the FBI after graduation, a fact not disclosed on Westwood's website" (*Id.*, ¶ 306) and "Westwood graduates cannot obtain employment as a State Trooper in Illinois, a fact not disclosed on Westwood's website." (*Id.*, ¶ 309.)

21. The primary author of the AG's allegations relating to Westwood's internet advertising was Kevin Hudspeth, a former Assistant Attorney General. (Exhibit F, Hudspeth Dep. 11:12-12:6.)

22. Mr. Hudspeth has admitted that he has only a "vague understanding of what keywords are." (*Id.*, Hudspeth Dep. 84:21-23), and does not understand many of the basic aspects of internet searches and internet marketing, including what pay-per-click searches are (*id.* 19:8-16); what organic searches are (*id.* 19:17-18); whether Google manages pay-per-click and organic search results the same way (*id.* 20:17-22); what broad matching is (*id.* 23:6-7); what phrase matching is (*id.* 25:16-17); what exact matching is (*id.* 25:19-20); how Google determines what ads are displayed in response to a search (*id.* 29:21-30:20; 34:15-20, 38:6-11); what a quality score is or how it is calculated (*id.* 39:2-14); and what a "click" is (*id.* 69:14-15).

23. Both parties' experts acknowledge that it is reasonable – meaning not deceptive, misleading, confusing, or unfair – for an advertiser to bid on keywords regarding a product that it does not sell if that product is similar or related to the advertiser's product such that a consumer considering purchasing one product might consider purchasing the other. (Exhibit E, Stricchiola Dep. 98:21-99:10; 118:6-119:11; Exhibit D, Claypool Dep. 90:17-91:14; Exhibit F, Hudspeth Dep. 48:18-49:16, 95:13- 96:2.)

24. For example, as Mr. Hudspeth, the former Assistant Attorney General who drafted the AG's allegations relating to Westwood's internet advertising, acknowledged it would not be

5

deceptive for a company that sells chocolates to bid on keywords relating to flowers, because someone who is shopping for flowers might also be interested in buying chocolates. (Exhibit F, Hudspeth Dep. 48:18-49:16.) Likewise, a Tesla dealer might bid on "hybrid" cars – even though Teslas are not hybrids at all – in case (a) potential customers did not realize that Tesla engines are entirely electric, not hybrid electric/combustion, or (b) a consumer looking for a hybrid car might be convinced to buy an electric car instead. (Exhibit E, Stricchiola Dep. 98:21-99:10.)

25. The AG's internet marketing expert testified that, because it is reasonable for an advertiser to bid on keywords relating to a product that it does not sell but that is similar or related to the advertiser's product, Westwood's bidding on keywords relating to "Illinois State Trooper" was "fair" and not deceptive. (Exhibit D, Claypool Dep. 88:16-91:14.)

26. Former Assistant Attorney General Hudspeth also agreed that even if a college's degree was not recognized by some police departments in Illinois, it would be "fair" for an advertiser to bid on the keyword phrase "Illinois State Police," "because some people might be interested in working for a police department within the State of Illinois that accepts a nationally accredited degree." (Exhibit F, Hudspeth Dep. 95:13-96:2.)

27. To become an FBI Special Agent an applicant must possess a four year degree from a national or regionally accredited school. (*Id.*, Hudspeth Deposition, Ex. 356.)

28. A degree from Westwood's criminal justice program satisfies the educational prerequisites to become a FBI Special Agent as well as an officer in numerous police departments in Illinois. (*Id.*; Exhibit G, Rivera Dep., Ex. 59.)

29. The AG's expert admitted that if a criminal justice program provides the prerequisites to become a FBI Special Agent, then it is "perfectly valid" and "fair" for Westwood to bid on terms relating to the FBI, such as "FBI career path," "FBI college," "FBI requirements," "FBI academy," and "FBI school." (Exhibit D, Claypool Dep. 63:21-64:11; 67:2-8; 72:16-23; 73:9-14.)

6

30. The AG's internet marketing expert testified "I see nothing deceptive" about the specific advertisements Westwood used in connection with FBI-related searches. (Exhibit D, Claypool Dep. 93:12-96:10.)

31. Internet advertising is difficult because determining a user's intent from a Google search is an inherently imprecise endeavor. (Exhibit B, Stricchiola Dep. 97:5-99:10 (emphasizing that Google searches are a process whereby "a human is entering language by characters and keywords, and a machine is trying to interpret and determine intent."); *id.* 116:6-10 (a search engine "understand[s], generally speaking, the theme . . . or the various concepts that might be entered using keywords, but we can't limit them without the person literally saying in great detail, paragraph upon paragraph, this is exactly what I want.").

32. An appropriate characterization of the information conveyed by the appearance of an advertisement in response to a Google search is something along the lines of "this website may have information that is relevant to your query." (Exhibit E, Stricchiola Dep. 73:14-75:2; 103:23-104:1 ("the goal is to provide relevant results and related information. And that the users decide what they deem to be important and what they deem to be not important."); *id.* 116:3-16.)

33. The AG's internet marketing expert testified that "the job of the internet [is] to return answers to the exact query *and other things that [the user] might be interested in as well*." (Exhibit D, Claypool Dep. 85:8-22 (emphasis added).) For example, he agreed that someone performing a Google search for "become a federal agent" "might be interested in criminal justice generally." (*Id.* 61:11-17.)

34. A well-designed AdWords campaign seeks to maximize the likelihood that potentially interested consumers will receive the advertisement. (Exhibit C, Stricchiola Report at 2; Exhibit D, Claypool Dep. 16:12-16:17.) For example, as Westwood's internet marketing expert explained, "[i]t makes sense, in the mind of a search marketer, to presume that someone who is interested in the requirements to become a police officer might also be interested in a Criminal

7

Justice program …. Based on these understandings I would consider the serving of Defendants' ads in response to the query in question to be a standard component of [pay-per-click] advertising." (Exhibit C, Stricchiola Report at 1-2.)

35. Google's "keyword planner" is a widely used tool which helps advertisers to select relevant keywords. (Exhibit D, Claypool Dep. 132:7-133:16.) This tool suggests possible words that advertisers may want to bid on. (Exhibit E, Stricchiola Dep. 25:9-11.) Using keywords suggested by Google's keyword planner is a standard, fair, and non-deceptive practice. (Exhibit D, Claypool Dep. 136:13-20; 141:3-142:2.)

36. Many of the FBI-related keywords used by Westwood are suggested by the Google keyword planner. (*Id*., Claypool Dep. 134:15-138:9.16.)

37. Bidding on AdWords keywords that are related, but not perfectly tailored, to the advertiser's product are an unavoidable outgrowth of the imprecise nature of trying to determine a user's intent. They are "inherent to the standard process of internet and search engine marketing." (Exhibit C, Stricchiola Report at 1-2, 11, 15.)

38. The AG's assertion that Westwood's AdWords campaign is deceptive "is tantamount to stating that internet search advertising as a whole is inherently deceptive." (Exhibit C, Stricchiola Report at 1.)

39. Whether an ad is deceptive depends in large part on the content of the website to which the user is directed (*i.e.,* the landing page). (Exhibit D, Claypool Dep. 76:6-9; Exhibit E, Stricchiola Dep. 91:18-92:22; Exhibit F, Hudspeth Dep. 119:13-120:6.

40. The AG does not allege that Westwood's landing pages *(i.e.,* website) contained any inaccurate or untruthful information. Mr. Hudspeth, the former Assistant Attorney General who drafted the allegations relating to Westwood's internet advertising agreed consumers could not be misled unless they "clicked" on a Westwood advertisement to proceed to Westwood's website, and Westwood's website contained inaccurate or false information. (Exhibit F, Hudspeth Dep. 73:15-

8

74:23.)

41. Westwood's website includes informational pages that provide information regarding qualifications for various jobs. For example, Westwood's "How To Become A Police Officer" page states that "[e]ducational requirements for becoming a police officer vary from agency to agency." (Exhibit D, Hudspeth Dep., Ex. 355, at 1.)

42. The AG's internet marketing expert testified that Westwood's disclosures "would clarify any deception that had potentially occurred with the advertisement." (Exhibit D, Claypool Dep. 121:19-124:2; 128:15-129:11.)

43. No-one has ever complained to the Attorney General's Office about Westwood's internet advertising. (Exhibit H, Plaintiff's Responses and Objections to Defendant's Fourth Set of Interrogatories to Plaintiff at 5.)

44. Westwood has "used traditional and appropriate methodology" in its AdWords campaign. (Exhibit C, Stricchiola Report at 1.)

## V. Plaintiff the Illinois Attorney General's Consumer Financial Protection Act Claims Brought Under Counts III and IV of the Second Amended Complaint.

45. Counts III and IV purport to state claims under the Consumer Financial Protection Act ("CFPA"), 12 U.S.C. §§ 5481, *et seq*. (SAC, ¶¶ 484, 493.)

46. The CFPA, 12 U.S.C. §§ 5481, *et seq*., became effective July 21, 2011, and is not retroactive. (Dkt. 31, Plaintiff's Response to Defendants' Motion to Dismiss, p. 18.)

47. The allegations of Counts III and IV of the AG's SAC are not limited to the timeframe of July 21, 2011 to the present, but instead incorporate all of the allegations from the SAC into those Counts. (SAC, ¶¶ 474, 485.)

48. Nor are the remedies that the AG seeks for Count III and IV limited to the effective time period of the CFPA. (SAC, ¶ 494; Prayer for Relief.)

49. For example, Prayer for Relief J asks the Court to "Order[] rescission of all APEX

9

contracts with Illinois Criminal Justice students under the Consumer Financial Protection Act of 2010;" and Prayer for Relief K asks the Court to "Order[] disgorgement against Defendants under the Consumer Financial Protection Act of 2010."  (SAC, ¶ 494; Prayer for Relief.)

Dated:  December 22, 2014                                      Respectfully submitted,

ALTA COLLEGES, INC.; WESTWOOD COLLEGE, INC.; WESGRAY CORPORATION; ELBERT, INC.; and EL NELL, INC.


By: *Mariah E. Moran*
        One of Their Attorneys

Joseph J. Duffy
William P. Ziegelmueller
Mariah E. Moran
Henry M. Baskerville
STETLER, DUFFY & ROTERT, LTD.
10 South LaSalle Street, Suite 2800
Chicago, Illinois  60603
Phone: 312-338-0200
Fax:    312-338-0070
Attorney No. 35853