**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No.  14-cv-3786 |
| vs. | ) | |
| | ) | |
| ALTA COLLEGES, INC., *et al* | ) | Judge Ronald Guzman |
| | ) | |
| Defendants. | ) | Mag. Judge Geraldine Soat Brown |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR**
**SUMMARY JUDGMENT**

## <u>TABLE OF CONTENTS</u>

Table of Authorities……………………………………….................………………..iii

Summary Judgment Standard…………………………………………………………5

Argument……………………………………………………………………...………..6

I.    The Net Impression Conveyed by Defendants' Online Advertising is an Issue of Fact….6

II.    Defendants' Online Marketing Has the Capacity to Mislead Illinois Consumers……...…7

     A.    State Trooper and FBI Agent, Among Other Law Enforcement Positions, are not Career Outcomes for Westwood Graduates………………………………8

     B.    The Appearance of Westwood ads among "State Trooper" and "FBI" Search Results Conveys the Net Impression that Westwood Will Prepare Graduates for these Careers…………………………..…………………...……8

          1.    Because a reasonable consumer interested in becoming an Illinois State Trooper or FBI agent would not pursue a degree at Westwood, Westwood's online advertising is premised on deception……………………………………………………………8

          2.    The click-through rate on Westwood's online advertising is evidence of its capacity to deceive………………………………9

          3.    Westwood's website contributes to the deceptiveness of Westwood's online marketing…………………………………..………11

          4.    That aspiring Illinois State Troopers and FBI agents have enrolled at Westwood to prepare for those job opportunities demonstrates the advertising's capacity to deceive………………………..……...12

          5.    By training its recruiters to conceal information from internet "leads," Westwood heightens the risk of deception……………………..…..……13

     C.    Whether Graduates of Westwood Can Obtain Careers in their Desired Field is a Material Fact for Prospective Students………………………..……14

     D.    Westwood Intends for Students to Rely on its Deceptive Advertising…………..14

     E.    Defendants Fail in their Attempt to Substitute Actual Evidence with Witnesses' Out-of-Context Opinions on Matters Beyond their Expertise………..………..…15

III.    Since Plaintiff Has Never Alleged A Retroactive Application of the CFPA, Summary Judgment on the Non-Existent Claim Should Be Denied……………………18

## **TABLE OF AUTHORITIES**

### *Statutes*

Fed.R. Civ. P. 56(a)……………………………………..…………………………………...……5

Fed. R. Civ. P 8(a)…………………………………………………………………………19

815 ILCS 505/2………………………………………………………………….……...…7


### *Policy Statements*

FTC, POLICY STATEMENT ON DECEPTION (1983)……………………………….…7, 9

### *Cases*

*Swenson v. Salient Mgmt. Co.,* 2013 WL 4401323, at *1 (N.D. Ill. Aug. 14, 2013)……..…..……5

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)..….6

*O'Leary v. Accretive Health, Inc.,* 657 F.3d 623, 630 (7th Cir. 2011)……………………………6

*B. Sanfield, Inc. v. Finlay Fine Jewelry Corp.*, 168 F.3d 967, 970-71 (7th Cir. 1999)…….6, 7, 11

*Mulligan v. QVC, Inc.*, 888 N.E.2d 1190, 1196 (Ill. 2008). ………………………………..………6

*People ex rel. Madigan v. United Const. of Am., Inc.*, 981 N.E.2d 404, 410-11 (Ill. 2012)……....6

*Robinson v. Toyota Motor Credit Corp.,* 775 N.E.2d 951, 960 (Ill. 2002)………………………..6

*Garcia v. Overland Bond & Inv. Co.*, 668 N.E.2d 199, 203 (Ill. 1996)……………………6, 7 ,12

*F.T.C. v. QT, Inc.*, 448 F. Supp. 2d 908, 957-58 (N.D. Ill. 2006)………………………………...7

*F.T.C. v. Nat'l Urological Grp., Inc.*, 645 F. Supp. 2d 1167, 1189 (N.D. Ga. 2008)……………7

*Connick v. Suzuki Motor Co.*, 675 N.E.2d 584, 595 (Ill. 1996)……………………………..……14

*Mackinac v. Arcadia Nat. Life Ins. Co.*, 648 N.E.2d 237 (Ill. 1995)……………………………15

*Totz v. Continental Du Page Acura*, 602 N.E.2d 1374, 1382 (Ill. 1992)………………………...15

*Bontkowski v. Smith*, 305 F.3d 757, 762 (7th Cir. 2002)…………………………………………19

Plaintiff's Second Amended Complaint ("SAC") alleges that Defendants' for-profit college, Westwood, engaged in numerous deceptive and unfair practices in violation of state and federal law with respect to the operation of its criminal justice program in Illinois. The breadth of the alleged conduct comprising Count I is captured in paragraph 456, where nineteen separate subparagraphs detail a non-exhaustive list of deceptive conduct. Those misrepresentations and omissions allegedly occurred in person, over the phone, in written materials, on Defendants' website, and through misleading television and internet advertising.

Defendants' motion for partial summary is of limited utility in resolving the case. By Defendants' own admission, Defendants seek summary judgment on just two points: (1) one of the nineteen deceptive practices itemized in paragraph 456 that would allegedly reduce the trial by two witnesses and (2) a point of law that was not alleged by Plaintiff and is not in dispute. Defendants' motion should be denied.

The single deceptive act targeted by Defendants' motion is Plaintiff's allegation that Defendants deceptively advertise online. Defendants concede that they advertised their criminal justice program by tying it to Illinois consumers' internet searches that include "FBI" and "state troopers." Defs.' Mot. Sum. J. at 4. Defendants further concede that the intent of such advertising is "to reach consumers who might be interested in educational programs relating to criminal justice." *Id.* Through this advertising, Defendants recruit "leads" – prospective students – searching for careers as an FBI agent or Illinois state trooper. Defendants contend that such advertising could never cause deception or confusion and that any deception would be immaterial. Defendants are incorrect:

- *First,* the issue of the net impression of consumers in response to Defendants' internet advertising is an issue of fact inappropriate for summary judgment.

1

- *Second*, Defendants erroneously contend the parties' two "experts agree that Westwood's marketing ads were not deceptive." Mot. at 10. These are experts on internet search methodology – not on whether certain marketing is deceptive, a point conceded by both. The experts were proffered for the purpose of establishing which keywords Defendants advertised on – a point Defendants previously denied (*see* Answer ¶¶304, 307) but now admit. Even so, both experts testified that Defendants' internet marketing *can* lead to deception or confusion.

- *Third*, Defendants never disclose that the jobs linked to their advertising – FBI agent or State Trooper – were not realistic or attainable through Defendants' criminal justice program. Nonetheless, more than forty-five percent of internet users who search Google for variations of "how to become an Illinois State Trooper" or "FBI school" and see a Westwood ad among the results click through the ad to Westwood's website, which touts state trooper and FBI agent as job opportunities. As such, Westwood's marketing has the capacity to deceive Illinois consumers and, in fact, does.

Defendants' second assertion must fail because the claim on which it rests does not exist. Plaintiff has not claimed that the federal Consumer Financial Protection Act ("CFPA") applies retroactively. In fact, Plaintiff acknowledged that the CFPA only applies prospectively.

## **Background**

The Illinois State Troopers will not hire Westwood graduates because Westwood lacks the required accreditation. SOF ¶ 5.[1] Yet if an Illinois consumer searches Google for "how to become an Illinois State Trooper," an ad for Westwood will appear among the search results, linking the consumer to a Westwood website that describes state trooper job opportunities. SOF ¶¶ 15, 20. This is no accident. Through a marketing technique known as pay-per-click advertising, Westwood targets Illinois students making specific Google queries related to the Illinois State Troopers and the FBI. The goal is to lure such students to enroll in Westwood's criminal justice program. Defs.' SOF ¶ 19.

---

[1] Facts taken from Plaintiff's Local Rule 56.1 Statement of Additional Material Facts are cited as "SOF ¶ _____." Facts taken from Defendants' Statement of Facts or Plaintiff's Response thereto are cited as "Defs.' SOF ¶ _____" or "Pl.'s Resp. to Defs.' SOF ¶ _____."

Pay-per-click is a 21st century approach to advertising that allows companies to target potential customers based on where they are located and what they search for on the internet. Defs.' SOF ¶ 11; SOF 16. For example, companies that want their ads to appear among sponsored Google search results may "bid on" or "purchase" keywords through the Google AdWords platform. By doing so, a company increases the likelihood that when an internet user searches for a term or phrase related to a purchased keyword, an ad for the company, linking to the company's website or "landing page," will appear among the search results. Defs.' SOF ¶¶ 11, 14. AdWords also gives companies the ability to target internet users in specific geographic regions—a process known as geotargeting. SOF ¶ 16.

Defendants have used this tool to purchase very specific keywords geotargeted to Illinois including "fbi college," "fbi school," "become a state trooper," and "state trooper qualifications," among other law enforcement-related terms. SOF ¶ 14. This means that students who live in Illinois and type these phrases or related phrases into Google see, at or near the top of their search results, a Westwood ad that links to Westwood's website. SOF ¶¶ 14, 16.

Westwood's strategy works. The success of a pay-per-click campaign can be evaluated based on the click-through rate, which is the percentage of users who click on an ad out of the total number who view it. SOF ¶¶ 17-18. While a typical pay-per-click campaign by an educational institution has a click-through rate of 1.29%, the rate on Westwood's State Trooper and FBI campaigns are both over 45%. SOF ¶¶ 17-19. To take four examples of this success, the record shows that individuals who searched using the following terms were served with Westwood ads:

>"what is a good fbi college in illinois"
>"for being a illinois state trooper what college classes should you have"
>"how to become a state trooper in illinois"

"illinois state trooper requirements"

Defs.' Ex. E, Exhs. 284, 285. Each of these individuals clicked on the Westwood ad and was directed to the company's website, which describe state trooper and FBI agent under "Job Opportunities." SOF ¶ 20.

Left unsaid on Westwood's website or its ads is that the Illinois State Police—the sole employer of Illinois State Troopers—will not consider a graduate of Westwood for employment. SOF ¶ 5. This is because Westwood lacks regional accreditation, which is the type of accreditation maintained by schools like the University of Illinois and Loyola University. SOF ¶ 12. Westwood instead has national accreditation, which means that Westwood credits are unlikely to transfer and its $78,000 degree is unlikely to be recognized by graduate schools or certain employers, including the Illinois State Police, the DuPage County Sheriff, the Will County Sheriff, the Des Plaines Police Department and, until 2010, the Chicago Police Department. SOF ¶¶ 11, 13.

Similarly omitted from Westwood's website is the material fact after almost a decade of tracking graduate employment, Westwood has not identified a single Illinois criminal justice graduate who has obtained a job with the FBI. SOF ¶ 6. The FBI requires a four-year degree, while Westwood's is three years. Pl.'s Resp. to Defs.' SOF ¶ 28. A Westwood student who applied to the FBI was told by an FBI representative that she needed a degree from "an accredited school." The representative "was surprised [she] even showed up in there. He was just like are you serious…." SOF ¶ 7. Nonetheless, Westwood targets students interested in an "FBI college," and its recruiters tout FBI job opportunities. SOF ¶¶ 14, 28.

Notably, Defendants have attempted to conceal the extent of their online marketing efforts throughout this litigation. In February, they obtained a Protective Order blocking Plaintiff

from accessing the entire database of keywords that Defendants purchased. And in their Answer to Plaintiff's SAC, filed only four months ago, Defendants **denied** Plaintiff's allegations that they bid on variations of the term "FBI" and "State Trooper." Answer ¶¶ 304, 307. It was thus with great surprise that Plaintiff read Par. 19 of Defendants' Rule 56.1 statement, which now admits that Westwood purchased "keywords relating to 'police,' 'FBI,' 'state troopers,' and 'criminal justice'"— the very practice that Defendants had tried to conceal.

The Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA") prohibits advertising that has the capacity to mislead students, and Westwood's internet marketing does just that. Illinois consumers searching on the internet for jobs as Illinois State Troopers or FBI agents see a Westwood ad and are led to believe that Westwood will prepare them for such jobs. Moreover, Westwood's ad directs such students to Westwood's website describing the criminal justice program, but Westwood never discloses that Westwood will not prepare them for the careers they hope to achieve. Westwood students have gone through years of the program and tens of thousands of dollars before realizing, to their dismay, that Westwood's criminal justice program would never allow them to pursue their dream jobs. SOF ¶ 32. Plaintiff's claim against Westwood's online marketing aims to prevent future students from suffering the same waste of precious time and personal resources.

## Summary Judgment Standard

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). To defeat summary judgment, the responding party must demonstrate a genuine dispute of material fact. Fed.R.Civ.P. 56(c)(1). *See also, Swenson v. Salient Mgmt. Co.,* 2013 WL 4401323, at *1 (N.D. Ill. Aug. 14, 2013). A genuine dispute of material fact exists

when there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). It is not for the court at summary judgment to weigh evidence or determine the credibility of witness testimony. *O'Leary v. Accretive Health, Inc.,* 657 F.3d 623, 630 (7th Cir. 2011). In determining whether a genuine dispute of material fact exists, courts construe all facts and draw all inferences, in favor of the non-moving party. *Id.*

<u>Argument</u>

**I.      The Net Impression Conveyed by Defendants' Online Advertising is an Issue of Fact**

To prevail on a claim under the Illinois Consumer Fraud Act ("ICFA"), Plaintiff must prove that Defendant (1) engaged in a deceptive act or practice, (2) with the intent that another rely on the deception, (3) while engaged in trade or commerce. *B. Sanfield, Inc. v. Finlay Fine Jewelry Corp.*, 168 F.3d 967, 970-71 (7th Cir. 1999). Unlike private litigants, "the Attorney General may prosecute a violation of the Act without showing that any person has in fact been damaged." *Mulligan v. QVC, Inc.*, 888 N.E.2d 1190, 1196 (Ill. 2008). Further, "[b]ecause there is no 'actual damages' requirement in section 7 as there is in section 10a(a), the Attorney General is not required to establish proximate cause in order to have standing to litigate a violation of the Act." *People ex rel. Madigan v. United Const. of Am., Inc.*, 981 N.E.2d 404, 410-11 (Ill. 2012). The ICFA is a remedial statute that is to be liberally construed to effectuate its purpose. *Robinson v. Toyota Motor Credit Corp.,* 775 N.E.2d 951, 960 (Ill. 2002).

Advertising is deceptive if it creates the likelihood of deception or has the capacity to deceive. *B. Sanfield*, 168 F.3d at 970-71. The test to be used "is the net impression that [the advertising] is likely to make on the general populace." *Garcia v. Overland Bond & Inv. Co.*, 668 N.E.2d 199, 203 (Ill. 1996) (internal citations and quotations omitted). *See also F.T.C. v.*

*QT, Inc.*, 448 F. Supp. 2d 908, 957-58 (N.D. Ill. 2006) (noting that, "in determining what messages or claims an ad communicates to reasonable consumers, the Court looks to the overall, net impression made by the advertisement to determine whether the net impression is such that the ads would be likely to mislead reasonable consumers"). The advertisement need not contain an affirmative misstatement and can accomplish its deception by innuendo. *Garcia,* 668 N.E.2d at 203 (Ill. 1996).

In evaluating CFA claims, courts should consider the interpretations of the Federal Trade Commission and other federal courts interpreting Section 5(a) of the Federal Trade Commission Act.[2] 815 ILCS 505/2. *See also Garcia*, 668 N.E. 2d at 203. The FTC has opined that when advertising targets a specific audience, courts may consider whether a reasonable member of that group can be deceived. FTC, POLICY STATEMENT ON DECEPTION (1983), *appended to Cliffdale Assoc., Inc.*, 103 F.T.C. 110, 179 (1984) (*cited by Kraft, Inc. v. FTC*, 970 F.2d 311, 314 (7th Cir. 1992)).

Summary judgment is an inappropriate vehicle for resolving net impression claims. "The meaning of an advertisement, the claims or net impressions communicated to reasonable consumers, is a question of fact." *F.T.C. v. QT, Inc.*, 448 F. Supp. 2d 908, 957-58 (N.D. Ill. 2006), *amended by* 472 F. Supp. 2d 990 (N.D. Ill. 2007). *See also F.T.C. v. Nat'l Urological Grp., Inc.*, 645 F. Supp. 2d 1167, 1189 (N.D. Ga. 2008) (noting that "[net impression] is fundamentally a question of fact").

## II.    Defendants' Online Marketing Has the Capacity to Mislead Illinois Consumers.

Defendants posit that their advertising campaign could never confuse consumers and that any such confusion would be immaterial. Mot. 7-9. But Defendants' online marketing conveys

---

[2] Illinois law may, in fact, have a deception standard more protective of consumers. *See, e.g.*, *B. Sanfield, Inc. v. Finlay Fine Jewelry Corp.,* 168 F.3d 967, 974 (7th Cir. 1999) (analyzing a deception claim under distinct federal and state standards).  Plaintiff's claim easily meets the federal standard, however.

the net impression that Defendants' criminal justice program will prepare students for post-graduation employment as an FBI agent or Illinois State Trooper. Indeed, Defendants concede that the words selected – including phrases using "FBI" and "state trooper" – are targeted to those "who might be interested in educational programs relating to criminal justice or law enforcement." Mot. at 4.[3] The obvious intent of using such terms is to convince consumers that Defendants' schools can aid them in obtaining a job in law enforcement, including as an FBI agent or Illinois State Trooper. Defendants' internet marketing has the capacity to deceive Illinois consumers, for whom the inability to obtain careers in law enforcement – including as a "state trooper" or FBI agent – is a material fact towards their enrollment in Defendants' school.

A.     **State Trooper and FBI Agent, among other law enforcement positions, are not career outcomes for Westwood graduates.**

For purposes of the motion, Defendants do not appear to contest that no graduate of the Illinois criminal justice program has reported obtaining a job with the FBI. SOF ¶ 6. Nor do Defendants contest that the Illinois State Police – who employ the only "state troopers" in Illinois – will not accept credits earned at Defendants' school. SOF ¶ 5. By Defendants' own admission, only 3.5 percent of criminal justice graduates reported post-graduation employment in law enforcement. SOF ¶ 8. Thus, the real issue for summary judgment is whether Defendants' online advertising practice creates the impression that such careers are attainable.

B.     **The appearance of Westwood ads among "State Trooper" and "FBI" search results conveys the net impression that Westwood will prepare graduates for these careers.**

1.     **Because a reasonable consumer interested in becoming an Illinois State Trooper or FBI agent would not pursue a degree at Westwood, Westwood's online advertising strategy is premised on deception.**

---

[3] Westwood defends its marketing by suggesting that Google's keyword planner, not Westwood, chose the keywords at issue. Defs.' SOF ¶¶ 35-36. Westwood concedes, however, that its compliance department must approve all marketing. SOF ¶ 8. This defense fails.

A reasonable consumer who wants to become a State Trooper or FBI agent and knows he cannot do so with a Westwood degree would not enroll at Westwood. SOF ¶ 32. Even so, Westwood's online advertising specifically targets consumers located in Illinois[4] who are interested in State Trooper or FBI jobs. SOF ¶ 16. The only way Westwood's advertising can work, then, is if Illinois consumers believe that Westwood *can* prepare them to become State Troopers or FBI agents. The campaign's efficacy depends on its deceptiveness.

Westwood compares its strategy to Tesla, an electric carmaker, bidding on terms like "hybrid car." Mot. at 4. But there is no evidence of consumer confusion in Westwood's example: government disclosures and Tesla's marketing make the car's engine type clear. Westwood, by contrast, takes deliberate advantage of the information asymmetry between the school and its prospective students. Westwood knows that the Illinois State Police will not hire its graduates; its prospective students do not. SOF ¶ 9. And Westwood knows that none of its graduates have ever joined the FBI; its prospective students are led to believe the opposite. SOF ¶¶ 6, 10, 28.

In addition to taking advantage of an information asymmetry, Westwood takes advantage of a sophistication gap. Westwood students are less affluent and have less experience in the educational marketplace than typical students. SOF ¶ 26. Many Westwood students, for example, do not understand the difference between national and regional accreditation, let alone how that would affect job opportunities. SOF ¶ 32. That Westwood targets less sophisticated students with its marketing increases the likelihood of deception. *See* FTC, POLICY STATEMENT ON DECEPTION (1983).

---

[4] Exhibit E to Westwood's Motion for Summary Judgment includes a report which reflects actual searches that resulted in the appearance of Westwood ads. The heading of the section on the Illinois State Police is "Nationally Targeted – State Trooper Related – Illinois of Chicago." Notwithstanding this title, however, there is uncontroverted evidence that the company has a dedicated campaign based on "state trooper" queries geotargeted to Illinois. SOF ¶ 16. Because Defendants blocked Plaintiff from accessing their AdWords database, it is unknown whether Defendants also target students nationally.

Before the advent of pay-per-click advertising, if Defendants wanted to recruit aspiring State Troopers, they could have run ads with the headline "Westwood College—Become an Illinois State Trooper," or perhaps have included photos of Illinois State Troopers in their television or print ads. Such a practice would have the capacity to deceive. Today, however, Defendants need not include misleading headlines, text, or photos: they simply position their ads strategically to give a false impression about the job opportunities available with a Westwood criminal justice degree.

> **2.      The click-through rate on Westwood's online advertising is evidence of its capacity to deceive.**

The fact that aspiring Illinois State Troopers and FBI agents saw Westwood's ads and clicked them is evidence of the ads' capacity to deceive. For example, the consumer who searched "for being a illinois state trooper what college classes should you have" was served with a Westwood ad. SOF ¶ 17. It is highly unlikely that this individual would have clicked the ad if he did not have the impression that Westwood could offer college classes to become a State Trooper—but he clicked it. *Id.* Cases like this are not isolated: Westwood's State Trooper and FBI ad campaigns have been highly effective in driving consumers to Westwood's website. While a typical pay-per-click campaign by an educational institution has a click-through rate of 1.29 percent—meaning that 1.29 percent of users who see the ad click it and are directed to the company's landing page—the click-through rate on Westwood's State Trooper campaign is 46.27 percent, and its FBI click-through rate is 45.86 percent. SOF ¶¶ 17-19. The fact that nearly half of aspiring State Troopers and FBI agents who see Westwood ads click them is evidence

that Defendants' internet advertising conveys a net impression that has the capacity to deceive.

*B. Sanfield, Inc. v. Finlay Fine Jewelry Corp.,* 168 F.3d 967, 970-71 (7th Cir. 1999).[5]

### 3. Westwood's website contributes to the deceptiveness of Westwood's online marketing.

Plaintiff's claim survives summary judgment even under Defendants' mistaken theory that internet advertising "can only be deceptive when the content of the landing page is deceptive." Mot. at 8. Defendants' theory of when advertising may be deceptive rests entirely on the erroneous claim that "the AG admits" this claim. Yet, to support the purported admission, Defendants cite only deposition testimony of three persons, none of whom have any expertise in the contours of consumer deception and two of whom are subject to motions to strike their testimony. *See* Pl.'s Resp. to Defs.' SOF ¶ 39.

Even if Defendants' theory were correct, Defendants' argument fails. Defendants contend that "[t]he AG has not alleged that Westwood's website contains, false, misleading or deceptive information." Mot. at 8. In fact, the SAC repeatedly alleges, with exhibits, that Defendants' website contains false misrepresentations and omissions regarding the career paths available to students. *See, e.g.,* SAC ¶¶ 192, 194-206, 306, 309. In fact, Westwood's website is tailored to the same students targeted by its keyword bidding—those interested in law enforcement. Thus, Westwood bids on terms such as "become a state trooper" and "fbi college," while its website highlights criminal justice "job opportunities" such as state troopers and FBI agents. SOF ¶ 20.

---

[5] Exhibit E, the search report that contains click-through rate data, also tracks "conversions," which is an event defined by the marketer signifying an affirmative step by the consumer that demonstrates interest in the product or service. Defs.' Ex. D, Claypool Dep. 103:1-103:21. The report indicates two conversions for FBI searches and none for State Trooper searches. Defs.' Ex. E. Because Defendants blocked Plaintiff's access to the AdWords account, it is unknown how Defendants define conversion. In any event, the conversion figure does not represent the number of searchers who enrolled but rather the number who took a defined action during a defined time period. Defs.' Ex. D, Claypool Dep. 103:1-103:21. It is thus unknown whether any of the users whose searches are reflected in Exhibit E ultimately enrolled at Westwood.

By using its AdWords campaign to target students interested in becoming Illinois State Troopers and FBI agents, and then using its ads to direct these students to a website describing state trooper and FBI job opportunities, Westwood's online marketing has the capacity to mislead Illinois consumers. *See Garcia,* 668 N.E.2d at 203.

Even as its website touts state trooper and FBI jobs, Westwood does not disclose that the Illinois State Police will not hire its graduates.[6] SOF ¶ 9. Nor does Westwood disclose that no Illinois graduate has ever obtained a job with the FBI. SOF ¶ 10. Westwood's targeting of Illinois consumers interested in State Trooper and FBI jobs without disclosing the truth about the limitations of its degree has the capacity to deceive.[7]

> **4.  That aspiring Illinois State Troopers and FBI Agents have enrolled at Westwood to prepare for those job opportunities demonstrates the advertising's capacity to deceive.**

There is extensive evidence that Westwood students have been confused and misled about how the school's accreditation affects job opportunities. To take just one example, Todd Brown had always wanted to become an Illinois State Trooper and he was drawn to Westwood when a recruiter came to his high school. He followed up by researching Westwood online and, shortly after turning eighteen, decided to enroll. Three years later, after incurring more than $60,000 in debt, Mr. Brown graduated from Westwood and applied to become an Illinois State Trooper. He went through an extensive application process that included a background check, interviews, and a written exam, and he was on his way to his dream job. But then, Mr. Brown got

---

[6] At times, Westwood has made generic disclosures to students—albeit buried in a form otherwise about criminal backgrounds—that its national accreditation "could have an impact on opportunities with some Chicago area employers." *See* Ex. 11. The specific nature of the "impact" and the identity of the employers are not disclosed, however. *Id.*

[7] Even Westwood's expert, in making her Tesla/Hybrid analogy, acknowledges that "of course" consumers should be exposed to the fact that Tesla is not a hybrid before purchasing a Tesla. Pl.'s Resp. to Defs.' SOF ¶ 32.

a call from the Illinois State Police: he was ineligible for employment, they explained, because Westwood's lacked the required accreditation. No one at Westwood had told him. SOF ¶ 34.

Todd Brown was not alone. Numerous students who enrolled at Westwood did so believing they could become FBI agents or State Troopers. SOF ¶¶ 28-30. Many learned about Westwood online, including through Google searches. SOF ¶ 26. And nearly half of consumers who see these ads click them—a success rate more than 35 times greater than a typical AdWords campaign. SOF ¶¶ 17-19. The fact that aspiring FBI agents and Illinois State Troopers can go through the entire enrollment process and incur thousands in debt before realizing the reality about Westwood's degree raises a genuine issue of material fact as to whether an ad campaign targeting these consumers has the capacity to deceive. *Mulligan*, 888 N.E.2d at 1196.

> **5.      By training its recruiters to conceal information from internet "leads," Westwood heightens the risk of deception.**

Westwood's marketing strategy includes barraging students who express interest in the school via its website with calls and emails from Westwood recruiters. SOF ¶ 22. These recruiters are given the following training with respect to internet "leads": "[Internet leads] may be more focused on aspects they are looking for in terms of their education, **do not reveal too much information about the College on the phone[.]**" *Id.* (emphasis added).

Westwood recruiters follow this guidance. For example, in attempting to enroll Tiffany Winfrey, a Westwood recruiter "kept talking about the state police and how the students interned and were ultimately hired." SOF ¶ 30. A Westwood recruiter who came to Paul Lindsey's high school "was harping on somebody being in the FBI. He was talking about Illinois State Police officers being Westwood graduates.  He was talking about all the like fame that these people had acquired after leaving Westwood." SOF ¶ 31. That Westwood recruiters tout careers unattainable

with a Westwood degree heightens the risk that aspiring State Troopers and FBI agents lured by Westwood's online advertising will be deceived. *See Mulligan*, 888 N.E.2d at 1196.

### C. Whether Graduates of Westwood Can Obtain Careers in their Desired Field is a Material Fact for Prospective Students

For students interested in becoming state troopers or FBI agents—students like Todd Brown and Paul Lindsey—Westwood's ability to prepare them is highly material. A fact is material if "a buyer would have acted differently knowing the information, or it concerned the type of information about which a buyer would be expected to rely in making a decision whether to purchase." *Connick v. Suzuki Motor Co.*, 675 N.E.2d 584, 595 (Ill. 1996). For consumers shopping for a career school, available career outcomes is a material fact. For example, one Westwood graduate, Steven Cholity, testified that he would not have enrolled in Westwood had he known that the Illinois State Police would not hire Westwood graduates, as the Illinois State Police was his dream job and it "would have been a waste of time and money to go to a school that was not going to help me at all." SOF ¶ 32. Unsurprisingly, other students also testified that they would not have enrolled in Westwood had they known how Westwood's lack of regional accreditation would affect their job opportunities. *Id.*

Westwood tries to reframe the materiality requirement by claiming the question is whether consumers would have behaved differently in response to the ad being served. But this misunderstands the claim. Here, the material fact at issue is the very appearance of the ad in response to a specified search by prospective Illinois students with a manifest interest in FBI and State Trooper careers. The inability of Westwood to prepare these students for their sought-after careers is exactly "the type of information about which a buyer would be expected to rely" in deciding whether to enroll in a $78,000 degree program. *Connick*, 675 N.E.2d at 595.

### D. Westwood Intends for Students to Rely on its Deceptive Advertising

14

To prevail on an ICFA claim, a Plaintiff need not prove intent to deceive but only intent to rely. *Mackinac v. Arcadia Nat. Life Ins. Co.*, 648 N.E.2d 237 (Ill. 1995). Circumstantial evidence may be used to establish the seller's intent. *Totz v. Continental Du Page Acura*, 602 N.E.2d 1374, 1382 (Ill. 1992). Defendants' claim that "[t]here is no proof Westwood intended for any student to enroll" based on its advertising is belied by their admission that "Westwood's Google AdWords campaign uses a variety of terms designed to reach consumers who might be interested in educational programs relating to criminal justice or law enforcement." Mot. at 4, 10. Defendants likewise admit that the goal of their marketing campaign is "to attract students." Defs.' SOF ¶ 8. That an advertising campaign would *not* aim to attract potential customers defies both common sense and Westwood's own admissions. Defendants would not pay Google per click if they did not want consumers to click. Defs.' SOF ¶ 13.[8]

**E.   Defendants fail in their attempt to substitute actual evidence with witnesses' out-of-context opinions on matters beyond their expertise.**

Defendants make much of testimony from Ms. Stricchiola, Mr. Claypool, and Mr. Hudspeth regarding when advertising may be deceptive. Mot. at 7-8. Ms. Stricchiola and Mr. Claypool each have a field of expertise in internet advertising methodology. Each admitted that they are not experts on consumer deception. Pl.'s Resp. to Defs.' SOF ¶ 39. Yet, Defendants' motion relies not on their expertise in internet advertising but on alleged conclusions about whether Defendants' conduct could be deceptive to consumers. Ms. Stricchiola's testimony and affirmative opinions on the topic of consumer deception should be stricken, and is the subject of

---

[8] Without analysis, Defendants cite *Lidecker* as an example of a court finding a lack of intent. *Lidecker v. Kendall Coll.*, 550 N.E.2d 1121, 1124 (Ill. 1990). That case, however, concerned an omission about the school's accreditation, and the student-plaintiffs admitted that they still would have enrolled had they known about the absence of accreditation. *Id.* Here, in addition to Defendants admitting that their advertising aims to recruit students, the evidence shows that students would not have enrolled had they not been deceived. SOF ¶ 32.

15

a separate motion to strike. Mr. Claypool's testimony regarding deception should not be considered because he responded to incomplete and irrelevant hypotheticals posed by defense counsel. *See* Pl.'s Resp. to Defs.' SOF ¶ 23.

In fact, Westwood's Motion is premised largely on expert opinions that were based on either misleading information or ignorance of predicate facts. For example, Westwood did not inform Ms. Stricchiola, its expert, that Westwood graduates were ineligible for jobs with the Illinois State Police, and she first learned of this during her deposition. *Id.* Nor was Ms. Stricchiola informed that no graduate had ever obtained a job with the FBI. *Id.* With respect to Plaintiff's expert, Kyle Claypool, Defendants relied on misleading hypotheticals in order to attempt to elicit the testimony they sought. For example, Defendants asked Mr. Claypool to assume a fact contradicted by the evidence—that Westwood qualifies graduates for the FBI:

        1    Q.  And if you offer a criminal justice
        2    program that allows one to get prerequisites
        3    that would qualify a person to work with the
        4    FBI, do you think it's fair for them to bid
        5    on an FBI career path?

Pl.'s Resp. to Defs' SOF ¶ 29. Similarly, Defendants' State Trooper hypotheticals were based on a misleading insinuation that "state trooper" is among the "various police departments" for which "Westwood has prepared graduates":

        5    Q:  Every single question
        6    I said until I was done I want him to assume
        7    that Westwood has prepared graduates and, in
        8    fact, placed graduates in various police
        9    departments within the Chicago metropolitan
        10   area, and that is the assumption.  Given
        11   those assumptions, would it be fair for
        12   Westwood to bid on state trooper college or
        13   state trooper degrees?

Pl.'s Resp. to Defs.' SOF ¶ 23. Mr. Claypool's subsequent responses were based on this misleading hypothetical.

When presented with the facts, both experts opined that Westwood's marketing can lead to deception or confusion. For example, defense counsel's misleading hypothetical may have been in response to Mr. Claypool's testimony that immediately preceded it, testimony that is conspicuously absent from Defendants' Statement of Facts:

> 11  Q.  So if you put in join the Illinois
> 12  State Police and you think the only way it
> 13  would not be deceptive is if it prepared you
> 14  for a job with the Illinois State Police?
> 15     A.  Correct.

Pl.'s Resp. to Defs.' SOF ¶ 25. That was consistent with his expert report which concluded that, as an internet marketing strategist, he would consider it inappropriate and deceptive to advertise as Defendants have. *Id.* Westwood also leaves out Ms. Stricchiola's testimony, proffered after she was informed by Plaintiff's counsel that the Illinois State Police did not hire Westwood graduates:

> Q. And if somebody Googles, I want to become an
> 3 Illinois State Trooper, and they see an ad for Westwood
> 4 College, that may cause some confusion as to whether the
> 5 Criminal Justice Program at Westwood prepares them to
> 6 become an Illinois State Trooper, right?
> 7 A. Yes.

Pl.'s Resp. to Defs' SOF ¶ 23. Thus, when presented with the actual facts at issue in this case, both experts agree that Westwood's online marketing can lead to deception or confusion.

Regarding Mr. Hudspeth, a former Assistant Attorney General, he is not an expert on deception or internet marketing. Defs.' SOF ¶ 22. He has not been employed by Plaintiff since 2012, well before his deposition, and he is not a party in this litigation. Mr. Hudspeth also had no

role in the drafting of the pleadings at issue – which were filed in 2014. In short, Mr. Hudspeth's testimony is wholly irrelevant and the subject of a separate motion to strike.

### III. Since Plaintiff Has Never Alleged A Retroactive Application of the CFPA, Summary Judgment on the Non-Existent Claim Should Be Denied.

Defendants also seek partial summary judgment on a claim *not* asserted by Plaintiff. The request for judgment on the non-existent claim should be denied.

For years, Defendants offered loans to students through Defendants' APEX program despite knowing that the vast majority of student borrowers would default on their obligations. (*See, e.g.,* SAC ¶¶ 89, 463-64.) Plaintiff contends that the APEX program is unfair in violation of state law (Count II) and unfair and abusive in violation of federal law (Counts III and IV, respectively). One notable distinction between the state and federal counts is the relevant timeframe for the violating conduct. Count II alleges liability under the Illinois Consumer Fraud Act ("ICFA"), which the state court recognized has no statute of limitations for claims brought by the Attorney General. *See* Ex. 3 to Pl.'s Memo. in Opp. to Defs.' Mot. to Dismiss. Accordingly, Plaintiff's claim under Count II will include evidence of conduct reaching backwards to the early use of the APEX program with Illinois criminal justice students. On the other hand, the federal counts assert a violation of the CFPA, which became effective July 21, 2011. As such, Defendants' liability under Counts III and IV may only attach for conduct occurring after July 21, 2011. Indeed, when briefing the motion to dismiss, Plaintiff explicitly stated "Counts III and IV (the CFPA counts) are applicable only to conduct after July 2011." Pl. Memo. at 18. In turn, this Court noted that "as Plaintiff concedes, it cannot recover for violations of the CFPA that occurred before the statute went in effect on July 21, 2011." 9/4/2014 Order at 3. It should be settled that neither Count III nor Count IV claim a retroactive liability.

18

Undeterred by the explicit statement to the contrary, Defendants contend that such a claim exists by implication. Mot. at 11. Yet, Defendants only point to a single allegation in the operative complaint: "From 2004 through the present, Defendants have induced Illinois Criminal Justice students to sign Defendants' institutional financing contracts through a variety of unfair acts and practices designed to interfere with the consumers' ability to make informed choices," before listing some of the unfair practices. (SAC ¶477). That allegation is consistent with Plaintiff's assertion that Defendants' conduct was "ongoing and continuous." (*See, e.g.,* SAC ¶311). Just because liability attaches under the CFPA only for conduct after July 21, 2011, does not mean that evidence of an ongoing practice is precluded. Past unlawful conduct can give rise to the inference that future violations will occur. *See F.T.C. v. Citigroup, Inc.*, 239 F. Supp.2d 1302, 1306 (N.D. Ga. 2001).[9]

Defendants' recitation to Plaintiff's Prayer for Relief is similarly misplaced. *First,* the determination of the scope of Plaintiff's claims is derived from the allegations. A prayer for relief is not part of the claim. *See, e.g.,* Fed. R. Civ. P 8(a); *Bontkowski v. Smith*, 305 F.3d 757, 762 (7th Cir. 2002). *Second,* both the request for "disgorgement against Defendants" and "rescission of all APEX contracts" are specifically couched as requests "under the Consumer Financial Protection Act of 2010." (Second Am. Compl. Prayer J, K.) Thus, the relief sought necessarily is limited by the contours of the CFPA.

As Plaintiff has never asserted that Defendants are liable under the CFPA for conduct occurring prior to the enactment of the CFPA, there can be no "judgment" ordered. To the extent Defendants are surreptitiously asserting a motion to bar evidence of Defendants' conduct before July 2011, it is improper and should be rejected.

---

[9] As noted above, evidence of Defendants' conduct before July 2011 will also be relevant for liability determination under Count II.

WHEREFORE, Plaintiff respectfully request that the Court deny Defendants' Motion for

Partial Summary Judgment.

Respectfully submitted,

THE PEOPLE OF THE STATE OF
ILLINOIS, by LISA MADIGAN,
ATTORNEY GENERAL OF ILLINOIS,


BY:     _/s/  Samuel A.A. Levine_
                Assistant Attorney General

**GARY CAPLAN**
Assistant Chief Deputy Attorney General
**DEBORAH HAGAN**
Division Chief, Consumer Protection Division
**SUSAN ELLIS**
Chief, Chicago Consumer Fraud Bureau
**JOHN WOLFSMITH**
Assistant Attorney General, Split Litigation Bureau
**CECILIA ABUNDIS**
**KHARA COLEMAN WASHINGTON**
**OSCAR PINA**
**JOSEPH SANDERS**
Assistant Attorneys General, Consumer Fraud Bureau
(312) 814-4984

## CERTIFICATE OF SERVICE

I, Samuel Levine, an Assistant Attorney General, certify that on January 30, 2015, I caused a true and correct copy of the attached Statement of Facts to be filed and served via the CM/ECF system to all attorneys of record on the system in this matter, including:

Joseph Duffy
William P. Ziegelmueller
Mariah Moran
Henry Baskerville
**Stetler Duffy & Rotert, LTD**
Counsel for Defendants
10 S. LaSalle Street, Suite 2800
Chicago, Illinois 60603

BY:    */s/  Samuel A.A. Levine*
Assistant Attorney General
Consumer Fraud Bureau
100 W. Randolph St., 12th Fl.
Chicago, IL 60601
(312) 814-4984
slevine@atg.state.il.us

21